## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* [UNDER SEAL], | ) ) ) | **09CV5418** |
| Plaintiff, | ) ) ) | **JUDGE HOLDERMAN** **MAGISTRATE JUDGE KEYS** |
| v. | ) ) | JURY TRIAL DEMANDED |
| [UNDER SEAL], | ) ) | |
| Defendants. | ) | |

## **COMPLAINT**

### **FILED IN CAMERA AND UNDER SEAL**

### **Pursuant to 31 U.S.C. § 3730(b)(2)**

**FILED**

SEP 0 1 2009 TC

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA )
*ex rel.* BIJAN OUGHATIYAN; THE STATE OF )
CALIFORNIA *ex rel.* BIJAN OUGHATIYAN; )
THE STATE OF DELAWARE *ex rel.* )
BIJAN OUGHATIYAN; THE STATE OF )
FLORIDA *ex rel.* BIJAN OUGHATIYAN; )
THE STATE OF GEORGIA *ex rel.* )
BIJAN OUGHATIYAN; THE STATE OF )
ILLINOIS *ex rel.* BIJAN OUGHATIYAN; )
THE STATE OF MASSACHUSETTS *ex rel.* )
BIJAN OUGHATIYAN; THE STATE OF )
MICHIGAN *ex rel.* BIJAN OUGHATIYAN; )
THE STATE OF NEVADA *ex rel.* )
BIJAN OUGHATIYAN; THE STATE OF )
NEW HAMPSHIRE *ex rel.* )
BIJAN OUGHATIYAN; THE STATE OF )
NEW JERSEY *ex rel.* BIJAN OUGHATIYAN; )
THE STATE OF OKLAHOMA *ex rel.* )
BIJAN OUGHATIYAN; THE STATE OF )
TENNESSEE *ex rel.* BIJAN OUGHATIYAN; )
and THE STATE OF TEXAS *ex rel.* )
BIJAN OUGHATIYAN, )
)
          Plaintiffs, )
)
      v. )
)
IPC THE HOSPITALIST COMPANY, INC., )
a California corporation; IPC HOSPITALISTS OF )
COLORADO, INC., a Colorado corporation; )
IPC THE HOSPITALIST MANAGEMENT )
COMPANY, LLC, a Delaware limited liability )
company; INPATIENT CONSULTANTS OF )
ALABAMA, INC., an Alabama corporation; )
INPATIENT CONSULTANTS OF DELAWARE, )
INC., d/b/a IPC OF DELAWARE, a Delaware )
corporation; INPATIENT CONSULTANTS OF )
FLORIDA, INC., d/b/a IPC OF FLORIDA and )
IPC OF FLORIDA, INC., a Florida corporation; )
INPATIENT CONSULTANTS OF KENTUCKY, )

**09CV5418**
**JUDGE HOLDERMAN**
**MAGISTRATE JUDGE KEYS**

JURY TRIAL DEMANDED

**FILED IN CAMERA AND**
**UNDER SEAL**

INC., a Kentucky corporation; INPATIENT )
CONSULTANTS OF MISSOURI, INC., d/b/a )
IPC OF MISSOURI, a Missouri corporation; )
INPATIENT CONSULTANTS OF MISSISSIPPI, )
INC., a Mississippi corporation; INPATIENT )
CONSULTANTS OF UTAH, INC., d/b/a IPC OF )
UTAH, a Utah corporation; HOSPITALISTS, INC., )
d/b/a HOSPITALISTS OF CALIFORNIA, INC., )
a California corporation; HOSPITALISTS )
MANAGEMENT OF NEW HAMPSHIRE, INC., )
a New Hampshire corporation; HOSPITALISTS OF )
ARIZONA, INC., an Arizona corporation; )
HOSPITALISTS OF ILLINOIS, INC., an Illinois )
corporation; HOSPITALISTS OF GEORGIA, INC., )
a Georgia corporation; HOSPITALISTS OF )
MARYLAND, INC., a Maryland corporation; )
HOSPITALISTS OF MICHIGAN, INC., )
a Michigan corporation; HOSPITALISTS OF )
NORTH CAROLINA, INC., a North Carolina )
corporation; HOSPITALISTS OF NEVADA, INC., )
a Missouri corporation; HOSPITALISTS OF OHIO, )
INC., an Ohio corporation; HOSPITALISTS OF )
PENNSYLVANIA, INC., a Pennsylvania )
corporation; HOSPITALISTS OF )
SOUTH CAROLINA, INC., a South Carolina )
corporation; HOSPITALISTS OF TENNESSEE, )
INC., a Tennessee corporation; HOSPITALISTS )
OF TEXAS, L.P., a California limited partnership; )
HOSPITALISTS SERVICES OF FLORIDA, INC., )
a Florida corporation; and INPATIENT )
CONSULTANTS OF WYOMING, LLC, )
a Wyoming limited liability company, )
)
               Defendants. )

## **COMPLAINT**

       Plaintiff and Relator Bijan Oughatiyan, through his undersigned counsel, for

his Complaint against Defendants IPC The Hospitalist Company, Inc., a California

corporation; IPC Hospitalists of Colorado, Inc., a Colorado corporation; IPC The Hospitalist

Management Company, LLC, a Delaware limited liability company; InPatient Consultants of

Alabama, Inc., an Alabama corporation; InPatient Consultants of Delaware, Inc., d/b/a IPC of Delaware, a Delaware corporation; InPatient Consultants of Florida, Inc., d/b/a IPC of Florida and IPC of Florida, Inc., a Florida corporation; InPatient Consultants of Kentucky, Inc., a Kentucky corporation; InPatient Consultants of Missouri, Inc., d/b/a IPC of Missouri, a Missouri corporation; InPatient Consultants of Mississippi, Inc., a Mississippi corporation; InPatient Consultants of Utah, Inc., d/b/a IPC of Utah, a Utah corporation; Hospitalists, Inc., d/b/a Hospitalists of California, Inc., a California corporation; Hospitalists Management of New Hampshire, Inc., a New Hampshire corporation; Hospitalists of Arizona, Inc., an Arizona corporation; Hospitalists of Illinois, Inc., an Illinois corporation; Hospitalists of Georgia, Inc., a Georgia corporation; Hospitalists of Maryland, Inc., a Maryland corporation; Hospitalists of Michigan, Inc., a Michigan corporation; Hospitalists of North Carolina, Inc., a North Carolina corporation; Hospitalists of Nevada, Inc., a Missouri corporation; Hospitalists of Ohio, Inc., an Ohio corporation; Hospitalists of Pennsylvania, Inc., a Pennsylvania corporation; Hospitalists of South Carolina, Inc., a South Carolina corporation; Hospitalists of Tennessee, Inc., a Tennessee corporation; Hospitalists of Texas, L.P., a California limited partnership; Hospitalist Services of Florida, Inc., a Florida corporation; and InPatient Consultants of Wyoming, LLC, a Wyoming limited liability company, (collectively, "IPC" or "Defendants"), states as follows:

## I.    NATURE OF THE CASE

1.     This is an action brought under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*; the California False Claims Act, Cal. Gov't. Code §§ 12650, *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201, *et seq.*; the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*; the Georgia False Medicaid Claims

Act, Ga. Code Ann. §§ 49-4-168, *et seq.*; the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5, *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601, *et seq.*; the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010, *et seq.*; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §§ 167:61, *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053, *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*; and the Texas Medicaid Fraud Protection Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.* (collectively, the "False Claims Acts"), to recover damages and civil penalties from Defendants on behalf of the United States of America and the States of California, Delaware, Florida, Georgia, Illinois, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, Oklahoma, Tennessee, and Texas (collectively, the "Government").

2.      IPC, for many years, has been engaged in a fraudulent scheme whereby it causes the physicians it employs, called hospitalists, to create records seeking payment from medical insurers for higher and more expensive levels of medical service than were actually performed – a practice commonly referred to as "upcoding." IPC then submits those upcoded records for payment to the Government. Over one-half of IPC's revenues – over $125 million in 2008 alone – come from Government medical insurers, including Medicare and Medicaid. IPC's upcoding scheme has caused those Government health insurers to overpay millions of dollars to IPC, and has adversely impacted patient care.

3.      The Relator, Dr. Bijan Oughatiyan ("Relator" or "Oughatiyan"), is a physician who worked for IPC as a hospitalist from 2003 to 2008. Upset by IPC's upcoding

scheme, Oughatiyan began collecting billing records from various IPC hospitalists that demonstrate IPC's scheme. Those limited records, which represent only a small fraction of the fraudulent billing records created by IPC hospitalists, demonstrate the following:

- IPC trains and encourages its hospitalists to upcode. IPC's training can be seen by comparing the billing records of IPC hospitalists when they first joined IPC with the billing records of those same IPC hospitalists after they have received IPC's training and become assimilated into IPC's fraudulent culture. A review of the billing records submitted by 5 IPC hospitalists when they initially joined IPC reveals that those hospitalists, in connection with the patient admissions process, billed at the lowest level 6.9% of the time, the intermediate level 58.6% of the time, and the highest level 34.5% of the time. After receiving IPC's training, however, those percentages changed dramatically: those same hospitalists did not submit a single bill at the lowest level; only 8.9% of the bills were at the intermediate level; and over 91% of the bills were submitted at the highest level. The same pattern is evidenced in the bills submitted by those hospitalists in connection with patient discharge services. Before receiving IPC's training, those hospitalists used the lower of two possible discharge codes 93.3% of the time. After receiving IPC's training, those same hospitalists did not submit a single bill at the lowest level.

- IPC hospitalists disproportionately billed at the highest level billing codes established by Government insurers. A review of 73 different billing records prepared by 29 different IPC hospitalists reveals those hospitalists submitted a bill in connection with the patient admissions process at the highest of three possible levels a staggering 94% of the time. The remainder of the bills submitted by those hospitalists in connection with the admission process were at the intermediate level. Of the 400 total admissions services billed, not one was at the lowest level.

- IPC hospitalists regularly submitted daily billing records for services that would have taken in excess of 24 hours to perform, even using extremely conservative estimates.

Oughatiyan has collected records for 12 different IPC hospitalists who each submitted daily billing records for services that would have taken in excess of 24 hours to perform. Those 12 hospitalists submitted 32 such daily billing records.

- IPC's upcoding scheme causes IPC hospitalists to increase the number of patients they treat in one day and, therefore, decrease the amount of time they spend with each patient, jeopardizing patient care. Indeed, at least one IPC hospitalist submitted a billing record for treating 65 patients in a single day.

4. IPC is a rapidly growing corporation which, if unchecked, will continue to submit false claims for reimbursement for upcoded services, causing the already-strained Medicare and Medicaid systems to overpay millions of dollars to IPC, and continue to adversely impact patient care, all in violation of the False Claims Acts.

5. The False Claims Acts prohibit knowingly presenting (or causing to be presented) to the Government a false or fraudulent claim for payment or approval. The False Claims Acts also prohibit knowingly making or using a false or fraudulent record or statement to get a false or fraudulent claim paid or approved by the Government. In addition, the False Claims Acts prohibit conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid. The False Claims Acts also prohibit knowingly making or using a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. Any person who violates the Federal False Claims Act is liable for civil penalties of up to $11,000 for each violation, plus three times the amount of the damages sustained by the Government.

6.      The False Claims Acts allow any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery. Relator states that all allegations in this Complaint are based on evidence obtained directly by Relator independently and through his own labor and efforts. The information and evidence that Relator has obtained or of which Relator has personal knowledge, and on which these allegations of False Claims Acts violations are based, consist of documents, computer data, conversations with authorized agents and employees of IPC, and his own entry of computer data or other actions taken pursuant to instructions while employed at IPC. Relator is therefore an original source of the information alleged herein, and has provided that information to the Government in advance of filing this action.

7.      Pursuant to 31 U.S.C. § 3730(b)(2), Relator is providing the Government and the States with a copy of the Complaint and a written disclosure of substantially all material evidence and material information in Relator's possession, along with a copy of the Complaint.

8.      In accordance with 31 U.S.C. § 3730(b)(2), the Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on Defendants until the Court so orders.

9.      Based upon these and other provisions of the False Claims Acts, Oughatiyan seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Acts.

## II.     **PARTIES**

10.     Plaintiff and Relator Bijan Oughatiyan resides in Dallas, Texas and was employed by IPC as a hospitalist from 2003 through November 2008. Oughatiyan has direct

and independent knowledge of the false claims alleged in this Complaint, and brings this action for violation of the False Claims Acts on behalf of himself and the Government.

11. Defendant IPC The Hospitalist, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in North Hollywood, California. IPC The Hospitalist, Inc., transacts business and, through various affiliates and subsidiaries, provides medical services to patients covered by Medicare and Medicaid in Arizona, California, Colorado, Delaware, Florida, Georgia, Massachusetts, Michigan, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, and Illinois, including this District. IPC The Hospitalist, Inc. provides all of the non-medical, administrative and management services – including billing services – necessary for the operations of each of its subsidiaries and affiliates pursuant to long-term management agreements.

12. Defendant IPC Hospitalists of Colorado, Inc., is a corporation organized under the laws of Colorado, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

13. Defendant IPC The Hospitalist Management Company, LLC, is a limited liability company organized under the laws of Delaware, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

14. Defendant InPatient Consultants of Alabama, Inc., is a corporation organized under the laws of Alabama, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

15. Defendant InPatient Consultants of Delaware, Inc., d/b/a IPC of Delaware, is a corporation organized under the laws of Delaware, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

16. Defendant InPatient Consultants of Florida, Inc., d/b/a IPC of Florida and IPC of Florida, Inc., is a corporation organized under the laws of Florida, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

17. Defendant InPatient Consultants of Kentucky, Inc., is a corporation organized under the laws of Kentucky, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

18. Defendant InPatient Consultants of Missouri, Inc., d/b/a IPC of Missouri, is a corporation organized under the laws of Missouri, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

19. Defendant InPatient Consultants of Mississippi, Inc., is a corporation organized under the laws of Mississippi, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

20. Defendant InPatient Consultants of Utah, Inc., d/b/a IPC of Utah, is a corporation organized under the laws of Utah, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

21. Defendant Hospitalists, Inc., d/b/a Hospitalists of California, Inc., is a corporation organized under the laws of California, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

22.     Defendant Hospitalists Management of New Hampshire, Inc., is a corporation organized under the laws of New Hampshire, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

23.     Defendant Hospitalists of Arizona, Inc., is a corporation organized under the laws of Arizona, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

24.     Defendant Hospitalists of Illinois, Inc., is a corporation organized under the laws of Illinois, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

25.     Defendant Hospitalists of Georgia, Inc., is a corporation organized under the laws of Georgia, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

26.     Defendant Hospitalists of Maryland, Inc., is a corporation organized under the laws of Maryland, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

27.     Defendant Hospitalists of Michigan, Inc., is a corporation organized under the laws of Michigan, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

28.     Defendant Hospitalists of North Carolina, Inc., is a corporation organized under the laws of North Carolina, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

29.     Defendant Hospitalists of Nevada, Inc., is a corporation organized under the laws of Missouri, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

30.     Defendant Hospitalists of Ohio, Inc., is a corporation organized under the laws of Ohio, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

31.     Defendant Hospitalists of Pennsylvania, Inc., is a corporation organized under the laws of Pennsylvania, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

32.     Defendant Hospitalists of South Carolina, Inc., is a corporation organized under the laws of South Carolina, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

33.     Defendant Hospitalists of Tennessee, Inc., is a corporation organized under the laws of Tennessee, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

34.     Defendant Hospitalists of Texas, L.P., is a limited partnership organized under the laws of California, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

35.     Defendant Hospitalist Services of Florida, Inc., is a corporation organized under the laws of Florida, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

36.     Defendant InPatient Consultants of Wyoming, LLC, is a limited liability company organized under the laws of Wyoming, and a subsidiary of IPC The Hospitalist, Inc. that employs hospitalists.

## III.     JURISDICTION AND VENUE

37.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, in

particular, the False Claims Act. Further, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

38.    This Court has supplemental jurisdiction over the subject matter of the claims brought under state laws pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for actions brought under state laws arising from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

39.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and Defendants have sufficient minimum contacts with the United States of America.

40.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c) because at least one of the Defendants resides or transacts business in this District.

41.    This action is not based on a public disclosure. It is based on information that is within the direct and independent knowledge of Oughatiyan, who has provided the information alleged herein to the Government prior to filing this action.

## IV.    **BACKGROUND**

42.    IPC is a national physician group practice focused on the delivery of hospital medicine through physicians called hospitalists.

### A.    **Hospitalist Services**

43.    Hospitalist medicine is a growing medical specialty. Hospitalists are acute-care physician specialists, who focus on a patient's care exclusively at inpatient

facilities, including hospitals, long-term acute care facilities ("LTACs"), and skilled nursing facilities.  Hospitalists, who have medical training generally in primary care, assume the inpatient care responsibilities, from admission to discharge, that otherwise would be provided by primary care physicians, specialists, or attending physicians.  Hospitalists provide care for patients who do not have a primary care physician; who have a primary care physician who is unavailable; or where it is inefficient or unnecessary for the patient's primary care physician or specialist to visit the hospital.

44.     The number of hospitalists in the United States has grown from an estimated 800 in the mid-1990s to approximately 23,000 in 2007.

**B.     IPC**

45.     IPC is a national hospitalist group practice that employs, through various subsidiaries and affiliates, approximately 650 hospitalists, including physicians, nurse practitioners and physician assistants.  IPC provides hospitalists with administrative services – including marketing, technology, and billing and collection services – that reduce the burdens associated with practicing hospitalist medicine.  In return, IPC takes a varying, but significant percentage of the reimbursement that medical insurers pay for the services of IPC's hospitalists.

46.     IPC was founded in 1995 by Adam D. Singer, M.D., and was incorporated in Delaware in January 1998.  IPC went public through an initial public offering on January 25, 2008, and trades on the NASDAQ Global Market under the ticker symbol "IPCM."

47.     IPC is now the largest dedicated hospitalist company in the United States, based on revenues, patient encounters, and the number of affiliated hospitals.

48.     Through its 170 local practice groups, IPC provides hospitalist services at over 445 hospitals and other inpatient facilities in 19 states including: Arizona, California, Colorado, Delaware, Florida, Georgia, Illinois, Massachusetts, Michigan, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, and Texas.

49.     Each of IPC's practice groups, or "Pods," has one hospitalist that acts as the Practice Group Leader. The Practice Group Leader manages the practice group by handling staffing and scheduling, monitoring the quality of care, attending to new business initiatives, and monitoring the financial performance of the practice group.

50.     IPC's practice groups are organized into 14 different regions. Each region has an Executive Director and a team of marketing and administrative staff responsible for the non-clinical management of the practice groups within the region. The non-clinical management responsibilities include: recruiting hospitalists, monitoring financial performance, contracting with facilities and medical insurers, and attending to billing and collection activities. Each region also has a Medical Director that attends to the clinical management of the region.

51.     IPC's principal executive offices are located in North Hollywood, California. IPC's training and billing and collections functions are based in IPC's executive offices.

52.     IPC has grown substantially in recent years as seen from the selected data below:

|  | **2004** | **2005** | **2006** | **2007** | **2008** |
|---|---|---|---|---|---|
| Net Revenue | $91,668,000 | $110,883,000 | $148,098,000 | $190,002,000 | $251,179,000 |
| Net Income | $3,639,000 | $3,645,000 | $1,778,000 | ($867,000) | $13,554,000 |
| Total Assets | $39,613,000 | $63,187,000 | $76,029,000 | $97,376,000 | $162,691,000 |
| Stockholder Equity | ($16,416,000) | ($12,796,000) | ($11,014,000) | $43,017,000 | $122,947,000 |
| Patient Encounters | 1,065,000 | 1,302,000 | 1,747,000 | 2,153,000 | 2,790,000 |
| Hospitalists | 292 | 421 | 432 | 546 | 659 |

(IPC's 10-K, Item 6, p. 36.)

     53.    IPC is intent on growing its business, primarily through the acquisition of existing hospitalist groups. For example, since the beginning of 2006, IPC has acquired at least 24 separate practice groups. IPC currently intends to retain all of its earnings to fund future growth initiatives.

    **C.**    **IPC's Interaction With Government Medical Insurers**

     54.    Hospitalists, like most physicians, are paid for their services primarily by submitting invoices to medical insurers and other payors, including Medicare and Medicaid. IPC assumes responsibility for all billing, reimbursement, and collection processes relating to its hospitalists' services.

     55.    To accomplish this task, IPC uses proprietary software called IPC-Link that IPC's hospitalists access through IPC's web-based "Virtual Office" portal. After treating a patient, IPC's hospitalists enter a collection of information into the IPC-Link program,

including basic patient information, a diagnosis, and a billing code that is supposed to correspond with the level of service provided by the hospitalist during a particular encounter.

56. IPC has a department devoted to auditing the billing information entered by its hospitalists for completeness and accuracy, and preparing billing forms for each patient that are electronically submitted to payors.

57. As seen in the chart below, IPC receives approximately 50% of its revenues from Government medical insurers:

| Payor | 2006 | 2007 | 2008 |
|---|---|---|---|
| Medicare | 46% | 46% | 45% |
| Medicaid | 6% | 5% | 6% |
| Other third insurers | 39% | 39% | 42% |
| Self-pay patients | 9% | 10% | 7% |

(IPC's 10-K, Item 7, p. 40.)

58. The Medicare program reimburses IPC for the services provided by its hospitalists based upon the rates in Medicare's Physician Fee Schedule (the "Fee Schedule"), which is updated annually. Many other medical payors, including private insurers, base their reimbursement rates on the Fee Schedule. The Fee Schedule is based upon various codes found in the American Medical Association's ("AMA") Current Procedural Terminology that correspond to the level of service provided ("CPT Codes"). IPC has adopted "shortcut" codes for its hospitalists to use that correspond with the CPT Codes.

59. As seen from the selected CPT Codes below, the fees Medicare pays for services vary depending upon the complexity of the service provided and the amount of time expended in providing the service.

| CPT Code | IPC Code | Payment[1] | Description of Services Provided[1] |
|---|---|---|---|
| 99221 | A1 | $87.61 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components: A detailed or comprehensive history; A detailed or comprehensive examination; and Medical decision-making that is straightforward or of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the problem(s) requiring admission are of low severity. **Physicians typically spend 30 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99222 | A2 | $119.63 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components: A comprehensive history; A comprehensive examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the problem(s) requiring admission are of moderate severity. **Physicians typically spend 50 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99223 | A3 | $175.88 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components: A comprehensive history; A comprehensive examination; and Medical decision-making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the problem(s) requiring admission are of high severity. **Physicians typically spend 70 minutes at the bedside and on the patient's hospital floor or unit.** |

---

[1]     The rate and description information is based upon 2009 Medicare reimbursement rates for services provided in Texas. Reimbursement rates vary geographically.

| CPT Code | IPC Code | Payment[1] | Description of Services Provided[1] |
|---|---|---|---|
| 99231 | V1 | $36.17 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: A problem focused interval history; A problem focused examination; Medical decision making that is straightforward or of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the patient is stable, recovering or improving. **Physicians typically spend 15 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99232 | V2 | $64.98 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: An expanded problem focused interval history; An expanded problem focused examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the patient is responding inadequately to therapy or has developed a minor complication. **Physicians typically spend 25 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99233 | V3 | $93.14 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: A detailed interval history; A detailed examination; Medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the patient is unstable or has developed a significant complication or a significant new problem. **Physicians typically spend 35 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99238 | D<30 | $64.25 | Hospital discharge day management; **30 minutes or less** |
| 99239 | D>30 | $93.41 | Hospital discharge day management; **more than 30 minutes** |

60.     A copy of Medicare's Fee Schedule, for services provided in Texas in 2009, for the CPT Codes most frequently used by IPC's hospitalists, is attached hereto as Exhibit 1.   A copy of the AMA CPT Code Descriptions, describing the services to be provided for each CPT Code is attached hereto as Exhibit 2.  A copy of an IPC-created table, reflecting the CPT Codes its hospitalists most frequently use, and the corresponding IPC "shortcut" code, is attached hereto as Exhibit 3.

61.     As set forth below, IPC encourages and enables its physicians to upcode, or record into IPC-Link a higher level code – like A3, for example -- when the hospitalist actually only provided treatment that corresponds with a lower level of service – like A1 or A2.  IPC then submits the upcoded invoices for payment by Medicare, Medicaid and other payors.

## V.     RELATOR, DR. BIJAN OUGHATIYAN

62.     Oughatiyan was born and raised in Kuwait before moving to Germany to pursue his medical degree.  After receiving his medical degree from the Hanover School of Medicine in Hanover, Germany, Oughatiyan moved to Rochester, New York for his residency in internal medicine and primary care at Unity Health System, an affiliate of the University of Rochester, New York.  In approximately 2001, after completing his residency, Oughatiyan moved to San Antonio, Texas to work as a hospitalist for a small hospitalist company called Hospitalist of San Antonio ("HOSA"), that was owned in part by Dr. Felix Aguirre ("Aguirre").   IPC acquired HOSA in March 2003, at which point Oughatiyan became an IPC employee.

63.     Oughatiyan worked in a practice group, or Pod, that was a part of IPC's San Antonio region.   Aguirre was the Medical Director for the San Antonio region, and John H. Geanes was, and is, the Executive Director of the San Antonio region.

64.     While working as a hospitalist for IPC, Oughatiyan was respected by other hospitalists and by staff members of the hospitals at which he worked, one year winning the Consultant of the Year Award for San Antonio.   Despite his hard work, Oughatiyan's billings were not as high as other IPC hospitalists because of his refusal to participate in IPC's upcoding scheme.   Oughatiyan was, therefore, less profitable for IPC. Fearing that IPC might terminate his employment because of his refusal to upcode, Oughatiyan began collecting documentation of upcoding at IPC.

65.     In November 2008, Oughatiyan left IPC because of his dissatisfaction with IPC and because he wanted to move to Dallas, Texas.

## VI.     IPC'S UPCODING SCHEME

66.     IPC derives its revenues primarily by retaining a significant percentage of the amount it bills for the services of its hospitalists.   IPC's revenues, therefore, are dependant upon the amount it can bill to medical insurers for the services performed by its hospitalists.

67.     Because Medicare establishes reimbursement rates for physician services that other medical insurers generally follow, IPC cannot dictate, or even control, the price of specific services provided by its hospitalists.   Accordingly, IPC can grow revenues only by acquiring new hospitalists, or by increasing the productivity of each of its hospitalists.

-21-

68.     Indeed, IPC considers its most important performance indicators to be: (1) the number of patient encounters; (2) the revenue generated per patient encounter; and (3) the average number of patient encounters per hospitalist per day.  (IPC's 10-K, Item 7, p. 39.)

69.     The revenue generated per patient encounter can only increase if IPC hospitalists happen to treat a disproportionate number of critically ill patients, or if IPC hospitalists bill at higher levels for providing the same services.

70.     IPC employs a variety of strategies to cause its hospitalists to upcode. The results of IPC's efforts are evident in IPC hospitalists' billing records, some of which Oughatiyan has collected.

A.      **Overview of IPC's Scheme to Encourage and Enable Upcoding**

71.     As set forth below, IPC's recruiting and training program, compensation structure, and reporting and monitoring activities combine to cause its hospitalists to upcode.

(1)     **Recruiting and Training**

72.     IPC recruits new hospitalists in three primary ways:  (1) by recruiting physicians directly out of residency programs; (2) by acquiring existing hospitalist practice groups; and (3) by recruiting already practicing physicians.   Most, if not all, of these physicians have little training or experience with appropriate billing procedures.  IPC is therefore able to provide many of these physicians – particularly the physicians hired directly out of residency programs – with their first training on billing procedures.  IPC provides that training to newly-hired hospitalists typically within the first few months of employment.

-22-

73.     Members of IPC's training staff, who are not themselves physicians, are based in California and travel around the country to provide training to IPC's hospitalists. IPC's training program covers billing and coding protocol, medical record documentation, compliance, risk management, and other topics. Newly-hired hospitalists are also paired with experienced local hospitalists as part of the training program.

74.     The written materials and on-line training IPC provides to its hospitalists regarding billing and coding protocol generally are consistent with Medicare and other medical insurer guidelines and protocols.

75.     IPC's training staff, however, provides one-on-one training with each new hospitalist, during which IPC's staff encourages hospitalists to maximize their billings by upcoding. In some cases, IPC's staff gives flatly incorrect information regarding coding protocol.

76.     For example, in the Spring of 2003, during Oughatiyan's IPC training, a member of IPC's training staff told him that if he had to consult with a cardiologist or other specialist while treating a patient, he was to bill at the highest level because consultation with a specialist meant that the case was complicated. Oughatiyan later learned – through on-line training provided by Medicare (not IPC) – that having a specialist treat the patient after only a short consultation typically should be billed at a lower level.

77.     Similarly, IPC's training staff tells new hospitalists that hospitalist work is very complicated and, accordingly, IPC's hospitalists should generally be billing at the highest levels and rarely, if ever, at the lowest levels – regardless of the service provided by the hospitalist. Oughatiyan later learned, again through a Medicare training program, that the CPT Codes are different for services provided in a hospital than for services provided in an

office setting, and that the differences in the seriousness of a patient's condition is taken into account in the CPT Codes and the corresponding reimbursement rates.

**(2)      Compensation**

78.      IPC encourages its hospitalists to maximize their billings through IPC's compensation structure – specifically, its "physician incentive plan."

79.      In addition to receiving a base salary and benefits, IPC hospitalists also receive bonuses pursuant to IPC's physician incentive plan that are based upon the amount billed by the hospitalist.  These bonuses can equal or exceed the hospitalists' base salary.

80.      IPC calculates the total amount billed by each hospitalist on a monthly basis, and subtracts from that amount the cost of the hospitalist's salary and benefits.  Of the remainder, IPC keeps 30% and pays the hospitalist 70%.  Accordingly, the more IPC's hospitalists bill, the more they take home (and the more IPC earns).  As set forth below, IPC regularly reminds its hospitalists about this incentive.

**(3)      Monitoring, Encouraging, and Enabling Upcoding**

**(a)      Monitoring**

81.      After the initial training IPC provides to its new hospitalists, IPC continues to pressure its hospitalists to increase their billings by monitoring their billing activities and encouraging hospitalists with lower billings to "catch up" to their peers.

82.      Through IPC-Link, IPC has the ability to comprehensively monitor the activities of each of its physicians on a near real-time basis.  IPC actively tracks various metrics, including patient volumes and physician productivity, referral sources and trends, physician billings, clinical quality indicators, patient satisfaction, and patient post-discharge

survey results. IPC-Link organizes this data into a fully searchable database and allows IPC to create customized reports.

83. Accordingly, IPC is fully-aware of the coding and billing patterns of its hospitalists. IPC uses these reporting capabilities to identify hospitalists with coding and billing patterns that result in lower revenues for IPC. IPC then counsels those hospitalists, encouraging them to increase their billings by, among other things, suggesting that the hospitalists are using a lower billing code than the hospitalists should be using.

84. IPC also provides its hospitalists with access to some of IPC-Link's reporting capabilities, creating transparency in its physician incentive plan, so that hospitalists can benchmark and compare their performance with other IPC hospitalists. IPC uses this transparency to encourage its hospitalists to "keep up" with their co-workers.

**(b)      Trailblazer and IPC's Responses**

85. On January 31, 2005, Trailblazer Health Enterprises, LLC ("Trailblazer"), the Medicare Administrative Contractor in Texas,[2] sent a letter to Oughatiyan alerting him to a "potential problem" with his "billing practices," noting that his billing practices displayed "a pattern statistically different" from his peers – including non-IPC physicians. Specifically, Trailblazer noted that Oughatiyan disproportionately used the highest code when admitting, evaluating, and managing patients (CPT Code numbers 99221-23). Trailblazer instructed Oughatiyan to participate in a Medicare coding training program to reduce any future "errors." A copy of Trailblazer's January 31, 2005 letter to Oughatiyan is attached hereto as Exhibit 4.

---

[2]      The Government uses private organizations to administer the Medicare and Medicaid programs. 42 U.S.C. § 1395(u)(a). Trailblazer, an independent licensee of the Blue Cross and Blue Shield Association, administers some aspects of the Medicare program for beneficiaries and providers in virtually every state.

86. Oughatiyan was surprised to have received the January 31, 2005 Trailblazer letter because he knew that he was typically using lower level CPT Codes than his peers at IPC.

87. Oughatiyan took the Medicare training referenced in the January 31, 2005 Trailblazer letter, and discovered that much of what he learned from IPC's training staff was inaccurate. Oughatiyan, accordingly, changed his billing patterns.

88. Within approximately three months thereafter, a member of IPC's training staff, who was based in California, approached Oughatiyan and told him that IPC noticed a change in his billing practices and that he should not worry about the January 31, 2005 Trailblazer letter.

89. Aguirre, too, reiterated to Oughatiyan that the January 31, 2005 Trailblazer letter was not an indictment of Oughatiyan's billing practices. During an approximately 20 minute conversation in San Antonio's Baptist Medical Center during the Spring of 2005, Aguirre told Oughatiyan that he should resume use of the higher level CPT Codes Oughatiyan had used in the past. Aguirre also told Oughatiyan that IPC's hospitalists should continue to use higher level CPT Codes so that the average CPT Code level would be higher for the next year. Aguirre justified his position by again focusing on the high-level nature of work performed by hospitalists relative to the typical internist. Aguirre also told Oughatiyan that Oughatiyan's revenues per patient encounter were lower than most of the IPC hospitalists in the San Antonio region.

90. Oughatiyan told Aguirre that, according to Medicare, the billing codes for hospitalists were the same as the billing codes for internists, and that using higher level CPT Codes simply because Oughatiyan was a hospitalist was inappropriate. Oughatiyan also

told Aguirre that while Oughatiyan fully understood the financial incentives involved with coding protocol, he would not revert to his prior practices because he wanted to do the right thing.

91.    The next year, Trailblazer sent another round of letters to IPC's hospitalists, indicating that their billing patterns were unusually high.  On July 31, 2006, Aguirre sent an email to IPC executives encouraging them to tell hospitalists to, essentially, disregard the Trailblazer letters:

> . . . Trailblazer is at it again in Texas.
>
> All of the letters that were sent generically focused on admission coding without any specific documentation errors.
>
> It only generically explained the most common errors performed by physicians doing admission history and physicals.
>
> Please, with the help of the PGL's, have our physicians understand that is a strategy employed by Trailblazer to affect coding patterns and possibly decrease reimbursement.
>
> Our physicians should maintain their appropriate coding pattern and direct any specific questions to the PGL, Kathy or myself before altering their coding.
>
> Let us not get behind the eight ball again.

A copy of Aguirre's July 31, 2006 email is attached hereto as Exhibit 5.

**B.    Evidence of IPC's Upcoding Scheme**

92.    While he was employed at IPC, Oughatiyan collected from IPC-Link a variety of billing records that demonstrate IPC's success in encouraging its hospitalists to engage in upcoding through both the unreasonably high billing patterns of IPC's hospitalists, and the billing patterns of hospitalists that joined IPC after working with other physician groups.

**(1)    Evidence of Upcoding Through Unreasonably High Billing Patterns**

93.    The billing records collected by Oughatiyan, and described below, include a detailed description of the services provided by the particular IPC hospitalist on the day in question and present, among other things, the following information:  the name, Social Security number, and date of birth of the patient; the facility and room number in which the patient was treated; patient diagnosis codes; and the IPC Code and CPT Code that the IPC hospitalist entered after treating the patient.  Evidence of upcoding can be seen through the billing records in at least two ways.

94.    First, a review of the billing records summarized below, in conjunction with a review of the AMA's description of the CPT Codes, reveals that IPC hospitalists were billing for services performed in one day that would have taken far in excess of 24 hours to complete.  The AMA's description of the CPT Codes describes the amount of time that should be spent providing the service in question.  For example, the description for the admission process, for code 99221 (A1), provides that:  "Physicians typically spend 30 minutes at the bedside and on the patient's hospital floor or unit."  The time typically spent on the admission process is 50 minutes when billing to code 99222 (A2), and 70 minutes when billing to code 99223 (A3).  Accordingly, it is possible to determine the minimum amount of time that the hospitalist should have spent on the admissions process for any given day by multiplying the number of 99221 (A1), 99222 (A2), or 99223 (A3) billing entries by the amount of time corresponding to those codes in the AMA description.  The same is true for many other CPT Code groups including, for example, the "subsequent visit"

codes – 99231 (V1), 99232 (V2), and 99233 (V3) – for which the AMA description provides a specific amount of time that should be spent performing the service.

95.     The AMA descriptions for other CPT Code groups, however, provide a range of time that should be spent performing the task in question.  For example, the AMA description for the discharge code 99238 (D<30) states that the task should take "30 minutes or less," while the AMA description for discharge code 99239 (D>30) provides that the task should take "more than 30 minutes."

96.     The analysis of the billing records described below is as conservative as possible.  For example, it assumes that the IPC hospitalist took only 5 minutes to perform tasks billed as discharge code 99238 (D<30), despite the fact that there is no way to professionally discharge a patient in so little time.  The analysis also assumes that the IPC hospitalist spent the minimum 30 minutes for tasks billed as discharge code 99239 (D>30).

97.     Similarly, the AMA description for "critical care" services, 99291 (CC30-74), provides a range of time – 30 to 74 minutes – that should be spent caring for the patient.  The analysis below assumes that the IPC hospitalist spent the minimum 30 minutes performing critical care services.

98.     The AMA descriptions for some CPT Code groups do not provide any description of the amount of time that should be spent on the particular tasks within the group.  For example, the AMA description for CPT Code 99236 (A3/D) provides:

> Observation or inpatient hospital care, for the evaluation and management of a patient including admission and discharge on the same date, which requires these 3 key components: A comprehensive history; A comprehensive examination; and Medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the

patient's and/or family's needs. Usually the presenting problem(s) requiring admission are of high severity.

99.     CPT Code 99236 (A3/D), accordingly, requires admitting, treating, and discharging a patient presenting problems of high severity. The reimbursement amount for CPT Code 99236 (A3/D) is consistent with those significant responsibilities and is higher than the reimbursement amount for the highest level admission code, 99223 (A3), which requires 70 minutes to perform. Nonetheless, the analysis below assumes that the IPC hospitalist spent only 5 minutes performing the task billed as 99236 (A3/D).

100.     Similarly, the AMA description for CPT Code 99220 (OBS3) does not describe the amount of time required to perform the task. Properly performing that service takes no less than 50 minutes. As reflected by Medicare reimbursement amounts, performing CPT Code 99220 (OBS3) is similar in complexity and requires a time commitment similar to CPT Codes 99222 (A2) and 99223 (A3), which take between 50 and 70 minutes to perform. The analysis below, however, to avoid any possibility of overstating IPC's upcoding scheme, estimated that the IPC hospitalists would take only 5 minutes to perform CPT Code 99220 (OBS3).

101.     That same 5 minute estimate was used for all CPT Code billing entries for which the AMA description does not include a specific reference to the amount of time that should be spent performing the task in question, regardless of the fact that those services could not be professionally performed in only 5 minutes.

102.     The analysis of the billing records described below, accordingly, represents a significant underestimate of the amount of time it would have taken the IPC hospitalists to actually perform all of the tasks for which they billed. Even using these gross

underestimates, the billing records reveal that IPC hospitalists regularly billed in one day for services that could not have been performed within a 24-hour period.

103. Second, the billing records reveal that the IPC hospitalists disproportionately used the highest level CPT Codes for any particular activity.

104. As described above, Government payors reimburse physicians based upon the CPT Codes that correspond with the level of service provided.

105. For example, when a hospitalist evaluates and admits a patient to the hospital, the hospitalist can bill to one of three CPT Codes, depending on the level of complexity associated with the admission process: 99221 (A1); 99222 (A2); or 99223 (A3). Similarly, when discharging a patient, a hospitalist can bill to one of two CPT Codes, depending on whether the hospitalist spent more or less than 30 minutes on the discharge process: 99238 (D<30) or 99239 (D>30). Hospitalists typically see patients that would require the use of a reasonable distribution of the various coding levels.

106. The records described below demonstrate a disproportionately high use of the highest level CPT Codes, and almost no use of the lowest level CPT Codes. Indeed, the records analyzed below all reflect the use of significantly higher level admission codes (A1, A2, and A3) than those used by Oughatiyan in 2005 when he received a letter from Trailblazer suggesting that some of his entries might have been in error because they exceeded the national averages.

(a) **Rajasekhar Borra**

107. Rajasekhar Borra ("Borra") is an IPC hospitalist who worked in and around the San Antonio area who, on April 5, 2008, billed for treating 65 different patients in one day. The following chart summarizes Borra's billing record for April 5, 2008, and

-31-

calculates the total amount of time it would have take Borra to perform the services for which he submitted a bill:

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|----------|----------|----------|-------------------------------|---------------------|
| 99221 | A1 | 0 | 30 minutes | $0^3$ |
| 99222 | A2 | 1 | 50 minutes | 50 minutes |
| 99223 | A3 | 16 | 70 minutes | 18 hours, 40 minutes |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 13 | 25 minutes | 5 hours, 25 minutes |
| 99233 | V3 | 18 | 35 minutes | 10 hours, 30 minutes |
| 99291 | CC30-74 | 12 | 30-74 minutes | 6 hours (assuming 30 minutes per encounter) |
| 99238 | D<30 | 2 | 30 minutes or less | 10 minutes (assuming 5 minutes per encounter) |
| 99239 | D>30 | 3 | More than 30 minutes | 1 hour, 30 minutes (assuming 30 minutes per encounter) |
| TOTAL: | | 65 | | 43 hours, 5 minutes |

108.    Borra performed these services at two different facilities that are approximately 30 minutes apart.

109.    April 5, 2008 was not the first time Borra submitted a one-day billing record for services that could not be performed within 24 hours. The following chart sets forth the amount of time it would have taken Borra to perform the services for which he billed as set forth on Borra's billing records prior to April 5, 2008:

| Date of Billing Record | Time Required to Perform Services Billed |
|---|---|
| May 5, 2007 | 34 hours, 15 minutes |
| July 7, 2007 | 30 hours, 35 minutes |
| July 22, 2007 | 26 hours |
| August 2, 2007 | 18 hours, 50 minutes |
| August 5, 2007 | 25 hours, 5 minutes |
| August 13, 2007 | 23 hours |
| February 11, 2008 | 30 hours, 15 minutes |

110.     Oughatiyan knew Borra, and warned Borra to be careful about his billing practices, but Borra was unmoved.  In the Spring of 2008, during a Pod meeting in front of other IPC Hospitalists, Oughatiyan complained to Kevin Primeaux, a member of the regional administrative team, about excessive billing at IPC, using Borra as an example. Primeaux was neither surprised nor upset, but told Oughatiyan, "I know, I know, we're going to talk to him."

111.     But IPC failed to change Borra's billing practices.  Borra continued to submit records for excessive charges after the Spring of 2008, and IPC submitted those records to the Government for reimbursement.  On June 23, 2008, Borra billed for services that would have taken, using the extremely conservative calculation method described above, 23 hours and 55 minutes to perform.  On July 22, 2008, Borra billed for services that would have taken 30 hours and 35 minutes to perform.

112.     Borra's billing records demonstrate that one of the ways Borra inflated his daily bills was by systematically using the higher level CPT Codes to the exclusion of the

---

[3]     The chart includes Codes 99221 (A1) and 99231 (V1), the lowest level of billing codes for those activities, to show Borra's billing patterns.

lower level CPT Codes. The following chart demonstrates the frequency with which Borra used the three CPT Code levels for admissions:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| May 5, 2007 | 0 | 0 | 6 |
| July 7, 2007 | 0 | 0 | 5 |
| July 22, 2007 | 0 | 0 | 5 |
| August 2, 2007 | 0 | 0 | 6 |
| August 5, 2007 | 0 | 0 | 9 |
| August 13, 2007 | 0 | 0 | 6 |
| February 11, 2008 | 0 | 1 | 8 |
| April 5, 2008 | 0 | 1 | 16 |
| June 23, 2008 | 0 | 0 | 4 |
| July 22, 2008 | 0 | 0 | 9 |
| **Total:** | **0** | **2** | **74** |
| **Percentage of Total:** | **0%** | **2.6%** | **97.4%** |

113. The following chart reveals that Borra similarly upcoded for providing subsequent hospital care – CPT Codes 99231 (V1), 99232 (V2), and 99233 (V3):

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| May 5, 2007 | 0 | 5 | 32 |
| July 7, 2007 | 0 | 7 | 20 |
| July 22, 2007 | 0 | 4 | 23 |
| August 2, 2007 | 0 | 2 | 11 |
| August 5, 2007 | 0 | 5 | 15 |
| August 13, 2007 | 0 | 3 | 15 |
| February 11, 2008 | 0 | 12 | 13 |
| April 5, 2008 | 0 | 13 | 18 |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| June 23, 2008 | 0 | 11 | 13 |
| July 22, 2008 | 0 | 6 | 17 |
| **Total:** | **0** | **68** | **177** |
| **Percentage of Total:** | **0%** | **27.8%** | **72.2%** |

114.    Borra's use of the CPT Codes associated with patient discharge reveals a similar pattern:

| Date | 99238 (D<30) | 99239 (D>30) |
|---|---|---|
| May 5, 2007 | 0 | 6 |
| July 7, 2007 | 0 | 8 |
| July 22, 2007 | 0 | 3 |
| August 2, 2007 | 4 | 7 |
| August 5, 2007 | 0 | 3 |
| August 13, 2007 | 1 | 2 |
| February 11, 2008 | 0 | 10 |
| April 5, 2008 | 2 | 3 |
| June 23, 2008 | 0 | 7 |
| July 22, 2008 | 0 | 9 |
| **Total:** | **7** | **58** |
| **Percentage of Total:** | **10.8%** | **89.2%** |

115.    Borra was one of many IPC hospitalists working in the San Antonio area that engaged in IPC's upcoding scheme for their financial benefit, IPC's financial benefit, and to the detriment of the Medicare and Medicaid programs.

116.    Borra's billing records are attached hereto as Exhibit 6.

(b)    **Lino Ramos**

117.    Lino Ramos ("Ramos") is an IPC hospitalist who worked in and around

the San Antonio area who submitted a billing record for November 22, 2008 that reveals the

following information:

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 10 | 70 minutes | 11 hours, 40 minutes |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 2 | 25 minutes | 50 minutes |
| 99233 | V3 | 29 | 35 minutes | 16 hours, 55 minutes |
| 99291 | CC30-74 | 9 | 30-74 minutes | 4 hours, 30 minutes (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |
| 99239 | D>30 | 4 | More than 30 minutes | 2 hours (assuming 30 minutes per encounter) |
| 99236 | A3/D | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| **TOTAL:** | | **55** | | **36 hours** |

118.   Ramos' excessive billing took place with regularity as illustrated by the following chart:

| Date of Billing Record | Time Required to Perform Services Billed |
|---|---|
| June 28, 2008 | 21 hours, 15 minutes |
| July 7, 2008 | 24 hours, 5 minutes |
| August 16, 2008 | 26 hours, 40 minutes |
| October 18, 2008 | 33 hours, 50 minutes |
| November 22, 2008 | 36 hours (see above) |

119.   Like Borra, Ramos not only billed far in excess of 24 hours worth of services in a single day, but Ramos also performed those services at multiple facilities requiring travel time.

120.   Ramos' November 22, 2008 billing record is remarkable not only because he submitted bills for more than 36 hours worth of services in a 24-hour period, but also because 95% of his billing submissions for services provided in connection with admissions, subsequent hospital care, and discharges were at the highest possible CPT Code level.

121.   The following charts reveal that Ramos regularly billed excessively to the highest level CPT Codes:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| June 28, 2008 | 0 | 0 | 2 |
| July 7, 2008 | 0 | 1 | 0 |
| August 16, 2008 | 0 | 0 | 6 |

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| October 18, 2008 | 0 | 1 | 4 |
| November 22, 2008 | 0 | 0 | 10 |
| **Total:** | **0** | **2** | **22** |
| **Percentage of Total:** | **0%** | **8.3%** | **91.7%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| June 28, 2008 | 0 | 2 | 20 |
| July 7, 2008 | 0 | 6 | 20 |
| August 16, 2008 | 0 | 8 | 18 |
| October 18, 2008 | 0 | 9 | 29 |
| November 22, 2008 | 0 | 2 | 29 |
| **Total:** | **0** | **27** | **116** |
| **Percentage of Total:** | **0%** | **18.9%** | **81.1%** |

| Date | 99238 (D<30) | 99239 (D>30) |
|---|---|---|
| June 28, 2008 | 0 | 4 |
| July 7, 2008 | 0 | 9 |
| August 16, 2008 | 0 | 4 |
| October 18, 2008 | 0 | 10 |
| November 22, 2008 | 0 | 4 |
| **Total:** | **0** | **31** |
| **Percentage of Total:** | **0%** | **100%** |

122.    Ramos' billing records are attached hereto as Exhibit 7.

**(c)    Louis Pulicicchio**

123.    Louis Pulicicchio ("Pulicicchio") is an IPC hospitalist who worked in and around the San Antonio area who submitted a billing record for October 25, 2008 that reveals the following information:

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 1 | 50 minutes | 50 minutes |
| 99223 | A3 | 6 | 70 minutes | 7 hours |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 5 | 25 minutes | 2 hours, 5 minutes |
| 99233 | V3 | 28 | 35 minutes | 16 hours, 20 minutes |
| 99291 | CC30-74 | 4 | 30-74 minutes | 2 hours (assuming 30 minutes per encounter) |
| 99253 | C3 | 1 | 55 minutes | 55 minutes |
| 99238 | D<30 | 1 | 30 minutes or less | 5 minutes (assuming 5 minutes per encounter) |
| 99239 | D>30 | 6 | More than 30 minutes | 3 hours (assuming 30 minutes per encounter) |
| **TOTAL:** | | **52** | | **32 hours, 15 minutes** |

124.   On October 25, 2008, Pulicicchio billed for services provided at three different facilities, adding significant travel time to his day.

125.   On each of the following days, Pulicicchio traveled to multiple facilities and submitted bills for more than 24 hours worth of services:

| Date of Billing Record | Time Required to Perform Services Billed |
|---|---|
| April 10, 2008 | 30 hours |
| June 14, 2008 | 25 hours, 20 minutes |
| July 21, 2008 | 25 hours, 5 minutes |
| October 22, 2008 | 31 hours |
| October 25, 2008 | 32 hours, 15 minutes (see above) |

126.    The following charts reveal that Pulicicchio systematically billed to the highest level CPT Codes in order in increase the amount he could bill, consistent with IPC's scheme:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| April 10, 2008 | 0 | 1 | 7 |
| June 14, 2008 | 0 | 2 | 4 |
| July 21, 2008 | 0 | 1 | 8 |
| October 22, 2008 | 0 | 0 | 6 |
| October 25, 2008 | 0 | 1 | 6 |
| **Total:** | **0** | **5** | **31** |
| **Percentage of Total:** | **0%** | **13.9%** | **86.1%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| April 10, 2008 | 0 | 3 | 20 |
| June 14, 2008 | 0 | 0 | 18 |
| July 21, 2008 | 0 | 2 | 12 |
| October 22, 2008 | 0 | 3 | 27 |
| October 25, 2008 | 0 | 5 | 28 |
| **Total:** | **0** | **13** | **105** |
| **Percentage of Total:** | **0%** | **11.0%** | **89.0%** |

| Date | 99238 (D<30) | 99239 (D>30) |
|---|---|---|
| April 10, 2008 | 0 | 9 |
| June 14, 2008 | 0 | 9 |
| July 21, 2008 | 1 | 4 |
| October 22, 2008 | 0 | 6 |
| October 25, 2008 | 1 | 6 |
| **Total:** | **2** | **34** |
| **Percentage of Total:** | **5.6%** | **94.4%** |

127.    Pulicicchio's billing records are attached hereto as Exhibit 8.

(d)    **Stanislav Ivanov**

128.    Stanislav Ivanov ("Ivanov") is an IPC hospitalist who worked in and around the San Antonio area who submitted a billing record for August 11, 2008 that reveals the following information:

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 8 | 70 minutes | 9 hours, 20 minutes |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 9 | 25 minutes | 3 hour, 45 minutes |
| 99233 | V3 | 20 | 35 minutes | 11 hours, 40 minutes |
| 99291 | CC30-74 | 4 | 30-74 minutes | 2 hours (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |
| 99239 | D>30 | 5 | More than 30 minutes | 2 hours, 30 minutes (assuming 30 minutes per encounter) |
| 99220 | OBS3 | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| 99255 | C5 | 1 | 110 minutes | 1 hour, 50 minutes |
| TOTAL: | | 48 | | 31 hours, 10 minutes |

129.    Ivanov regularly, including on August 11, 2008, provided services at more than one facility.

130.    He also regularly submitted excessive daily billing totals, often billing for work that would have taken in excess of 24 hours to perform:

| Date of Billing Record | Time Required to Perform Services Billed |
|---|---|
| July 20, 2007 | 22 hours, 25 minutes |
| September 15, 2007 | 18 hours, 50 minutes |
| June 1, 2008 | 27 hours, 45 minutes |
| July 21, 2008 | 26 hours, 25 minutes |
| August 11, 2008 | 31 hours, 10 minutes (see above) |
| October 10, 2008 | 30 hours, 20 minutes |
| October 13, 2008 | 27 hours, 50 minutes |
| October 27, 2008 | 21 hours, 40 minutes |

131.    Ivanov's billing patterns, particularly with respect to the admissions and discharge process, are consistent with IPC's upcoding scheme:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 20, 2007 | 0 | 0 | 5 |
| September 15, 2007 | 0 | 0 | 2 |
| June 1, 2008 | 0 | 0 | 5 |
| July 21, 2008 | 0 | 3 | 6 |
| August 11, 2008 | 0 | 0 | 8 |
| October 10, 2008 | 0 | 0 | 9 |
| October 13, 2008 | 0 | 0 | 6 |
| October 27, 2008 | 0 | 0 | 3 |
| Total: | 0 | 3 | 44 |
| Percentage of Total: | 0% | 6.4% | 93.6% |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 20, 2007 | 0 | 8 | 17 |
| September 15, 2007 | 0 | 10 | 11 |
| June 1, 2008 | 0 | 9 | 23 |
| July 21, 2008 | 0 | 7 | 17 |
| August 11, 2008 | 0 | 9 | 20 |
| October 10, 2008 | 0 | 6 | 22 |
| October 13, 2008 | 0 | 9 | 16 |
| October 27, 2008 | 0 | 12 | 17 |
| **Total:** | **0** | **70** | **143** |
| **Percentage of Total:** | **0%** | **32.9%** | **67.1%** |

| Date | 99238 (D<30) | 99239 (D>30) |
|---|---|---|
| July 20, 2007 | 1 | 4 |
| September 15, 2007 | 0 | 4 |
| June 1, 2008 | 0 | 3 |
| July 21, 2008 | 0 | 4 |
| August 11, 2008 | 0 | 5 |
| October 10, 2008 | 1 | 8 |
| October 13, 2008 | 0 | 11 |
| October 27, 2008 | 0 | 2 |
| **Total:** | **2** | **41** |
| **Percentage of Total:** | **4.7%** | **95.3%** |

132.    Ivanov's billing records are attached hereto as Exhibit 9.

   **(e)    Obinna Ozigbo**

133.    Obinna Ozigbo ("Ozigbo") is an IPC hospitalist who worked in and around the San Antonio area, and who submitted a billing record for October 13, 2008 that reveals the following information:

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 6 | 70 minutes | 7 hours |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 0 | 25 minutes | 0 |
| 99233 | V3 | 23 | 35 minutes | 13 hours, 25 minutes |
| 99291 | CC30-74 | 6 | 30-74 minutes | 3 hours (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |
| 99239 | D>30 | 2 | More than 30 minutes | 1 hour (assuming 30 minutes per encounter) |
| 99236 | A3/D | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| TOTAL: | | 38 | | 24 hours, 30 minutes |

134. As seen above, on October 13, 2008, Ozigbo not only billed for services that would have taken in excess of 24 hours to perform, but he never used any code other than the highest level CPT Codes for any task he performed.

135.   As seen below, Ozigbo's October 13, 2008 billing record is consistent with Ozigbo's and IPC's pattern and practice:

| Date of Billing Record | Time Required to Perform Services Billed |
|---|---|
| August 10, 2007 | 20 hours, 45 minutes |
| August 29, 2007 | 19 hours, 5 minutes |
| September 8, 2007 | 23 hours, 20 minutes |
| October 13, 2008 | 24 hours, 30 minutes (see above) |
| October 20, 2008 | 24 hours, 45 minutes |

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| August 10, 2007 | 0 | 1 | 7 |
| August 29, 2007 | 0 | 0 | 3 |
| September 8, 2007 | 0 | 0 | 3 |
| October 13, 2008 | 0 | 0 | 6 |
| October 20, 2008 | 0 | 0 | 5 |
| Total: | 0 | 1 | 24 |
| Percentage of Total: | 0% | 4.0% | 96.0% |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| August 10, 2007 | 0 | 3 | 17 |
| August 29, 2007 | 0 | 1 | 19 |
| September 8, 2007 | 0 | 3 | 25 |
| October 13, 2008 | 0 | 0 | 23 |
| October 20, 2008 | 0 | 2 | 25 |
| Total: | 0 | 9 | 109 |
| Percentage of Total: | 0% | 7.6% | 92.4% |

| Date | 99238 (D<30) | 99239 (D>30) |
|------|-------------|-------------|
| August 10, 2007 | 1 | 1 |
| August 29, 2007 | 2 | 5 |
| September 8, 2007 | 0 | 5 |
| October 13, 2008 | 0 | 2 |
| October 20, 2008 | 0 | 7 |
| **Total:** | **3** | **20** |
| **Percentage of Total:** | **13.0%** | **87.0%%** |

136.    Ozigbo's billing records are attached hereto as Exhibit 10.

### (f)    Jesus Virlar

137.    Jesus Virlar ("Virlar") is an IPC hospitalist who worked in and around the San Antonio area, and who submitted a billing record for June 1, 2008 that reveals the following information:

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|----------|----------|----------|-------------------------------|--------------------|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 12 | 70 minutes | 14 hours |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 4 | 25 minutes | 1 hour, 40 minutes |
| 99233 | V3 | 19 | 35 minutes | 11 hours, 5 minutes |
| 99291 | CC30-74 | 2 | 30-74 minutes | 1 hour (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |

| CPT Code | IPC Code | Quantity | Time Required to Complete Task | Time Spent on Code |
|---|---|---|---|---|
| 99239 | D>30 | 5 | More than 30 minutes | 2 hours, 30 minutes (assuming 30 minutes per encounter) |
| 99220 | A2/D | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| 99255 | C4 | 1 | 80 minutes | 1 hour, 20 minutes |
| TOTAL: | | 44 | | 31 hours, 40 minutes |

138. Virlar regularly, including on June 1, 2008, provided services at more than one facility and submitted excessive daily billing totals:

| Date of Billing Record | Time Required to Perform Services Billed |
|---|---|
| July 14, 2007 | 31 hours, 5 minutes |
| July 16, 2007 | 29 hours, 35 minutes |
| August 26, 2007 | 23 hours, 15 minutes |
| September 8, 2007 | 27 hours, 45 minutes |
| February 2, 2008 | 22 hours, 5 minutes |
| June 1, 2008 | 31 hours, 40 minutes (see above) |

139. Virlar's use of the highest level CPT Codes is consistent with IPC's upcoding scheme:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 14, 2007 | 0 | 0 | 6 |
| July 16, 2007 | 0 | 0 | 9 |
| August 26, 2007 | 0 | 0 | 7 |
| September 8, 2007 | 0 | 0 | 7 |

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| February 2, 2008 | 0 | 1 | 3 |
| June 1, 2008 | 0 | 0 | 12 |
| **Total:** | **0** | **1** | **44** |
| **Percentage of Total:** | **0%** | **2.2%** | **97.8%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 14, 2007 | 0 | 13 | 23 |
| July 16, 2007 | 0 | 11 | 15 |
| August 26, 2007 | 0 | 13 | 10 |
| September 8, 2007 | 0 | 13 | 19 |
| February 2, 2008 | 0 | 10 | 13 |
| June 1, 2008 | 0 | 4 | 19 |
| **Total:** | **0** | **64** | **99** |
| **Percentage of Total:** | **0%** | **39.3%** | **60.7%** |

| Date | 99238 (D<30) | 99239 (D>30) |
|---|---|---|
| July 14, 2007 | 1 | 9 |
| July 16, 2007 | 1 | 8 |
| August 26, 2007 | 0 | 5 |
| September 8, 2007 | 0 | 4 |
| February 2, 2008 | 2 | 5 |
| June 1, 2008 | 0 | 5 |
| **Total:** | **4** | **36** |
| **Percentage of Total:** | **10.0%** | **90.0%** |

140.   Virlar's billing records are attached hereto as Exhibit 11.

**(g)     Additional Examples Of IPC Hospitalists Billing For
Services Requiring More Than 24 Hours To Perform**

141.    As seen in the chart below, the six IPC hospitalists discussed above
were not the only IPC hospitalists billing for services performed in one day that required
more than 24 hours to perform:

| IPC Hospitalist | Date of Billing Record | Time Required to Perform Services Billed |
|---|---|---|
| Ravi Santhanam | August 13, 2007 | 24 hours, 25 minutes |
| Timothy Osanma | December 29, 2007 | 29 hours, 10 minutes |
| Dan Muro | June 15, 2008 | 31 hours, 20 minutes |
| Defeng Chen | June 28, 2008 | 24 hours, 10 minutes |
| Michael Fields | July 29, 2007 | 28 hours, 0 minutes |
| Jose Pujol | October 26, 2008 | 24 hours, 15 minutes |

142.    These IPC hospitalists excessively used the highest level CPT Codes
and, like the hospitalists discussed above, their billing records do not include a single entry at
the lowest level CPT Code for either admissions or for subsequent hospital care.

143.    Billing records for Drs. Santhanam, Osanma, Muro, Chen, Fields, and
Pujol are attached hereto as Exhibit 12.

**(h)     Additional Examples Of Excessive Billing**

144.    Each of the examples discussed above involve IPC hospitalists who
submitted billing records that included services that – even using extremely conservative
estimates – could not have been performed in a single day.

145.    The IPC hospitalists listed on the chart below submitted billing records
for services that would have taken an unreasonable amount of time to complete in a single

day, even if the extremely conservative estimates of the time required to perform those services did not exceed 24 hours:

| IPC Hospitalist | Date of Billing Record | Time Required to Perform Services Billed |
|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 20 hours, 30 minutes |
| Vu Vu | August 1, 2007 | 23 hours, 55 minutes |
| Artemio Joel Ramirez | August 19, 2007 | 13 hours, 40 minutes |
| In Seok Park | September 5, 2007 | 20 hours, 50 minutes |
| Kwame Obeng | September 15, 2007 | 14 hours, 20 minutes |
| Orlando Kypuros | February 16, 2008 | 22 hours, 15 minutes |
| Vijaya Rasamallu | August 18, 2008 | 19 hours, 55 minutes |
| Venkata Yerramilli | October 9, 2008 | 20 hours, 0 minutes |

146. The use of more reasonable proxies for the time required to complete the tasks for which these IPC hospitalists billed would push most, if not all, of these estimates in the chart above over the 24-hour threshold. Similarly, accounting for transportation, meals, breaks, and the time required to prepare paperwork would, alone, push many of the estimates in the chart above over the 24-hour threshold.

147. The 24-hour threshold is only relevant because submitting a daily billing record for tasks that could not be completed within a 24-hour period is plainly fraudulent. That does not mean, of course, that daily billing records for tasks that could conceivably have been completed within a 24-hour period were not fraudulent.

148. To the contrary, the billing records for the IPC hospitalists listed in the chart above reveal that they too were using billing patterns consistent with IPC's upcoding scheme:

| IPC Hospitalist | Date of Billing Record | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 0 | 1 | 4 |
| Vu Vu | August 1, 2007 | 0 | 0 | 5 |
| Artemio Joel Ramirez | August 19, 2007 | 0 | 0 | 3 |
| In Seok Park | September 5, 2007 | 0 | 0 | 7 |
| Kwame Obeng | September 15, 2007 | 0 | 0 | 2 |
| Orlando Kypuros | February 16, 2008 | 0 | 0 | 5 |
| Vijaya Rasamallu | August 18, 2008 | 0 | 0 | 8 |
| Venkata Yerramilli | October 9, 2008 | 0 | 0 | 4 |
| **Total:** | | **0** | **1** | **38** |
| **Percentage of Total:** | | **0%** | **2.6%** | **97.4%** |

| IPC Hospitalist | Date of Billing Record | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 0 | 4 | 11 |
| Vu Vu | August 1, 2007 | 1 | 6 | 20 |
| Artemio Joel Ramirez | August 19, 2007 | 0 | 0 | 17 |
| In Seok Park | September 5, 2007 | 0 | 2 | 10 |
| Kwame Obeng | September 15, 2007 | 0 | 2 | 13 |
| Orlando Kypuros | February 16, 2008 | 0 | 8 | 18 |
| Vijaya Rasamallu | August 18, 2008 | 0 | 1 | 13 |
| Venkata Yerramilli | October 9, 2008 | 0 | 0 | 18 |
| **Total:** | | **1** | **23** | **120** |
| **Percentage of Total:** | | **0.7%** | **16.0%** | **83.3%** |

| IPC Hospitalist | Date of Billing Record | 99238 (D<30) | 99239 (D>30) |
|---|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 1 | 6 |
| Vu Vu | August 1, 2007 | 0 | 2 |
| Artemio Joel Ramirez | August 19, 2007 | 0 | 0 |
| In Seok Park | September 5, 2007 | 0 | 7 |
| Kwame Obeng | September 15, 2007 | 0 | 3 |
| Orlando Kypuros | February 16, 2008 | 0 | 5 |
| Vijaya Rasamallu | August 18, 2008 | 0 | 5 |
| Venkata Yerramilli | October 9, 2008 | 0 | 6 |
| **Total:** | | 1 | 34 |
| **Percentage of Total:** | | 2.9% | 97.1% |

149.    These billing patterns are the rule – not the exception – at IPC.

150.    Billing records for Drs. Gonzalez, Vu, Ramirez, Park, Obeng, Kypuros, Rasamallu, and Yerramilli are attached hereto as Exhibit 13.

### (i)    Long-Term Acute Care Facilities

151.    As set forth above, in addition to providing services in hospitals, IPC hospitalists provide services in LTACs.  LTACs typically treat patients that had previously been treated at traditional acute care hospitals, but who need continued observation and care before being completely discharged.  LTAC patients, having already been treated in a traditional acute care hospital, are almost always in stable condition and no longer require intensive diagnostic procedures.  Accordingly, hospitalists treating patients in LTACs should be expected to use lower billing codes much more often than hospitalists treating patients in a traditional hospital setting.

152.    IPC hospitalists working in LTACs, however, are compliant with IPC's upcoding scheme and bill for services provided to stable LTAC patients at disproportionately high levels.

153.    For example, Manju Poovathoor ("Poovathoor") is an IPC hospitalist working in and around the San Antonio area who worked primarily in LTACs.  On July 22, 2007, Poovathoor billed for 24 patient encounters, all for subsequent hospital care (CPT Codes 99231 (V1), 99232 (V2) or 99233 (V3)).  Poovathoor used a CPT Code other than the highest CPT Code only six times.

154.    Similarly, on August 27, 2007, Poovathoor billed 14 of 20 patient encounters at the highest level.

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 22, 2007 | 0 | 6 | 18 |
| August 1, 2007 | 0 | 6 | 14 |
| **Total:** | **0** | **12** | **32** |
| **Percentage of Total:** | **0%** | **27.3%** | **72.7%** |

155.    Poovathoor's billing records are attached hereto as Exhibit 14.

**(2)    Evidence of the Impact of IPC's Training**

156.    The overwhelming evidence of IPC hospitalist upcoding in conjunction with IPC's ability to, and strong financial interest in, monitoring its hospitalists plainly demonstrates that IPC knew about, did not stop, and in fact encouraged its hospitalists to upcode.  The evidence set forth below demonstrates that IPC's training and culture was the cause of the upcoding.

157.    The billing records of hospitalists that joined IPC from practice groups that IPC acquired reveal that when those hospitalists first started at IPC, their billing

-53-

practices were substantially more conservative than those of other IPC hospitalists. Over time, however, as IPC was able to put these newly acquired hospitalists through IPC's training program, these same hospitalists' billing practices changed dramatically.

158. The charts below capture some of the pattern changes, by showing the frequency with which new hospitalists increased their use of higher billing codes over time.

### (a) Edward Sternaman

159. Edward Sternaman ("Sternaman") started working for IPC shortly before July 15, 2007. Sternaman's billing record for July 15, 2007 reveals that – in stark contrast to other IPC hospitalists – Sternaman initially made substantial use of the lower level CPT Codes as seen below:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 15, 2007 | 1 | 4 | 3 |
| **Percentage of Total:** | **12.5%** | **50.0%** | **37.5%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 15, 2007 | 5 | 3 | 1 |
| **Percentage of Total:** | **55.6%** | **33.3%** | **11.1%** |

After IPC had an opportunity to put Sternaman through IPC's training program, Sternaman's billing patterns changed dramatically, as seen below:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| September 15, 2007 | 0 | 0 | 3 |
| October 7, 2007 | 0 | 0 | 1 |
| February 23, 2008 | 0 | 0 | 1 |
| June 26, 2008 | 0 | 0 | 3 |

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 22, 2008 | 0 | 0 | 7 |
| Total: | 0 | 0 | 15 |
| Percentage of Total: | 0% | 0% | 100% |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| September 15, 2007 | 0 | 8 | 12 |
| October 7, 2007 | 0 | 3 | 6 |
| February 23, 2008 | 0 | 4 | 9 |
| June 26, 2008 | 0 | 9 | 16 |
| July 22, 2008 | 0 | 2 | 10 |
| Total: | 0 | 26 | 53 |
| Percentage of Total: | 0% | 32.9% | 67.1% |

160.    Sternaman's billing records are attached hereto as Exhibit 15.

    **(b)    Marium Steele**

161.    Marium Steele ("Steele") started working for IPC shortly before July 11, 2007. Steele's billing record for July 11, 2007, like that of Sternaman when he first started at IPC, reflects the substantial use of the lower level CPT Codes:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 11, 2007 | 1 | 6 | 0 |
| Percentage of Total: | 14.3% | 85.7% | 0% |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 11, 2007 | 5 | 2 | 0 |
| Percentage of Total: | 71.4% | 28.6% | 0% |

162.    By September 2007, Steele's pattern began to conform to IPC's norms:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| September 9, 2007 | 0 | 0 | 6 |
| Percentage of Total: | 0% | 0% | 100% |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| September 9, 2007 | 0 | 10 | 7 |
| Percentage of Total: | 0% | 58.8% | 41.2% |

163.    By 2008, Steele had been fully indoctrinated into IPC's culture:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| April 8, 2008 | 0 | 2 | 5 |
| Percentage of Total: | 0% | 28.6% | 71.4% |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| April 8, 2008 | 0 | 0 | 18 |
| Percentage of Total: | 0% | 0% | 100% |

164.    Steele's billing records are attached hereto as Exhibit 16.

**(c)    Eduardo Uribe**

165.    Eduardo Uribe ("Uribe") also started working for IPC shortly before July 11, 2007.  Uribe's billing record for July 11, 2007 reflects a very high usage of the intermediate level subsequent hospital care CPT Code – 99232 (V2), relative to the highest level subsequent hospital care CPT Code preferred by IPC:

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 11, 2007 | 0 | 14 | 2 |
| Percentage of Total: | 0% | 87.5% | 12.5% |

166.   A few months later, Uribe's billing pattern with respect to the subsequent hospital care CPT Code had been conformed to the other IPC hospitalists pursuant to IPC's upcoding scheme:

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| October 6, 2007 | 0 | 3 | 12 |
| October 7, 2007 | 0 | 2 | 13 |
| December 24, 2007 | 0 | 7 | 14 |
| February 10, 2008 | 0 | 2 | 16 |
| **Total:** | **0** | **14** | **55** |
| **Percentage of Total:** | **0%** | **20.3%** | **79.7%** |

167.   Uribe's billing records are attached hereto as Exhibit 17.

### (d)   Cybele Mathai

168.   Cybele Mathai ("Mathai") started working for IPC shortly before July 21, 2007. Mathai's billing records for July 21 and 22, 2007, like Uribe's, reflect a very high usage of the intermediate level subsequent hospital care CPT Code – 99232 (V2), relative to the highest level subsequent hospital care CPT Code preferred by IPC:

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 21, 2007 | 0 | 16 | 0 |
| July 22, 2007 | 1 | 16 | 0 |
| **Total:** | **1** | **32** | **0** |
| **Percentage of Total:** | **3.0%** | **97.0%** | **0%** |

169.   By September 2007, Mathai's billing practices with respect to the subsequent hospital care CPT Code had reversed themselves:

Case: 1:09-cv-05418 Document #: 1 Filed: 09/01/09 Page 58 of 93 PageID #:58

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| September 15, 2007 | 0 | 1 | 9 |
| **Percentage of Total:** | **0%** | **10.0%** | **90.0%** |

170. Mathai's billing records are attached hereto as Exhibit 18.

      **(e)**    **Dominic Meza**

171. Dominic Meza ("Meza") started working for IPC shortly before November 4, 2007. Meza's billing record for November 4, 2007, reflects the substantial use of the lower level CPT Codes as seen below:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| November 4, 2007 | 0 | 7 | 0 |
| **Percentage of Total:** | **0%** | **100%** | **0%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| November 4, 2007 | 0 | 19 | 0 |
| **Percentage of Total:** | **0%** | **100%** | **0%** |

172. By 2008, Meza too had converted his billing patterns in conformity with the culture at IPC:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| February 10, 2008 | 0 | 3 | 2 |
| **Percentage of Total:** | **0%** | **60.0%** | **40.0%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| February 10, 2008 | 0 | 2 | 16 |
| **Percentage of Total:** | **0%** | **11.1%** | **88.9%** |

173. Meza's billing records are attached hereto as Exhibit 19.

**(f)      Michael Dugo**

174.    Michael Dugo ("Dugo") moonlights at IPC as a part-time hospitalist in San Antonio.  Dugo was not billing at a high level when he first started.

175.    By August 17, 2008, however, IPC told Dugo that if he wanted to continue to work at IPC in a part-time capacity, he had to increase his billings.   Dugo complied:   on August 17, 2008, Dugo billed for 27 patient encounters, all of them at the highest possible level.

176.    Dugo's billing records are attached hereto as Exhibit 20.

**(3)      Billing Pattern Summary**

177.    The impact of IPC's training can readily be seen from a review of the distribution of CPT Code usage in the aggregate.   The combined billing records for Sternaman, Steele, Uribe, Mathai, and Meza show the dramatic increase in the use of higher level CPT Codes:

**Admissions**

| **Before** | **99221** | **99222** | **99223** |
|---|---|---|---|
| Total: | 2 | 17 | 10 |
| **Percentage of Total:** | **6.9%** | **58.6%** | **34.5%** |

| **After** | **99221** | **99222** | **99223** |
|---|---|---|---|
| Total: | 0 | 5 | 51 |
| **Percentage of Total:** | **0%** | **8.9%** | **91.1%** |

**Subsequent Care**

| **Before** | **99231** | **99232** | **99233** |
|---|---|---|---|
| Total: | 11 | 80 | 10 |
| **Percentage of Total:** | **10.9%** | **79.2%** | **9.9%** |

| After | 99231 | 99232 | 99233 |
|---|---|---|---|
| Total: | 0 | 43 | 151 |
| Percentage of Total: | 0% | 22.2% | 77.8% |

**Discharge**

| Before | 99238 | 99239 |
|---|---|---|
| Total: | 14 | 1 |
| Percentage of Total: | 93.3% | 6.7% |

| After | 99238 | 99239 |
|---|---|---|
| Total: | 0 | 39 |
| Percentage of Total: | 0% | 100% |

178.     The billing patterns of these IPC hospitalists, after immersion in IPC's culture, is entirely consistent with the billing patterns of Borra, Ramos, Pulicicchio, Ivanov, Ozigbo, Virlar, Santhanam, Osanma, Muro, Chen, Fields, Pujol, Gonzalez, Vu, Ramirez, Park, Obeng, Kypuros, Rasamallu, Yerramilli, and Poovathoor as reflected in the charts below which summarize 62 billing records for these IPC hospitalists:

| Admissions | 99221 | 99222 | 99223 |
|---|---|---|---|
| Total: | 0 | 23 | 377 |
| Percentage of Total: | 0% | 5.75% | 94.25% |

| Subsequent Care | 99231 | 99232 | 99233 |
|---|---|---|---|
| Total: | 1 | 419 | 1256 |
| Percentage of Total: | 0.1% | 25.0% | 74.9% |

| Discharge | 99238 | 99239 |
|---|---|---|
| Total: | 33 | 334 |
| Percentage of Total: | 9.0% | 91.0% |

C.    **IPC's Scheme Adversely Impacts Patient Care**

179.    IPC's upcoding scheme adversely impacts patient care in a number of ways.

180.    First and foremost, IPC's upcoding practices cost Government medical insurers millions of dollars annually, preventing those programs from covering other, legitimate medical expenses.

181.    IPC's culture, including the pressure it applied to hospitalists to increase their total billing, and IPC's failure to curtail billing irregularities, caused a variety of additional harm to its patients.

182.    For example, many IPC hospitalists saw far more patients in one day than any physician could reasonably treat.    Typically, hospitalists treat about 12 to 20 patients in one day.  Hospitalists can treat up to 35 patients in one day in a professional manner, but are not expected to do so with any regularity.  Many of the IPC hospitalists discussed above, however, are "churning" patients, treating well over 40 in one day.  Those hospitalists necessarily spend less time with their patients and provide a lower standard of care.

183.    Indeed, Borra submitted a bill for treating 65 patients on April 5, 2008. Assuming Borra worked without any break for 24 straight hours, he would have spent, on average, only 22 minutes treating each patient.  Similarly, on November 22, 2008, Ramos

submitted a bill for treating 55 patients, giving Ramos an average of 26 minutes per patient encounter, again assuming not a single break for 24 hours.

184. One result of patient "churning" is a decrease in the quality of medical documentation. Government medical insurers require physicians to provide documentation sufficient to show that the claimed services were actually provided, and that they were medically necessary. IPC hospitalists failed to provide appropriate documentation of the services they allegedly provide.

185. At one point, Oughatiyan saw a patient that previously had been discharged by Steele (in 2008, after she had been assimilated into IPC's culture). The discharge summary Steele prepared was so bereft of the information that ordinarily would appear in a discharge summary, that Oughatiyan was forced to conduct a more thorough examination of the patient than he otherwise would have had to perform, wasting the patient's time and creating additional, unnecessary cost. A copy of the discharge summary prepared by Steele is attached hereto as Exhibit 21.

186. Another risk to patients is the unsupervised use of physician assistants. Because of physician shortages, IPC encourages its hospitalists to use physician assistants to increase the total number of patients that IPC can treat. To do so, IPC pays its hospitalists additional bonuses based upon the billings of the physician assistants the hospitalist supervises. These physician assistants engage in the same upcoding practices as hospitalists. For example, on July 15, 2007, IPC physician assistant Robert Valdespino ("Valdespino") submitted a billing record revealing that, of the 20 patients he treated for subsequent hospital care – CPT Code 99231-33 (V1-V3) – 19 were billed at the highest CPT Code level.

Valdespino's billing records are attached hereto as Exhibit 22. Moreover, these physician's assistants often work unsupervised, jeopardizing patients' health.

187. Finally, IPC's upcoding scheme has created a culture that emphasizes and rewards the quantity of patients treated, rather than the quality of care each patient receives. That culture has led to instances of IPC hospitalists billing for treating patients that were never even seen. Several IPC hospitalists in the San Antonio area were aware that Aguirre, one of IPC's Medical Directors, regularly billed for patients that he never saw. Aguirre's billing records are attached hereto as Exhibit 23.

188. IPC submitted claims for payment to the Government with respect to each of the IPC hospitalists described in this Complaint.

189. Oughatiyan never had one of the bills submitted to IPC for submission to the Government for payment questioned, adjusted, rejected or returned to him by IPC for any reason, and none of the hospitalists with whom Oughatiyan worked ever reported to Oughatiyan that IPC had questioned, adjusted, rejected or returned any of the billing records they submitted though IPC-Link for submission to the Government for payment.

190. IPC hospitalists, including Oughatiyan, enter patient information in IPC-Link, often including health insurance information. The overwhelming majority of patients over age 65 in the San Antonio area were Medicare patients.

191. IPC's practices are nationwide, as evidenced by the following facts: IPC's training staff serves IPC's hospitalists nationwide; IPC's compensation program applies to all IPC hospitalists; IPC's monitoring capabilities cover IPC's hospitalists nationwide; IPC applies uniform policies nationwide; and IPC encourages its hospitalists to increase their total billings by comparing them to other IPC hospitalists from around the country.

## COUNT I
### (Violation of the Federal False Claims Act)

192.     Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 191 of this Complaint as though fully set forth herein.

193.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

194.     Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who –

> (1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .
>
> (7)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . .

195.     On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

> (1)     any person who –
>
> > (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> >
> > (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .

196.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(A), as amended on May 20, 2009.

197.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B), as amended on May 20, 2009.

198.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the United States Government by knowingly presenting, or causing to be presented to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(3) and continue to do so in violation of 31 U.S.C. § 3729(a)(1)(C), as amended on May 20, 2009.

199. Defendants also conspired among themselves and IPC hospitalists to defraud the United States Government by knowingly making, using or causing to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(3) and, upon information and belief, continue to do so in violation of 31 U.S.C. § 3729(a)(1)(C), as amended on May 20, 2009.

200. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(1)(G), as amended on May 20, 2009.

201. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

202. The United States Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

203. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT II
### (Violation of the California False Claims Act)

204.     Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 203 of this Complaint as though fully set forth herein.

205.     This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code §§ 12650, *et seq.*

206.     Cal. Gov't Code § 12651(a) provides liability for any person who –

(1)     Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

(3)     Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

207.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of California or a political subdivision thereof, false claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

208.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the State of California or a political subdivision thereof in violation of Cal. Gov't Code § 12651(a)(2).

209.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of California or a political subdivision thereof by getting a false claim allowed or paid by the State of California or a political subdivision thereof in violation of Cal. Gov't Code § 12651(a)(3).

210.    Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

211.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

212.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT III
### (Violation of the Delaware False Claims and Reporting Act)

213.    Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 212 of this Complaint as though fully set forth herein.

214.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201, *et seq.*

215.    Del. Code Ann. tit. 6, § 1201(a) provides liability for any person who –

(1)    Knowingly presents, or causes to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)    Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .

216.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Delaware false or fraudulent claims for payment or approval in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

217.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

218.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of Delaware by getting false or fraudulent claims allowed or paid by the State of Delaware in violation of Del. Code Ann. tit. 6, § 1201(a)(3).

219.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

220.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

-69-

Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

221. By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT IV
### (Violation of the Florida False Claims Act)

222. Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 221 of this Complaint as though fully set forth herein.

223. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.*

224. Fla. Stat. § 68.082(2) provides liability for any person who –

   (a) Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

   (b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

   (c) Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid . . .

225. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers or employees of an agency of the State of Florida false or fraudulent claims for payment or approval in violation of Fla. Stat. § 68.082(2)(a).

226. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements

to get false or fraudulent claims paid or approved by an agency of the State of Florida in violation of Fla. Stat. § 68.082(2)(b).

227.   Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to submit a false or fraudulent claim to an agency of the State of Florida or to deceive an agency of the State of Florida for the purpose of getting a false or fraudulent claim allowed or paid in violation of Fla. Stat. § 68.082(2)(c).

228.   Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

229.   The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

230.   By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### COUNT V
### (Violation of the Georgia False Medicaid Claims Act)

231.   Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 230 of this Complaint as though fully set forth herein.

232.   This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168, *et seq.*

233.    Ga. Code Ann. § 49-4-168.1 provides liability for any person who –

   (1)    Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

   (2)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

   (3)    Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid . . .

234.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Georgia Medicaid program false or fraudulent claims for payment or approval in violation of Ga. Code Ann. § 49-4-168.1(1).

235.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program in violation of Ga. Code Ann. § 49-4-168.1(2).

236.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the Georgia Medicaid program by getting false or fraudulent claims paid or approved by the Georgia Medicaid program in violation of Ga. Code Ann. § 49-4-168.1(3).

237.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

238.   The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

239.   By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT VI
### (Violation of the Illinois Whistleblower Reward and Protection Act)

240.   Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 239 of this Complaint as though fully set forth herein.

241.   This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*

242.   Section 3 of the Illinois Whistleblower Reward and Protection Act provides liability for any person who –

> (1)   knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

> (2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

> (3)   conspires to defraud the State by getting a false or fraudulent claim allowed or paid . . .

243.   Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents

of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(1).

244.   Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(2).

245.   Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of Illinois by getting false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(3).

246.   Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

247.   The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

248.   By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT VII
### (Violation of the Massachusetts False Claims Act)

249.    Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 248 of this Complaint as though fully set forth herein.

250.    This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5, *et seq.*

251.    Mass. Gen. Laws ch. 12, § 5B provides liability to any person who –

    (1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

    (3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim . . .

252.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the Commonwealth of Massachusetts, or a political subdivision thereof, false or fraudulent claims for payment or approval in violation of Mass. Gen. Laws ch. 12, § 5B(1).

253.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to obtain payment or approval of a claim by the Commonwealth of Massachusetts, or a political subdivision thereof, in violation of Mass. Gen. Laws ch. 12, § 5B(2).

254.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the

Commonwealth of Massachusetts, or a political subdivision thereof, through the allowance or payment of a fraudulent claim in violation of Mass. Gen. Laws ch. 12, § 5B(3).

255. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

256. The Commonwealth of Massachusetts, unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants which resulted in the Commonwealth of Massachusetts being damaged, in an amount to be established at trial.

257. The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

258. By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT VIII
### (Violation of the Michigan Medicaid False Claims Act)

259. Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 258 of this Complaint as though fully set forth herein.

260. This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601, *et seq.*

261. Mich. Comp. Laws § 400.607 provides, in part, that:

(1) A person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false.

262. Mich. Comp. Laws § 400.606 provides, in part, that:

(1) A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws.

263. Through the acts described above, Defendants and their agents and employees knowingly made or presented, or caused to be made or presented, to employees, officers, or agents of the State of Michigan a claim under the Michigan Social Welfare Act, upon or against the State of Michigan, knowing the claim to be false, in violation of Mich. Comp. Laws § 400.607.

264. Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of Michigan obtaining or aiding another to obtain the payment or allowance of a false claim under the Michigan Social Welfare Act in violation of Mich. Comp. Laws § 400.606.

265. Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

266. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

267. By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT IX
### (Violation of the Nevada Submission of False Claims to State or Local Government Act)

268. Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 267 of this Complaint as though fully set forth herein.

269. This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010, *et seq.*

270. Nev. Rev. Stat. § 357.040(1) provides liability to any person who –

    (a)    Knowingly presents or causes to be presented a false claim for payment or approval.

    (b)    Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim.

    (c)    Conspires to defraud by obtaining allowance or payment of a false claim.

271. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Nevada false claims for payment or approval in violation of Nev. Rev. Stat. § 357.040(1)(a).

272.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to obtain payment or approval of a false claim in violation of Nev. Rev. Stat. § 357.040(1)(b).

273.     Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of Nevada by obtaining allowance or payment of a false claim in violation of Nev. Rev. Stat. § 357.040(1)(c).

274.     Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

275.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

276.     By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT X
### (Violation of the New Hampshire False Claims Act)

277.     Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 276 of this Complaint as though fully set forth herein.

278.    This is a claim for treble damages and civil penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §§ 167:61, *et seq.*

279.    N.H. Rev. Stat. Ann. § 167:61-b(I) provides liability to any person who –

    (a)    Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

    (b)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.

    (c)    Conspires to defraud the department by getting a false or fraudulent claim allowed or paid.

280.    Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of New Hampshire false or fraudulent claims for payment or approval in violation of N.H. Rev. Stat. Ann. §§ 167:61-b(I)(a).

281.    Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Hampshire in violation of N.H. Rev. Stat. Ann. §§ 167:61-b(I)(b).

282.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of New Hampshire by getting false or fraudulent claims allowed or paid by the State of New Hampshire in violation of N.H. Rev. Stat. Ann. §§ 167:61-b(I)(c).

283.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

284.    The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

285.    By reason of Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### COUNT XI
### (Violation of the New Jersey False Claims Act)

286.    Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 285 of this Complaint as though fully set forth herein.

287.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*

288.    N.J. Stat. Ann. § 2A:32C-3 provides liability to any person who –

    a.    Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

    b.    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    c.    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State . . .

289.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to employees, officers, or agents of the State of New Jersey, or to any contractor, grantee, or other recipient of New Jersey state funds, false or fraudulent claims for payment or approval in violation of N.J. Stat. Ann. §§ 2A:32C-3(a).

290.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey in violation of N.J. Stat. Ann. §§ 2A:32C-3(b).

291.     Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State of New Jersey by getting false or fraudulent claims allowed or paid by the State of New Jersey in violation of N.J. Stat. Ann. §§ 2A:32C-3(c).

292.     Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

293.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

294.     By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XII
### (Violation of the Oklahoma Medicaid False Claims Act)

295.     Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 294 of this Complaint as though fully set forth herein.

296.     This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §§ 5053, *et seq.*

297.     Okla. Stat. tit. 63 § 5053.1(B) provides liability to any person who –

    1.     Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

    2.     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

    3.     Conspires to defraud the state by getting a false or fraudulent claim allowed or paid . . .

298.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Oklahoma false or fraudulent claims for payment or approval in violation of Okla. Stat. tit. 63 § 5053.1(B)(1).

299.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma in violation of Okla. Stat. tit. 63 § 5053.1(B)(2).

300.     Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State

of Oklahoma by getting false or fraudulent claims allowed or paid by the State of Oklahoma in violation of Okla. Stat. tit. 63 § 5053.1(B)(3).

301.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

302.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

303.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XIII
### (Violation of the Tennessee Medicaid False Claims Act)

304.    Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 303 of this Complaint as though fully set forth herein.

305.    This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*

306.    Tenn. Code Ann. § 71-5-182(a)(1) provides liability to any person who –

> (A)    Presents, or causes to be presented, to the state a claim for payment under the medicaid program knowing such claim is false or fraudulent;

> (B)    Makes, uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the

medicaid program paid for or approved by the state
knowing such record or statement is false;

(C)     Conspires to defraud the state by getting a claim allowed
or paid under the medicaid program knowing such claim
is false or fraudulent . . .

307.    Through the acts described above, Defendants and their agents and
employees presented, or caused to be presented, to officers, employees, or agents of the State
of Tennessee claims for payment under the Tennessee Medicaid program knowing such
claims were false or fraudulent, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

308.    Through the acts described above, Defendants and their agents and
employees made, used, or caused to be made or used, false records or statements to get false
or fraudulent claims under the Tennessee Medicaid program paid for or approved by the
State of Tennessee knowing such records or statements to be false, in violation of
Tenn. Code Ann. § 71-5-182(a)(1)(B).

309.    Through the acts described above and otherwise, Defendants entered
into a conspiracy or conspiracies among themselves and IPC hospitalists to defraud the State
of Tennessee by getting claims allowed or paid under the Tennessee Medicaid program
knowing such claims were false or fraudulent, in violation of Tenn. Code Ann.
§ 71-5-182(a)(1)(C).

310.    Defendants knew that these claims for payment were false or
fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in
reckless disregard of whether said claims were true or false.

311.    The Tennessee State Government, unaware of the falsity of the records,
statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

      312.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XIV
### (Violation of the Texas Medicaid Fraud Protection Act)

      313.    Plaintiff-Relator Oughatiyan realleges and incorporates by reference the allegations made in Paragraph 1 through 312 of this Complaint as though fully set forth herein.

      314.    This is a claim for double damages and civil penalties under the Texas Medicaid Fraud Protection Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

      315.    Tex. Hum. Res. Code Ann. § 36.002 provides liability to any person who –

    (1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    (2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    . . .

    (4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

    . . .

(B)  information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

. . .

(7)  knowingly makes a claim under the Medicaid program for:

. . .

(B)  a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

. . .

(9)  knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

316. Through the acts described above, Defendants and their agents and employees knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit Defendants to receive payments under the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

317. Through the acts described above, Defendants and their agents and employees knowingly concealed or failed to disclose information that permitted Defendants to receive payments under the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

318.    Through the acts described above, Defendants and their agents and employees knowingly made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Texas Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

319.    Through the acts described above, Defendants and their agents and employees knowingly made claims under the Texas Medicaid program for services that were substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(B).

320.    Through the acts described above and otherwise, Defendants entered into one or more agreements, combinations or conspiracies among themselves and IPC hospitalists to defraud the State of Texas by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Texas Medicaid program or a fiscal agent, in violation of Tex. Hum. Res. Code Ann. § 36.002(9).

321.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

322.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

323. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Plaintiff-Relator Bijan Oughatiyan, on behalf of the United States of America and the States of California, Delaware, Florida, Georgia, Illinois, Massachusetts, Michigan, Nevada, New Hampshire, New Jersey, Oklahoma, Tennessee, and Texas demands that judgment be entered against Defendants IPC The Hospitalist Company, Inc., a California corporation; IPC Hospitalists of Colorado, Inc., a Colorado corporation; IPC The Hospitalist Management Company, LLC, a Delaware limited liability company; InPatient Consultants of Alabama, Inc., an Alabama corporation; InPatient Consultants of Delaware, Inc., d/b/a IPC of Delaware, a Delaware corporation; InPatient Consultants of Florida, Inc., d/b/a IPC of Florida and IPC of Florida, Inc., a Florida corporation; InPatient Consultants of Kentucky, Inc., a Kentucky corporation; InPatient Consultants of Missouri, Inc., d/b/a IPC of Missouri, a Missouri corporation; InPatient Consultants of Mississippi, Inc., a Mississippi corporation; InPatient Consultants of Utah, Inc., d/b/a IPC of Utah, a Utah corporation; Hospitalists, Inc., d/b/a Hospitalists of California, Inc., a California corporation; Hospitalists Management of New Hampshire, Inc., a New Hampshire corporation; Hospitalists of Arizona, Inc., an Arizona corporation; Hospitalists of Illinois, Inc., an Illinois corporation; Hospitalists of Georgia, Inc., a Georgia corporation; Hospitalists of Maryland, Inc., a Maryland corporation; Hospitalists of Michigan, Inc., a Michigan corporation; Hospitalists of North Carolina, Inc., a North Carolina corporation; Hospitalists of Nevada, Inc., a Missouri corporation; Hospitalists of Ohio, Inc., an Ohio corporation; Hospitalists of Pennsylvania, Inc., a Pennsylvania corporation; Hospitalists of South Carolina, Inc., a South Carolina corporation; Hospitalists of Tennessee, Inc., a Tennessee corporation;

Hospitalists of Texas, L.P., a California limited partnership; Hospitalist Services of Florida, Inc., a Florida corporation; and InPatient Consultants of Wyoming, LLC, a Wyoming limited liability company, ordering that:

As to the Federal Claims:

(a)     Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained as a result of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729(a);

(b)     Relator be awarded his relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(c)     Relator be awarded all costs and expenses of this action, including attorney's fees pursuant to 31 U.S.C. § 3730(d); and

(d)     Relator and the United States of America be awarded such other and further relief as the Court may deem to be just and proper.

As to the State Claims:

(e)     Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a

result of Defendant's actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State, all as provided by: Cal. Gov't Code § 12651; Del. Code Ann. tit. 6, § 1201; Fla. Stat. § 68.082; Ga. Code Ann. § 49-4-168.1(a); 740 Ill. Comp. Stat. 175/3; Mass. Gen. Laws ch. 12, § 5B.; Mich. Comp. Laws § 400.612; Nev. Rev. Stat. § 357.040; N.H. Rev. Stat. Ann. § 167:61-b; N.J. Stat. Ann. § 2A:32C-3; Okla. Stat. Ann. tit. 63 § 5053.1(B); and Tenn. Code Ann. § 71-5-182;

(f)     Relator and Plaintiff State of Texas be awarded statutory damages in an amount equal to two times the amount of actual damages that Texas has sustained as a result of Defendant's actions, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.002;

(g)     Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to: Cal. Gov't Code § 12652(g); Del. Code Ann. tit. 6, § 1205; Fla. Stat. § 68.085; Ga. Code Ann. § 49-4-168.2(i); 740 Ill. Comp. Stat. 175/4(d); Mass. Gen. Laws ch 12, § 5F.; Mich. Comp. Laws § 400.610a; Nev. Rev. Stat. § 357.210; N.H. Rev. Stat. Ann. § 167:61-e; N.J. Stat.

Ann. § 2A:32C-7; Okla. Stat. Ann. tit. 63 § 5053.4; Tenn. Code Ann. § 71-5-183(d); and Tex. Hum. Res. Code Ann. § 36.110;

(h)     Relator be awarded all costs and expenses associated with each of the pendent State claims, plus attorney's fees, as provided pursuant to: Cal. Gov't Code § 12652(g)(8); Del. Code Ann. tit. 6, § 1205; Fla. Stat. § 68.086; Ga. Code Ann. § 49-4-168.2(i); 740 Ill. Comp. Stat. 175/4(d); Mass. Gen. Laws ch. 12, § 5F.; Mich. Comp. Laws § 400.610a; Nev Rev. Stat. § 357.180; N.H, Rev. Stat. Ann. § 167:61-e; N.J. Stat. Ann. § 2A:32C-8; Okla. Stat. Ann. tit. 63 § 5053.4; Tenn. Code Ann. § 71-5-183(d); Tex. Hum. Res. Code Ann. § 36.110; and

(i)     Relator and the State Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

## **TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.


Dated:  September 1, 2009                    Respectfully submitted,

                                             BIJAN OUGHATIYAN

                                             By _____

                                             Frederick H. Cohen
                                             David J. Chizewer
                                             Matthew K. Organ
                                             GOLDBERG KOHN BELL BLACK
                                               ROSENBLOOM & MORITZ, LTD.
                                             55 East Monroe Street
                                             Suite 3300
                                             Chicago, Illinois  60603
                                             (312) 201-4000
                                             Attorneys for Plaintiff-Relator Bijan Oughatiyan