UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* BIJAN OUGHATIYAN,<br><br>               Plaintiff,<br><br>               v.<br><br>IPC THE HOSPITALIST COMPANY, INC., a Delaware corporation; IPC THE HOSPITALIST MANAGEMENT COMPANY, LLC, a Delaware limited liability company; INPATIENT CONSULTANTS OF ALABAMA, INC., an Alabama corporation; HOSPITALISTS OF ARIZONA, INC., d/b/a HOSPITALISTS OF ARIZONA and INPATIENT CONSULTANTS OF ARIZONA, an Arizona corporation; HOSPITALISTS OF CALIFORNIA, LLC, a California limited liability company; INPATIENT CONSULTANTS OF CALIFORNIA, INC., a California corporation; IPC HOSPITALISTS OF COLORADO, INC., a Colorado corporation; INPATIENT CONSULTANTS OF DELAWARE, INC., d/b/a IPC OF DELAWARE, a Delaware corporation; INPATIENT CONSULTANTS OF FLORIDA, INC., d/b/a IPC OF FLORIDA and  IPC OF FLORIDA, INC., a Florida corporation;  HOSPITALIST SERVICES OF FLORIDA, INC., a Florida corporation; HOSPITALISTS OF GEORGIA, INC., a Georgia corporation; HOSPITALISTS OF ILLINOIS, INC., an Illinois corporation; HOSPITALISTS OF KENTUCKY, INC., a Kentucky corporation; INPATIENT CONSULTANTS OF MISSOURI, INC., d/b/a IPC OF MISSOURI, a Missouri corporation; INPATIENT CONSULTANTS OF MISSISSIPPI, INC., a Mississippi corporation; HOSPITALISTS OF MARYLAND, INC., a Maryland corporation; HOSPITALISTS OF MICHIGAN, INC., a Michigan corporation; HOSPITALISTS OF NEVADA, INC., a Missouri corporation;  HOSPITALISTS MANAGEMENT OF NEW HAMPSHIRE, INC., a New Hampshire corporation; IPC HOSPITALISTS OF NEW MEXICO, INC., a New Mexico corporation; IPC MANAGEMENT CONSULTANTS OF NEW YORK, INC., a New York corporation; HOSPITALIST MANAGEMENT | No. 09 C 5418<br><br>Judge Lefkow<br><br>JURY TRIAL DEMANDED |

CONSULTANTS OF NEW YORK, INC., a New York )
corporation; HOSPITALISTS OF NORTH CAROLINA, )
INC., a North Carolina corporation; HOSPITALISTS OF )
OHIO, INC., an Ohio corporation; HOSPITALISTS OF )
PENNSYLVANIA, INC., a Pennsylvania corporation; )
HOSPITALISTS OF SOUTH CAROLINA, INC., a South )
Carolina corporation; HOSPITALISTS OF TENNESSEE, )
INC., a Tennessee corporation; HOSPITALISTS OF )
TEXAS, L.P., a California limited partnership; INPATIENT )
CONSULTANTS OF UTAH, INC., d/b/a IPC OF UTAH, a )
Utah corporation; and INPATIENT CONSULTANTS OF )
WYOMING, LLC, d/b/a IPC OF WYOMING, LLC, )
a Wyoming limited liability company, )
)
               Defendants. )
)

## UNITED STATES' COMPLAINT IN INTERVENTION

Plaintiff, the United States of America, by and through its undersigned counsel, states as follows:

## INTRODUCTION

1.      This is an action brought by plaintiff, the United States of America (United States or Government), by the Department of Justice and the United States Attorney's Office for the Northern District of Illinois, on behalf of the Department of Health and Human Services (HHS), Tricare Management Agency (TRICARE), the Office of Personnel Management Federal Employees Health Benefits Program (FEHBP), and the Railroad Retirement Board (RRB) to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 (FCA), and to recover damages under the common law theories of payment by mistake and

unjust enrichment, from defendants IPC The Hospitalist Company, Inc., a California corporation, and other defendants as listed below.

2.      The FCA provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, submits or causes to be submitted a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained because of the false claim. The FCA allows any person having knowledge of a false or fraudulent claim against the United States to bring an action for himself and for the United States, and to share in any recovery. The party bringing the action is known as a relator and the action that a relator brings is called a *qui tam* action.

3.      Relator, Bijan Oughatiyan, originally filed this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).

4.      The United States files this Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A).

5.      From January 1, 2003, through the present (the "relevant period"), IPC The Hospitalist Company, Inc. and its affiliates and subsidiaries named below (collectively, IPC) knowingly and systematically billed Medicare and Medicaid, and other federal payors including TRICARE, FEHBP, and the RRB, for higher and more expensive levels of medical service than were actually performed.

3

6.     IPC is one of the largest hospitalist companies in the United States and employs approximately 2,500 hospitalists in 28 states.   Hospitalists are medical professionals whose primary focus is the general medical care of hospitalized patients.

7.     Throughout the relevant period, IPC engaged in a false and/or fraudulent scheme whereby it knowingly allowed and/or encouraged its hospitalists to submit records to IPC billing departments claiming higher and more expensive levels of medical service than were actually performed — a practice commonly referred to as "upcoding."

8.     IPC then submitted the upcoded claims for payment to Medicare, Medicaid and other federal payors.

9.     IPC's upcoding scheme has, and still continues, to cause Medicare, Medicaid and other federal payors to overpay millions of dollars to IPC.

10.     Had the United States been aware of IPC's upcoding, it would not have paid the claims submitted by IPC.

## JURISDICTION AND VENUE

11.     This action arises under the FCA, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment.   This court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

12.     This court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because this provision of the FCA allows suit to be filed in any district in which at

4

least one defendant transacts business and authorizes nationwide service of process on all defendants.

13.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

## PARTIES

14.     Plaintiff, the United States of America, acting through HHS, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§1395 *et seq*., (Medicare), and the Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq*., (Medicaid). The United States also funds additional health insurance and benefits programs including the TRICARE Program, 10 U.S.C. §§ 1071-1110a, the Federal Employee Health Benefits Program, 5 U.S.C. §§ 8901-8914; and the Railroad Retirement Medicare Program, administered under the Railroad Retirement Act of 1974, 45 U.S.C. §§ 231-231v, by the United States Railroad Retirement Board (collectively, other federal programs).

15.     Relator Bijan Oughatiyan (Relator) resides in Dallas, Texas, and was employed by IPC as a hospitalist from 2003 through November 2008.  Relator brought this action for violations of the FCA on behalf of himself and the United States.

16.     Defendant IPC The Hospitalist Company, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in North Hollywood, California.  IPC The Hospitalist Company, Inc., transacts business and, through various affiliates and

5

subsidiaries, provides medical services to patients covered by Medicare, Medicaid and other federal programs in Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Kansas, Idaho, Illinois, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wyoming. IPC The Hospitalist Company, Inc. provides all of the non-medical, administrative and management services — including billing services — necessary for the operations of each of its subsidiaries and affiliates pursuant to management agreements.

17.     Defendant IPC The Hospitalist Management Company, LLC, is a limited liability company organized under the laws of Delaware, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

18.     Defendant InPatient Consultants of Alabama, Inc., is a corporation organized under the laws of Alabama, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

19.     Defendant Hospitalists of Arizona, Inc., d/b/a Hospitalists of Arizona and InPatient Consultants of Arizona, is a corporation organized under the laws of Arizona, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

20.     Defendant Hospitalists of California, LLC, is a limited liability company organized under the laws of California, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

21.     Defendant Inpatient Consultants of California, Inc., is a corporation organized under the laws of California, and a subsidiary of IPC the Hospitalist Company, Inc. that employs hospitalists.

22.     Defendant IPC Hospitalists of Colorado, Inc., is a corporation organized under the laws of Colorado, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

23.     Defendant InPatient Consultants of Delaware, Inc., d/b/a IPC of Delaware, is a corporation organized under the laws of Delaware, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

24.     Defendant InPatient Consultants of Florida, Inc., d/b/a IPC of Florida and IPC of Florida, Inc., is a corporation organized under the laws of Florida, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

25.     Defendant Hospitalists Services of Florida, Inc., is a corporation organized under the laws of Florida, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

26.     Defendant Hospitalists of Georgia, Inc., is a corporation organized under the laws of Georgia, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

27.     Defendant Hospitalists of Illinois, Inc., is a corporation organized under the laws of Illinois, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

28.     Defendant Hospitalists of Kentucky, Inc., is a corporation organized under the laws of Kentucky, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

29.     Defendant Hospitalists of Maryland, Inc., is a corporation organized under the laws of Maryland, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

30.     Defendant Hospitalists of Michigan, Inc., is a corporation organized under the laws of Michigan, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

31.     Defendant InPatient Consultants of Mississippi, Inc., is a corporation organized under the laws of Mississippi, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

32.     Defendant InPatient Consultants of Missouri, Inc., d/b/a IPC of Missouri, is a corporation organized under the laws of Missouri, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

33.     Defendant Hospitalists of Nevada, Inc., is a corporation organized under the laws of Missouri, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

34.     Defendant Hospitalists Management of New Hampshire, Inc. is a corporation organized under the laws of New Hampshire, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

8

35.    Defendant IPC Hospitalists of New Mexico, Inc., is a corporation organized under the laws of New Mexico, and a subsidiary of IPC The Hospitalist Company, Inc., that employs hospitalists.

36.    Defendant IPC Management Consultants of New York, Inc., is a corporation organized under the laws of New York, and a subsidiary of IPC The Hospitalist Company, Inc., that employs hospitalists.

37.    Hospitalist Management Consultants of New York, Inc. is a corporation organized under the laws of New York, and a subsidiary of IPC The Hospitalist Company, Inc., that employs hospitalists.

38.    Defendant Hospitalists of North Carolina, Inc., is a corporation organized under the laws of North Carolina, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

39.    Defendant Hospitalists of Ohio, Inc., is a corporation organized under the laws of Ohio, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

40.    Defendant Hospitalists of Pennsylvania, Inc., is a corporation organized under the laws of Pennsylvania, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

41.    Defendant Hospitalists of South Carolina, Inc., is a corporation organized under the laws of South Carolina, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

42.     Defendant Hospitalists of Tennessee, Inc., is a corporation organized under the laws of Tennessee, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

43.     Defendant Hospitalists of Texas, L.P., is a limited partnership organized under the laws of California, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

44.     Defendant InPatient Consultants of Utah, Inc., d/b/a IPC of Utah, is a corporation organized under the laws of Utah, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

45.     Defendant InPatient Consultants of Wyoming, LLC, d/b/a IPC of Wyoming, LLC is a limited liability company organized under the laws of Wyoming, and a subsidiary of IPC The Hospitalist Company, Inc. that employs hospitalists.

## THE FALSE CLAIMS ACT

46.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States, or knowingly using a false record or statement material to get false claims paid by the United States.  31 U.S.C. § 3729(a)(1)(2008) and (a)(1)(B)(2009).  The FCA provides that any person who:

> (a)(1) knowingly presents, or causes to be presented, to an officer or  employee of the United States Government or a member of the

10

Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;[1]

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information —

    (1) has actual knowledge of the information;

    (2) acts in deliberate ignorance of the truth or falsity of the information; or

    (3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a), (b) (FCA, pre-2009 amendments). The False Claims Act was amended by

the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21. 31 U.S.C.

---

[1] Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), amended The False Claims Act on May 20, 2009. Section 4(f) of FERA set forth that Section 3729(a)(1)(B) "shall take effect as if enacted on June 7, 2008 and apply to all claims under the False Claims Act that are pending on or after that date." Section 4(F) of FERA is limited to Section 3729(a)(1)(B), so Section 3279(a)(1) of the statute prior to FERA remains applicable here.

§ 3729(a)(1)(A), (B) (reflecting changes to the wording of the pre-2009 FCA provisions previously found at 31 U.S.C. § (a)(1), (2) and (3)).

47.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, *47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.  *See also* 28 C.F.R. § 85.3(a)(9)(detailing current civil penalties of not less than $5,500 and not more than $11,000 for violations of the FCA).

## FEDERAL HEALTHCARE PROGRAMS AND AGENCIES

### Medicare

48.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A. Part B of the Medicare Program authorizes payment of federal funds for medical and other health services, including without limitation physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services.

49.    HHS is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

50.     Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program.  In order to be eligible for payment under the program, physicians must certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . .  The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Forms 855I.

51.     IPC is reimbursed for the Medicare services provided by its hospitalists based upon the rates in Medicare's physician Fee Schedule (the Fee Schedule), which is updated annually.

52.     The Fee Schedule is based upon various codes found in the American Medical Association's (AMA) Current Procedural Terminology (CPT) codes that correspond to the level of service provided.

53.     The fees Medicare pays for services vary depending upon the complexity of the service provided and the amount of time expended in providing the service.  Reimbursement rates for Medicare are thus based upon the level of service provided by IPC hospitalists.

54.     The following chart lists the CPT codes most frequently billed by IPC for admissions, subsequent hospital care, and discharge services; an internal IPC code or

"shorthand" used by hospitalists that corresponds to that CPT code; reimbursement rates representing the average reimbursement rate for the designated codes from 2003 through 2011 in the localities where IPC did business during that period; and a description of services required to be provided in order to charge for the particular CPT code. The CPT code descriptions used by Medicare are generally followed by other federal payors.

55. Reimbursement rates vary geographically.

| CPT Code | IPC Code | Payment | Description of Services Provided |
|---|---|---|---|
| 99221 | A1 | $82.16 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components: a detailed or comprehensive history; a detailed or comprehensive examination; and medical decision-making that is straightforward or of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the problem(s) requiring admission are of low severity. **Physicians typically spend 30 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99222 | A2 | $121.40 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components: a detailed or comprehensive history; a detailed or comprehensive examination; and medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the problem(s) requiring admission are of moderate severity. **Physicians typically spend 50 minutes at the bedside and on the patient's hospital floor or unit.** |

| CPT Code | IPC Code | Payment | Description of Services Provided |
|---|---|---|---|
| 99223 | A3 | $174.35 | Initial hospital care, per day, for the evaluation and management of a patient, which requires these 3 key components:  a detailed or comprehensive history; a detailed or comprehensive examination; and medical decision-making of high complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the problem(s) requiring admission are of high severity.  **Physicians typically spend 70 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99231 | V1 | $36.25 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components:  a problem focused interval history; a problem focused examination; medical decision making that is straightforward or of low complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the patient is stable, recovering or improving.  **Physicians typically spend 15 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99232 | V2 | $62.86 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components:  an expanded problem focused interval history; an expanded problem focused examination; medical decision making of moderate complexity.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the patient is responding inadequately to therapy or has developed a minor complication.  **Physicians typically spend 25 minutes at the bedside and on the patient's hospital floor or unit.** |

15

| CPT Code | IPC Code | Payment | Description of Services Provided |
|---|---|---|---|
| 99233 | V3 | $89.81 | Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: a detailed interval history; a detailed examination; medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the patient is unstable or has developed a significant complication or a significant new problem. **Physicians typically spend 35 minutes at the bedside and on the patient's hospital floor or unit.** |
| 99238 | D<30 | $69.80 | Hospital discharge day management; **30 minutes or less** |
| 99239 | D>30 | $98.56 | Hospital discharge day management; **more than 30 minutes** |

56.     Since 2003, IPC has submitted and/or caused the submission of claims for inpatient services purportedly provided to Medicare Part B beneficiaries.

### Medicaid

57.     The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.   The Medicaid program is jointly financed by the federal and state governments.   CMS administers Medicaid on the federal level.   Within broad federal rules, each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states

16

obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

58.     Providers participating in the Medicaid program submit claims for services rendered to recipients to designated agencies within the respective states for payment. Since 2003, IPC has submitted and/or caused the submission of claims for inpatient services purportedly provided to Medicaid recipients.

### TRICARE

59.     TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active-duty service members, retired service members, and their dependents. TRICARE is an agency and instrumentality of the United States and its activities, operations, and contracts are paid with federal funds. 10 U.S.C. §§ 1071 *et seq.* The TRICARE program is administered through the Department of Defense.

60.     The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. Like Medicare, TRICARE utilizes fiscal intermediaries to process claims for payment from providers of medical services. Since 2003, IPC has submitted and/or caused the submission of claims for inpatient services purportedly provided to TRICARE beneficiaries.

17

**FEHBP**

61.    FEHBP is a federally funded medical benefits program that provides health insurance coverage for federal employees, retirees, and their dependents.  5 U.S.C. §§ 8901-8914.  FEHBP provides health insurance to enrolled beneficiaries through a collection of individual health care plans, including but not limited to Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan.  FEHBP plans are managed by OPM.

62.    Since 2003, IPC has submitted and/or caused the submission of claims for inpatient services purportedly provided to FEHBP beneficiaries.

**RRB**

63.    While CMS has overall responsibility for the Medicare program, the RRB has administrative responsibilities under the Social Security Act for certain benefit payments and railroad workers' Medicare coverage.  45 U.S.C. § 231f.  The RRB was granted statutory authority to contract with a separate insurance carrier to be the agency's nationwide carrier for processing Medicare Part B claims.  In connection with its separate carrier authority, the RRB is responsible for certain Medicare program activities such as enrollment, premium collection, answering beneficiary inquiries, and conducting the annual carrier performance evaluation for the Medicare carrier.

64.     Since 2003, IPC has submitted and/or caused the submission of claims for inpatient services purportedly provided to beneficiaries of the Railroad Retirement Medicare Program.

## REVENUES RECEIVED BY IPC FROM THE UNITED STATES' HEALTH INSURANCE AND BENEFITS PROGRAMS

65.     As noted in the chart below, IPC has consistently received approximately 50 percent of its revenues from the United States' health insurance and benefits programs since at least 2006.

| IPC's Revenues from the United States' Health Insurance and Benefits Programs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Payor | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Medicare | 46% | 46% | 45% | 43% | 45% | 46% | 47% | 48% |
| Medicaid | 6% | 5% | 5% | 5% | 6% | 5% | 5% | 5% |
| Other Insurers | 39% | 39% | 43% | 45% | 44% | 43% | 43% | 42% |
| Self-Pay Patients | 9% | 10% | 7% | 7% | 5% | 6% | 5% | 5% |

## BACKGROUND — IPC

66.     IPC was founded in or around 1995 by Adam D. Singer, M.D., who acts as Chairman of the Board and Chief Executive Officer for IPC.  IPC was incorporated in Delaware in January 1998, is a publicly traded company, and its principal executive offices are located in North Hollywood, California.

19

67. IPC is a national hospitalist group practice that employs, through various subsidiaries and affiliates, approximately 2,500 hospitalists, including physicians, nurse practitioners, and physician assistants.

68. IPC provides its hospitalists with administrative services including training, marketing, technology, and billing and collection services. These services are based in IPC's executive offices.

69. Because IPC takes a percentage of the reimbursement that medical insurers pay for the services of IPC's hospitalists, IPC's revenues are directly affected by the amount it bills medical insurers for the services performed by its hospitalists. Net revenue per patient encounter is IPC's key metric for measuring physician performance and ensuring that revenue expectations are met. When IPC hospitalists bill for higher levels of service, both the federal reimbursement rates and revenue per patient encounter for IPC are higher.

70. Through its physician practice groups (numbering nearly 300), IPC provides hospitalist services at approximately 400 acute care and 1,100 post-acute-care facilities in 28 states. IPC's practice groups are organized into approximately 14 different regions. Each of IPC's practice groups, or pods, has one hospitalist who acts as the practice group leader. The practice group leader handles staffing and scheduling, monitoring the quality of care, attending to new business initiatives, and monitoring the financial performance of the practice group. The pods generally have monthly meetings during which financial performance of the pod is discussed.

71.     Each region has an executive director and a team of marketing and administrative staff responsible for the non-clinical management of the practice groups within the region. The non-clinical management responsibilities of IPC include recruiting hospitalists, monitoring financial performance, contracting with facilities and medical insurers, and attending to billing and collection activities. Each region also has a medical director who attends to the clinical management of the region.

72.     As stated previously, IPC is now one of the largest hospitalist companies in the United States, based on revenues, patient encounters, and the number of affiliated hospitals.

### IPC'S Billing Technology

73.     IPC uses a proprietary hospitalist management technology called IPC-Link®. IPC claims that this technology enables its hospitalists to track important patient management data, communicate with referring physicians, and monitor key metrics both specific and critical to the quality practice of hospital medicine. IPC hospitalists use IPC-Link® to record each patient encounter and are personally responsible for entering data into the system.

74.     Hospitalists access IPC-Link® through IPC's web-based "Virtual Office" portal. After treating a patient, IPC's hospitalist enters a collection of information into the IPC-Link® program, including basic patient information, a diagnosis, and a billing code that is supposed to correspond with the level of service provided by the hospitalist during a particular encounter.

75.     IPC audits the billing information entered by the hospitalists for "completeness and accuracy and creates an electronic billing file for automated submission to payor." The bills are then electronically submitted by IPC to the federal government for payment.

76.     IPC uses IPC-Link[®] to monitor its financial and clinical performance by creating customized, web-based reports based on near real-time data to track operating metrics, including length of stay, patient volumes and physician productivity, referral sources and trends, readmission rates, physician billings, clinical quality indicators, patient satisfaction and patient post-discharge survey results.

**IPC Compensation**

77.     IPC encourages its hospitalists to maximize their billings through IPC's compensation structure — specifically, its "physician incentive plan."

78.     In addition to receiving a base salary and benefits, IPC hospitalists also receive bonuses pursuant to IPC's physician incentive plan that are based upon the amount billed by the hospitalist. These bonuses can equal or exceed the hospitalists' base salary. IPC regularly reminds its hospitalists about this incentive.

79.     IPC calculates the total amount billed by each hospitalist on a monthly basis, and subtracts from that amount the cost of the hospitalist's salary and benefits. Of the remainder, IPC keeps 30 percent and pays the hospitalist 70 percent.

80.     Accordingly, the more IPC's hospitalists bill, the more they take home — and the more IPC earns.  IPC assures its investors that there is "no cap on the earnings" for its national group practices.

81.     IPC encourages its hospitalists to maximize their billings through peer pressure and ranking hospitalists against each other.  Each hospitalist's personal billing performance as compared to his or her peers is a subject of regular discussion in pod meetings. Low-billing hospitalists are pressured to use more complex billing codes that reimburse at higher rates and increase net revenue per patient encounter.  Hospitalists who consistently use more moderate billing codes are pressured by IPC trainers and/or management to change that practice.

82.     Corporate/management pressure to utilize the highest level billing codes is thus applied to IPC hospitalists as part of a systematic scheme to maximize billings and increase corporate revenue.

83.     In addition, IPC hospitalists are encouraged to excessively and improperly bill the highest level billing codes by IPC's corporate culture of "looking the other way," and therefore have no incentive to use appropriate billing codes.  Instead, these physicians maximize billings by using higher level codes regardless of the level of service provided to the patient.

84.     As a result of corporate/management pressure, and/or in keeping with IPC corporate culture and expectations to maximize billings, IPC hospitalists have routinely and systematically submitted upcoded claims for payment to the United States.

**Corporate Monitoring of Hospitalist Utilization of Highest Level Evaluation and Management CPT Codes**

85.     Since at least 2003, IPC has had the ability, through IPC-Link®, to comprehensively monitor the activities of each of its physicians on a near real-time basis.

86.     Beginning no later than 2003, IPC has used the data IPC physicians submit through IPC-Link® to track various metrics relating to the activities of IPC physicians, including patient volumes and physician productivity, referral sources and trends, physician billings, clinical quality indicators, patient satisfaction, and patient post-discharge survey results.

87.     IPC-Link® organizes this data into a fully searchable database and allows IPC to create customized reports relating to billing trends and patterns for individual hospitalists, pods, regions, and the company as a whole.

88.     IPC considers its most important physician performance indicators to be: (1) the number of patient encounters; (2) the revenue generated per patient encounter; and (3) the average number of patient encounters per hospitalist per day.

89.     The key variable affecting revenue per patient encounter is the CPT code that the IPC hospitalist selects when billing for the encounter.

90.     The only way for IPC hospitalists to increase the revenue they generate per patient encounter is to select CPT codes that are reimbursed at higher rates by Medicare, Medicaid, and other payors.

91.     IPC hospitalists' ability to meet revenue per encounter targets (as well as IPC's ability to meet its corporate revenue per encounter goals) is dependent on the rate at which IPC

24

hospitalists bill the highest level evaluation and management (E&M) CPT codes, particularly the highest level codes for Initial Hospital Care (CPT 99223), Subsequent Hospital Care (CPT 99233), and Hospital Discharge (CPT 99239).

92.     A physician regularly using mid- or low-level CPT codes for Initial Hospital Care, Subsequent Hospital Care, and Hospital Discharge cannot meet the revenue per encounter goals that IPC sets for its hospitalists.

93.     This point is made clear to IPC hospitalists on a regular basis both through monthly coding reports and other materials distributed to them, as well as through comments made to them by regional executive directors, business development staff, and others.

94.     Since at least 2003, IPC's corporate officers have been aware that high rates of utilization of the highest level E&M CPT codes are critical to IPC meeting its revenue goals.

95.      IPC's corporate officers, regional directors, and business development personnel such as Chairman and Chief Executive Officer Adam Singer, President and Chief Operating Officer Jeff Taylor, Vice President of Medical Affairs Felix Aguirre, Chief Medical Officer Mary Jo Gorman, Chief Financial Officer Devra Shapiro, Executive Vice President and Chief Development Officer Richard Russell, Vice President Financial Analysis and Revenue Controls Jamie Glazer, and Vice President Health Services and Chief Compliance Officer Kathleen Loya, were regularly provided with reports focusing on the rate at which individual IPC hospitalists, pods, and regions were billing A3 (CPT 99223), V3 (CPT 99233) and D>30 (CPT 99239).

96.     These regular reports also included documents in which individual IPC hospitalists were "red-flagged" for falling below IPC's revenue per encounter targets.

97.     When hospitalists were identified in these reports as missing their revenue per encounter target, the only other metric provided in the report was the rate at which the hospitalist had billed the highest level admission and subsequent hospital care codes.

98.     Beginning in or about 2003, IPC's Medical Affairs committee created a "dashboard" report that was circulated on a monthly basis to IPC's officers, executive directors, marketing and business development personnel and others.

99.     The dashboard tracked how individual hospitalists were performing with respect to the business metrics IPC believed to be the key indicators of hospitalist performance.

100.     In addition to two metrics related to volume of patient encounters per hospitalist, the dashboard tracked three metrics related to the rate at which individual hospitalists' billed A3 (CPT 99223) and V3 (CPT 99233).

101.     The dashboard "flagged" individual hospitalists that IPC believed were billing A3 (CPT 99223) at an insufficiently high rate. IPC flagged V3 (CPT 99233) at rates that IPC viewed as either "low" or "high." The "low" setting was around the national norm level. The "high" setting was far above the national norm, as described below.

102.     IPC's compliance department purportedly relied on these dashboard flags to identify hospitalists whose billing required scrutiny for potential upcoding (*i.e.,* billing for services in excess of what was actually rendered), as well as potential undercoding.

103. At the time the dashboard was created, members of IPC's medical affairs committee, including IPC's Chief Compliance Officer Kathy Loya, knew that the national average rate of use for A3 (CPT 99223) was approximately 65 percent, the national average rate of use for V3 (CPT 99233) was approximately 20 percent, and the national average rate of use for D>30 (CPT 99239) was approximately 24 percent.

104. Despite this knowledge, IPC ensured that it would not be alerted to potentially false and fraudulent billing by its hospitalist by setting no dashboard flag for excessive billing of A3 (CPT 99223) or D>30 (CPT 99239), and by setting its dashboard flag for high V3 (CPT 99233) billing at 95 percent rate of use.

105. As a result of IPC's detailed and regular monitoring of the rates at which its hospitalist were billing A3 (CPT 99223), V3 (CPT 99233) and D>30 (CPT 99239), IPC's corporate officers knew that IPC hospitalists were using these codes at rates that were far in excess of national norms, indicating that IPC's hospitalists were engaging in systematic upcoding of the claims being submitted to Medicare, Medicaid, and other federal payors.

106. Nonetheless, IPC submitted the upcoded claims to Medicare, Medicaid, and other federal payors.

107. For example, IPC's compliance department and corporate officers were aware in 2003-2004 that IPC hospitalists were billing V3 (CPT 99233) at an average rate of 70 percent, when non-IPC physicians were billing this code nationally at an average rate of approximately 20 percent.

27

108. IPC's compliance department and corporate officers knew that the huge disparity between its utilization of the highest level E&M CPT codes and the national average utilization rates was a significant red flag indicating that it was likely submitting an enormous number of upcoded claims.

109. This knowledge is reflected in a February 2004 email exchange in which IPC management, including Teresa Jones and Ken Epstein (regional medical directors), Kathy Loya, Felix Aguirre, and Mary Jo Gorman, discussed the fact that IPC's billing patterns for E&M CPT codes far exceeded national norms and agreed that they should not publically discuss the rate at which IPC hospitalists billed claims for V3 (CPT 99233) and other codes because this "easily could lead to trouble" and "publicizing our numbers has a large risk to it as well in terms of shouting out that we want to be audited."

110. Despite this knowledge, IPC continued to turn a blind eye to the obvious indicia of upcoding reflected in the billing data it monitored, and did not undertake reasonable steps to investigate the extent to which it was submitting false claims to Medicare, Medicaid and other federal payors for services in excess of what was actually being rendered by its hospitalists.

111. IPC's compliance personnel have been aware from 2003 through the present of the national norms for E&M and CPT codes, and yet IPC has continued to consistently encourage and/or allow its hospitalists to bill the highest codes at rates far exceeding those national norms.

112.    Since 2003, IPC has submitted more than five million claims for A3 (CPT 99223), V3 (CPT 99233), and D>30 (CPT 99239) to Medicare alone.

**Examples of how IPC's culture and expectations encouraged false billing practices**

113.    Substantial evidence of IPC hospitalist upcoding in conjunction with IPC's ability to closely monitor its hospitalists and its strong financial interest in doing so, demonstrates that IPC knew about upcoding and did not prevent it.

114.    The evidence set forth below demonstrates that IPC — the company as a whole, and the corporate culture in general — encouraged and/or disregarded the upcoding.

115.    The billing records of hospitalists that joined IPC from practice groups that IPC acquired reveal that when those hospitalists first started at IPC, their billing practices were substantially more conservative than those of other IPC hospitalists.

116.    Over time, however, as IPC was able to expose these newly acquired hospitalists to IPC's culture of maximizing billing by upcoding, these same hospitalists' billing practices changed dramatically.

117.    The charts below capture some of the pattern changes, by showing the frequency with which new hospitalists increased their use of higher billing codes over time.

**Dr. Edward Sternaman**

118.    Dr. Edward Sternaman (Sternaman) started working for IPC shortly before July 15, 2007.

119.    Sternaman's billing record for July 15, 2007 reveals that — in stark contrast to other IPC hospitalists — Sternaman initially made substantial use of the lower level CPT Codes as seen below:

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|:---:|:---:|:---:|:---:|
| July 15, 2007 | 1 | 4 | 3 |
| **Percentage of Total:** | **12.5%** | **50.0%** | **37.5%** |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|:---:|:---:|:---:|:---:|
| July 15, 2007 | 5 | 3 | 1 |
| **Percentage of Total:** | **55.6%** | **33.3%** | **11.1%** |

120.    After IPC exposed Sternaman to its billing expectations, Sternaman's billing patterns changed dramatically, as seen below:

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|:---:|:---:|:---:|:---:|
| September 15, 2007 | **0** | **0** | 3 |
| October 7, 2007 | **0** | **0** | 1 |
| February 23, 2008 | **0** | **0** | 1 |
| June 26, 2008 | **0** | **0** | 3 |
| July 22, 2008 | **0** | **0** | 7 |
| **Total:** | **0** | **0** | **15** |
| **Percentage of Total:** | **0%** | **0%** | **100%** |

30

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| September 15, 2007 | **0** | 8 | 12 |
| October 7, 2007 | **0** | 3 | 6 |
| February 23, 2008 | **0** | 4 | 9 |
| June 26, 2008 | **0** | 9 | 16 |
| July 22, 2008 | **0** | 2 | 10 |
| **Total:** | **0** | **26** | **53** |
| **Percentage of Total:** | **0%** | **32.9%** | **67.1%** |

**Dr. Marium Steele**

121.    Dr. Marium Steele (Steele) started working for IPC shortly before July 11, 2007. Steele's billing record for July 11, 2007, like that of Sternaman when he first started at IPC, reflects the substantial use of the lower level CPT Codes:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 11, 2007 | 1 | 6 | 0 |
| **Percentage of Total:** | **14.3%** | **85.7%** | **0%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 11, 2007 | 5 | 2 | 0 |
| **Percentage of Total:** | **71.4%** | **28.6%** | **0%** |

122.    By September 2007, Steele's pattern began to conform to IPC's norms:

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| September 9, 2007 | 0 | 0 | 6 |
| **Percentage of Total:** | **0%** | **0%** | **100%** |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| September 9, 2007 | 0 | 10 | 7 |
| **Percentage of Total:** | **0%** | **58.8%** | **41.2%** |

123. By 2008, Steele had been fully indoctrinated into IPC'scheme:

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| April 8, 2008 | 0 | 2 | 5 |
| **Percentage of Total:** | **0%** | **28.6%** | **71.4%** |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| April 8, 2008 | 0 | 0 | 18 |
| **Percentage of Total:** | **0%** | **0%** | **100%** |

**Dr. Eduardo Uribe**

124. Dr. Eduardo Uribe (Uribe) also started working for IPC shortly before July 11, 2007. Uribe's billing record for July 11, 2007 reflects a very high usage of the intermediate level subsequent hospital care CPT Code — 99232 (V2), relative to the highest level subsequent hospital care CPT Code preferred by IPC:

32

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 11, 2007 | 0 | 14 | 2 |
| **Percentage of Total:** | **0%** | **87.5%** | **12.5%** |

125.    A few months later, Uribe's billing pattern with respect to the subsequent hospital care CPT Code had been conformed to the other IPC hospitalists pursuant to IPC's upcoding scheme:

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| October 6, 2007 | 0 | 3 | 12 |
| October 7, 2007 | 0 | 2 | 13 |
| December 24, 2007 | 0 | 7 | 14 |
| February 10, 2008 | 0 | 2 | 16 |
| **Total:** | **0** | **14** | **55** |
| **Percentage of Total:** | **0%** | **20.3%** | **79.7%** |

**Dr. Cybele Mathai**

126.    Dr. Cybele Mathai (Mathai) started working for IPC shortly before July 21, 2007. Mathai's billing records for July 21 and 22, 2007, like Uribe's, reflect a very high usage of the intermediate level subsequent hospital care CPT Code — 99232 (V2), relative to the highest level subsequent hospital care CPT Code preferred by IPC:

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| July 21, 2007 | 0 | 16 | 0 |
| July 22, 2007 | 1 | 16 | 0 |

33

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| **Total:** | **1** | **32** | **0** |
| **Percentage of Total:** | **3.0%** | **97.0%** | **0%** |

127. By September 2007, Mathai's billing practices with respect to the subsequent hospital care CPT Code had reversed themselves:

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| September 15, 2007 | 0 | 1 | 9 |
| **Percentage of Total:** | **0%** | **10.0%** | **90.0%** |

**Dr. Dominic Meza**

128. Dr. Dominic Meza (Meza) started working for IPC shortly before November 4, 2007. Meza's billing record for November 4, 2007, reflects the substantial use of the mid-level CPT Codes as seen below:

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| November 4, 2007 | 0 | 7 | 0 |
| **Percentage of Total:** | **0%** | **100%** | **0%** |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| November 4, 2007 | 0 | 19 | 0 |
| **Percentage of Total:** | **0%** | **100%** | **0%** |

34

129.     By 2008, Meza, too, had converted his billing patterns in conformity with the IPC scheme:

| __Date__ | __99221 (A1)__ | __99222 (A2)__ | __99223 (A3)__ |
|---|---|---|---|
| February 10, 2008 | 0 | 3 | 2 |
| __Percentage of Total:__ | __0%__ | __60.0%__ | __40.0%__ |

| __Date__ | __99231 (V1)__ | __99232 (V2)__ | __99233 (V3)__ |
|---|---|---|---|
| February 10, 2008 | 0 | 2 | 16 |
| __Percentage of Total:__ | __0%__ | __11.1%__ | __88.9%__ |

### Dr. Michael Dugo

130.     Dr. Michael Dugo (Dugo) moonlights at IPC as a part-time hospitalist in San Antonio.  Dugo was not billing at a high level when he first started.

131.     By August 17, 2008, however, IPC told Dugo that if he wanted to continue to work at IPC in a part-time capacity, he had to increase his billings.

132.     Dugo complied:  on August 17, 2008, Dugo billed for 27 patient encounters, all of them at the highest possible level.

### Billing Patterns

133.     The impact of IPC's culture and encouragement to upcode can be seen from a review of the distribution of CPT Code usage in the aggregate.  The combined billing records for Sternaman, Steele, Uribe, Mathai, and Meza show the dramatic increase in the use of higher level CPT Codes from the time these hospitalists started at IPC to several months later.  The

35

"Before" column represents these hospitalists' early billings at IPC, "before" exposure to the culture, scheme, and practice of IPC.  The "After" column represents the billing practices "after" the hospitalists had been encouraged, expected, or allowed to upcode:

**Admissions:**

| **Before** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| Total: | 2 | 17 | 10 |
| **Percentage of Total:** | **6.9%** | **58.6%** | **34.5%** |

| **After** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| Total: | 0 | 5 | 51 |
| **Percentage of Total:** | **0%** | **8.9%** | **91.1%** |

**Subsequent Care:**

| **Before** | **99231(V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| Total: | 11 | 80 | 10 |
| **Percentage of Total:** | **10.9%** | **79.2%** | **9.9%** |

| **After** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| Total: | 0 | 43 | 151 |
| **Percentage of Total:** | **0%** | **22.2%** | **77.8%** |

**Discharge:**

| **Before** | **99238(D<30)** | **99239 (D>30)** |
|---|---|---|
| Total: | 14 | 1 |
| **Percentage of Total:** | **93.3%** | **6.7%** |

| **After** | **99238 (D<30)** | **99239 (D>30)** |
|:---:|:---:|:---:|
| Total: | 0 | 39 |
| **Percentage of Total:** | **0%** | **100%** |

134.    The shift in the billing patterns of these IPC hospitalists, after immersion in IPC's scheme and exposure to IPC's expectations, is consistent with a persistent, company-wide pattern in which IPC's hospitalists billing deviated substantially upward from proper billing practices after exposure to IPC's culture and expectations.

**Medicare Program Safeguard Contractor Warnings and IPC's Responses**

135.    Although IPC has hospitalists in 28 states, since at least 2003, services rendered by IPC hospitalists in Texas have been the single largest source of IPC's revenue.

136.    In 2005, TrailBlazer Health Enterprises, LLC served as the Medicare Administrative Contractor (MAC) for the state of Texas.

137.    TrailBlazer was charged with, among other things, processing and monitoring Medicare claims submitted for services rendered in Texas and ensuring that Medicare funds were being paid correctly for the services actually rendered.

138.    TrailBlazer's responsibilities included identifying physicians who were billing for levels of service in excess of the services actually provided (*i.e.*, upcoding).

139.    When TrailBlazer identified physicians in Texas who were using CPT codes in excess of national norms, it would respond in several ways.

37

140.    In some instances, TrailBlazer would send a provider education letter to the physician.

141.    In these letters, TrailBlazer would illustrate the degree to which the physician's billing patterns deviated from national norms, educate the physician on the Medicare guidelines for use of the CPT codes at issue, and encourage the physician to evaluate whether their billing practices were consistent with Medicare guidelines.

142.    In other instances in which TrailBlazer identified aberrant physician billing patterns, it would conduct an audit of a small sample of the physician's claims.

143.    If Trailblazer identified instances in which the physician had submitted claims for which the documentation did not support the level of service billed, it would provide the audit results to the physician and request repayment of amounts paid by Medicare in excess of what the physician should have billed.

144.    Between January 1, 2005, and September 19, 2006, TrailBlazer issued approximately 230 separate provider education and audit letters to IPC hospitalists in Texas identifying billing patterns indicating substantial deviation from national norms and/or documenting actual upcoding of E&M CPT codes that had been established through audits of IPC hospitalist claims.

145.    During this period, nearly every hospitalist working for IPC in Texas received some form of letter from TrailBlazer identifying potential or actual upcoding in the claims IPC

had submitted for E&M CPT codes, particularly focusing on claims for hospital admission (CPT 99223) and subsequent hospital visit (CPT 99233).

146.    IPC's corporate officers were aware that TrailBlazer had identified a pervasive pattern of upcoding in the CPT codes critical to IPC meeting the financial goals it had set for itself, and were alarmed that TrailBlazer's activity had caused IPC hospitalists in Texas to reduce their excessive and improper use of the highest level E&M CPT codes.

147.    As a result of the TrailBlazer activity in Texas, IPC knew or acted in reckless disregard of the fact that its hospitalists were routinely billing for services in excess of what they had actually rendered when they billed patient encounters using the highest level E&M CPT codes.

148.    Rather than take appropriate steps to address the issue in Texas, IPC actively directed and/or encouraged its Texas hospitalists to disregard TrailBlazer's provider education and audit activity and to continue billing the highest level E&M CPT codes at the grossly excessive rates expected by IPC's management.

149.    As a result of this conduct, IPC hospitalists in Texas continued their pattern of routinely submitting upcoded claims for Initial Hospital Care (CPT 99223), Subsequent Hospital Care (CPT 99233), and Hospital Discharge (CPT 99239).

150.    At a national level, IPC did not respond to the TrailBlazer activity in Texas by increasing its efforts to identify and stop obvious rampant upcoding by its hospitalists either there or elsewhere.

151.    Instead, after 2006, IPC took affirmative steps to bury its corporate head in the sand by discontinuing monitoring of hospitalist use of the highest level E&M CPT codes in relation to national norms, nor did it use any other reasonable benchmarks for identifying likely upcoding by its hospitalists, despite its ability to do so.  IPC purportedly relied upon its regional executive directors to flag potential upcoding, despite no monitoring tools to actually allow them to identify such upcoding.

152.    Accordingly, IPC has submitted false claims and false statements to the United States for upcoded services.  These false claims and statements were the result of IPC's corporate culture, and failure to correct patterns of inappropriate upcoding.

### IPC's STATEMENTS AND SUBMISSIONS TO FEDERAL PAYORS — REPRESENTATIVE SAMPLES

#### IPC's Upcoding Scheme — Initial Hospital Care

153.    By way of example, on or about August 23, 2004, February 9, 2008, November 21, 2008, September 25, 2010, and October 6, 2010, IPC submitted the following upcoded claims for initial hospital care (*i.e.*, hospital admission) to Medicare for payment:[2]

| Example No. | Claim Number | Date of Service | CPT Code Billed | Date Medicare Received Claim | Date Claim Paid by Medicare | Amount Paid to IPC |
|---|---|---|---|---|---|---|
| 1 | xxxxxxxxxxxxxx | 8/23/2004 | 99223 | 9/11/2004 | 9/13/2004 | $132.30 |
| 2 | xxxxxxxxxxxxxx | 2/09/2008 | 99223 | 2/25/2008 | 2/27/2008 | $146.80 |

---

[2]  The claim numbers will be provided to defendants under separate cover.

| 3 | xxxxxxxxxxxxxx | 11/21/2008 | 99223 | 12/03/2008 | 12/04/2008 | $136.79 |
| 4 | xxxxxxxxxxxxxx | 9/25/2010 | 99223 | 10/14/2010 | 10/15/2010 | $153.74 |
| 5 | xxxxxxxxxxxxxx | 10/06/2010 | 99223 | 10/13/2010 | 10/15/2010 | $166.58 |

154. Neither the documentation created by IPC's hospitalists nor any other information recorded in the patient medical records corresponding to these claims support the highest level of initial hospital care — CPT 99223 — billed to Medicare. Uniformly, the medical records purporting to document the hospitalist encounters forming the basis for these representative claims do not reflect the high level of service required to bill CPT 99223.

155. Specifically, the medical records for the following five claims do not support the level of service claimed by IPC:

a. Example 1 — the history, exam and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of comprehensive history, comprehensive exam and high complexity medical decision-making required to bill CPT 99223. As documented, this initial care encounter should have been billed at the lowest level — CPT 99221.

b. Example 2 — the history and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of comprehensive history and high complexity

medical decision making required to bill CPT 99223. As documented, this initial hospital care encounter should have been billed at the lowest level — CPT 99221.

c. Example 3 — the history and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of comprehensive history and high complexity medical decision making required to bill CPT 99223. As documented, this initial hospital care encounter should have been billed at the lowest level — CPT 99221.

d. Example 4 — the history and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of comprehensive history and high complexity medical decision making required to bill CPT 99223. As documented, this initial hospital care encounter should have been billed at the lowest level — CPT 99221.

e. Example 5 — the history and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of comprehensive history and high complexity medical decision making required to bill CPT 99223. As documented, this initial hospital care encounter should have been billed at the lowest level — CPT 99221.

156. These five examples represent a small fraction of the total upcoded CPT 99223 claims submitted by IPC since 2003 to Medicare, Medicaid and other federal payors.

**IPC's Upcoding Scheme — Subsequent Hospital Care**

157.    By way of example, on or about February 16, 2004, March 17, 2009, December 4, 2009, April 3, 2010, and November 23, 2010, IPC submitted the following upcoded claims for subsequent hospital visits to Medicare for payment: [3]

| Example No. | Claim Number | Date of Service | CPT Code Billed | Date Medicare Received Claim | Date Claim Paid by Medicare | Amount Paid to IPC |
|---|---|---|---|---|---|---|
| 1 | xxxxxxxxxxxxxx | 2/16/2004 | 99233 | 3/19/2004 | 3/22/2004 | $60.65 |
| 2 | xxxxxxxxxxxxxx | 3/17/2009 | 99233 | 3/23/2009 | 3/25/2009 | $80.79 |
| 3 | xxxxxxxxxxxxxx | 12/04/2009 | 99233 | 1/15/2010 | 1/16/2010 | $78.26 |
| 4 | xxxxxxxxxxxxxx | 4/03/2010 | 99233 | 9/29/2011 | 9/30/2011 | $76.76 |
| 5 | xxxxxxxxxxxxxx | 11/23/2010 | 99233 | 12/07/2010 | 12/08/2010 | $79.57 |

158.    Nether the documentation created by IPC's hospitalists nor any other information recorded in the patient medical records corresponding to these claims support the highest level of subsequent hospital care — CPT 99233 — billed to Medicare.  Uniformly, the medical records purporting to document the hospitalist encounters forming the basis for these representative claims do not reflect the high level of service required to bill CPT 99233.

159.    Specifically, the medical records for the following five claims do not support the level of service claimed by IPC:

---

[3] The claim numbers will be provided to defendants under separate cover.

a. Example 1 — the history, exam and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of detailed history, detailed exam and/or high complexity medical decision making required to bill CPT 99233. As documented, this subsequent hospital care encounter should have been billed at the lowest level — CPT 99231.

b. Example 2 — the history, exam and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of detailed history, detailed exam and/or high complexity medical decision making required to bill CPT 99233. As documented, this subsequent hospital care encounter should have been billed at the lowest level — CPT 99231.

c. Example 3 — the history, exam and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of detailed history, detailed exam and/or high complexity medical decision making required to bill CPT 99233. As documented, this subsequent hospital care encounter should have been billed at the lowest level — CPT 99231.

d. Example 4 — the history, exam and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for

this claim do not rise to the level of detailed history, detailed exam and/or high complexity medical decision making required to bill CPT 99233. As documented, this subsequent hospital care encounter should have been billed at the lowest level — CPT 99231.

e. Example 5 — the history, exam and medical decision-making that the IPC hospitalist documented in the medical record for the patient encounter that forms the basis for this claim do not rise to the level of detailed history, detailed exam and/or high complexity medical decision making required to bill CPT 99233. As documented, this subsequent hospital care encounter should have been billed at the lowest level — CPT 99231.

160. These five examples represent a small fraction of the total upcoded CPT 99233 claims submitted by IPC since 2003 to Medicare, Medicaid and other federal payors.

**IPC's Upcoding Scheme — Discharge**

161. By way of example, on or about October 28, 2006, September 30, 2008, October 9, 2009, November 16, 2009, and September 28, 2010, IPC submitted the following upcoded discharge claims to Medicare for payment: [4]

_____

[4] The claim numbers will be provided to defendants under separate cover.

45

| Example No. | Claim Number | Date of Service | CPT Code Billed | Date Medicare Received Claim | Date Claim Paid by Medicare | Amount Paid to IPC |
|---|---|---|---|---|---|---|
| 1 | xxxxxxxxxxxxxx | 10/28/2006 | 99239 | 12/13/2006 | 12/14/2006 | $77.20 |
| 2 | xxxxxxxxxxxxxx | 9/30/2008 | 99239 | 10/8/2008 | 10/9/2008 | $74.05 |
| 3 | xxxxxxxxxxxxxx | 10/9/2009 | 99239 | 10/17/2009 | 10/20/2009 | $83.10 |
| 4 | xxxxxxxxxxxxxx | 11/16/2009 | 99239 | 11/23/2009 | 11/25/2009 | $74.73 |
| 5 | xxxxxxxxxxxxxx | 09/28/2010 | 99239 | 10/06/2010 | 10/07/2010 | $78.66 |

162.    Neither the documentation created by IPC's hospitalists nor any other information recorded in the patient medical records corresponding to these claims support the highest level of discharge service — CPT 99329 — billed to Medicare.    Uniformly, the medical records purporting to document the hospitalist encounters forming the basis for these representative claims do not reflect the high level of service required to bill CPT 99239.

163.    Specifically, the medical records for the following five claims do not support the level of service claimed by IPC:

a.  Example 1 — there is no documentation of any physician discharge activities in the medical record relating to this claim, nor is there any documentation in the medical record of a face-to-face evaluation and management of the patient by the IPC hospitalist on the date of service identified in the claim.   As documented, this discharge should have been billed at the lowest level — CPT 99238.

b.   Example 2 — there is no documentation of any physician discharge activities in the medical record relating to this claim, nor is there any documentation in the medical record of a face-to-face evaluation and management of the patient by the IPC hospitalist on the date of service identified in the claim.  As documented, this discharge should have been billed at the lowest level — CPT 99238.

c.   Example 3 — there is no documentation of any physician discharge activities in the medical record relating to this claim, nor is there any documentation in the medical record of a face-to-face evaluation and management of the patient by the IPC hospitalist on the date of service identified in the claim.  As documented, this discharge should have been billed at the lowest level — CPT 99238.

d.   Example 4 — there is no documentation of time spent on discharge activities, nor is there any documentation in the medical record of a face-to-face evaluation and management of the patient by the IPC hospitalist or other physician discharge activities on the date of service identified in the claim.  As documented, this discharge should have been billed at the lowest level — CPT 99238.

e.   Example 5 — there is no documentation of time spent on discharge activities in the medical record, nor is there any documentation in the medical record of a face-to-face evaluation and management of the patient by the IPC hospitalist on the date of service identified in the claim.  As documented, this discharge should have been billed at the lowest level — CPT 99238.

47

164. These five examples represent a small fraction of the total upcoded CPT 99239 claims submitted by IPC since 2003 to Medicare, Medicaid and other federal payors.

## FURTHER EXAMPLES OF UPCODING

165. A variety of billing records demonstrate IPC's success in encouraging its hospitalists to engage in upcoding, including the unreasonably high billing patterns of IPC's hospitalists.

### Evidence of Upcoding Through Unreasonably High Billing Patterns

166. IPC billing records, as described in examples below, include a detailed description of the services provided by the particular IPC hospitalist on the day in question and present, among other things, the following information: the name, Social Security number, and date of birth of the patient; the facility and room number in which the patient was treated; patient diagnosis codes; and the IPC Code and CPT Code that the IPC hospitalist entered after treating the patient.

167. A review of the billing records summarized below, in conjunction with a review of the AMA's description of the CPT Codes, reveals that IPC hospitalists were billing for services performed in one day that would have taken far in excess of 24 hours to complete.

168. The AMA's description of the CPT Codes describes the amount of time that should typically be spent providing the service in question.

169.     For example, the description for the admission process, for CPT code 99221 (A1), provides that:  "Physicians typically spend 30 minutes at the bedside and on the patient's hospital floor or unit."

170.     The time typically spent on the admission process is 50 minutes when billing to CPT code 99222 (A2), and 70 minutes when billing to CPT code 99223 (A3).

171.     Accordingly, it is possible to determine the minimum amount of time that the hospitalist should have spent on the admissions process for any given day by multiplying the number of 99221 (A1), 99222 (A2), or 99223 (A3) billing entries by the amount of time corresponding to those codes in the AMA description.

172.     The same is true for many other CPT Code groups including, for example, the "subsequent visit" codes — 99231 (V1), 99232 (V2), and 99233 (V3) — for which the AMA description provides a specific amount of time that should typically be spent performing the service.

173.     The AMA descriptions for other CPT Code groups, however, provide a range of time that should typically be spent performing the task in question.

174.     For example, the AMA description for the discharge code 99238 (D<30) states that the task should take "30 minutes or less," while the AMA description for discharge code 99239 (D>30) provides that the task should take "more than 30 minutes."

175.     The analysis of the billing records described below is as conservative as possible. For example, it assumes that the IPC hospitalist took only five minutes to perform tasks billed as

discharge code 99238 (D<30), despite the fact it would be unreasonable to discharge a patient in so little time.

176.    The analysis also assumes that the IPC hospitalist spent the minimum 30 minutes for tasks billed as discharge code 99239 (D>30).

177.    Similarly, the AMA description for "critical care" services, 99291 (CC30-74), provides a range of time — 30 to 74 minutes — typically spent caring for the patient. The analysis below assumes that the IPC hospitalist spent the minimum 30 minutes performing critical care services.

178.    The AMA descriptions for some CPT Code groups do not provide any description of the amount of time typically spent on the particular tasks within the group. For example, the AMA description for CPT Code 99236 (A3/D) provides:

> Observation or inpatient hospital care, for the evaluation and management of a patient including admission and discharge on the same date, which requires these 3 key components: A comprehensive history; A comprehensive examination; and Medical decision making of high complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually the presenting problem(s) requiring admission are of high severity.

179.    CPT Code 99236 (A3/D), accordingly, requires admitting, treating, and discharging a patient presenting problems of high severity.

50

180.   The reimbursement amount for CPT Code 99236 (A3/D) is consistent with those significant responsibilities and is higher than the reimbursement amount for the highest level admission code, 99223 (A3), which typically requires 70 minutes to perform.

181.   Nonetheless, the analysis below assumes that the IPC hospitalist spent only five minutes performing the task billed as 99236 (A3/D).

182.   Similarly, the AMA description for CPT Code 99220 (OBS3) does not describe the amount of time required to perform the task.  Properly performing that service typically takes no less than 50 minutes.

183.   As reflected by Medicare reimbursement amounts, performing CPT Code 99220 (OBS3) is similar in complexity and requires a time commitment similar to CPT Codes 99222 (A2) and 99223 (A3), which typically take between 50 and 70 minutes to perform.

184.   The analysis below, however, to avoid any possibility of overstating IPC's upcoding scheme, estimated that the IPC hospitalists would take only five minutes to perform CPT Code 99220 (OBS3).

185.   That same five-minute estimate was used for all CPT Code billing entries for which the AMA description does not include a specific reference to the amount of time typically spent performing the task in question, regardless of the fact that those services could not be professionally performed in only five minutes.

51

186.    The analysis of the billing records described below, accordingly, represents a significant underestimate of the amount of time it would have taken the IPC hospitalists to actually perform all of the tasks for which they billed.

187.    Even using these gross underestimates, the billing records reveal that IPC hospitalists regularly billed in one day for services that could not have been performed within a 24-hour period.

188.    Second, the billing records reveal that the IPC hospitalists disproportionately used the highest level CPT Codes for any particular activity.

189.    As described above, the United States' payors reimburse physicians based upon the CPT Codes that correspond with the level of service provided.

190.    For example, when a hospitalist evaluates and admits a patient to the hospital, the hospitalist can bill to one of three CPT Codes, depending on the level of complexity associated with the admission process:  99221 (A1); 99222 (A2); or 99223 (A3).

191.    Similarly, when discharging a patient, a hospitalist can bill to one of two CPT Codes, depending on whether the hospitalist spent more or less than 30 minutes on the discharge process:   99238 (D<30) (less than 30 minutes) or 99239 (D>30) (greater than 30 minutes).

192.    Hospitalists typically see patients that would require the use of a reasonable distribution of the various coding levels.

193.    The records described below demonstrate a disproportionately high use of the highest level CPT Codes, and almost no use of the lowest level CPT Codes.

194.    Indeed, the records analyzed below all reflect the use of significantly higher level admission codes (A1, A2, and A3) than those used by Relator in 2005 when he received a letter from Trailblazer suggesting that some of his entries might have been in error because they exceeded the national averages.

### Dr. Rajasekhar Borra

195.    Dr. Rajasekhar Borra (Borra) is an IPC hospitalist who worked in and around the San Antonio area and who, on April 5, 2008, billed for treating 65 different patients in one day. The following chart summarizes Borra's billing records for April 5, 2008, and calculates the total amount of time it would have taken Borra to perform the services for which he submitted a bill:

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|----------|----------|----------|------------------------------------------|------------------------------|
| 99221 | A1 | 0 | 30 minutes | $0^5$ |
| 99222 | A2 | 1 | 50 minutes | 50 minutes |
| 99223 | A3 | 16 | 70 minutes | 18 hours, 40 minutes |
| 99231 | V1 | 0 | 15 minutes | 0 |

---

[5]    The chart includes Codes 99221 (A1) and 99231 (V1), the lowest level of billing codes for those activities, to show Borra's billing patterns.

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99232 | V2 | 13 | 25 minutes | 5 hours, 25 minutes |
| 99233 | V3 | 18 | 35 minutes | 10 hours, 30 minutes |
| 99291 | CC30-74 | 12 | 30-74 minutes | 6 hours (assuming 30 minutes per encounter) |
| 99238 | D<30 | 2 | 30 minutes or less | 10 minutes (assuming 5 minutes per encounter) |
| 99239 | D>30 | 3 | More than 30 minutes | 1 hour, 30 minutes (assuming 30 minutes per encounter) |
| TOTAL: | | 65 | | 43 hours, 5 minutes |

196.    Borra performed these services at two different facilities that are approximately 30 minutes apart.

197.    April 5, 2008, was not the first time Borra submitted one-day billing records for services that could not be performed within 24 hours.  The following chart sets forth the amount of time it would have taken Borra to perform the services for which he billed, as set forth on Borra's billing records prior to April 5, 2008.

| Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|
| May 5, 2007 | 34 hours, 15 minutes |
| July 7, 2007 | 30 hours, 35 minutes |
| July 22, 2007 | 26 hours |

54

| Date of<br>Billing Record | Time Estimated to<br>Perform Services Billed |
|---|---|
| August 2, 2007 | 18 hours, 50 minutes |
| August 5, 2007 | 25 hours, 5 minutes |
| August 13, 2007 | 23 hours |
| February 11, 2008 | 30 hours, 15 minutes |

198. In the Spring of 2008, during a pod meeting in front of other IPC hospitalists, Relator complained to Kevin Primeaux (Primeaux), a member of the regional administrative team, about excessive billing at IPC, using Borra as an example.

199. Primeaux was neither surprised nor upset, but told Relator, "I know, I know, we're going to talk to him."

200. But IPC failed to change Borra's billing practices. Borra continued to submit claims for excessive charges after the Spring of 2008, and IPC submitted those claims to the United States for reimbursement.

201. On June 23, 2008, Borra billed for services that, using the extremely conservative calculation method described above, equals 23 hours and 55 minutes to perform.

202. On July 22, 2008, Borra billed for services that, using the extremely conservative calculation method described above, would have taken 30 hours and 35 minutes to perform.

203. Borra's billing records demonstrate that one of the ways Borra inflated his daily bills was by systematically using the higher level CPT Codes to the exclusion of the lower level CPT Codes.

55

204.    The following chart demonstrates the frequency with which Borra used the three CPT Code levels for admissions:

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| May 5, 2007 | 0 | 0 | 6 |
| July 7, 2007 | 0 | 0 | 5 |
| July 22, 2007 | 0 | 0 | 5 |
| August 2, 2007 | 0 | 0 | 6 |
| August 5, 2007 | 0 | 0 | 9 |
| August 13, 2007 | 0 | 0 | 6 |
| February 11, 2008 | 0 | 1 | 8 |
| April 5, 2008 | 0 | 1 | 16 |
| June 23, 2008 | 0 | 0 | 4 |
| July 22, 2008 | 0 | 0 | 9 |
| **Total:** | **0** | **2** | **74** |
| **Percentage of Total:** | **0%** | **2.6%** | **97.4%** |

205.    The following chart reveals that Borra similarly upcoded for providing subsequent hospital care — CPT Codes 99231 (V1), 99232 (V2), and 99233 (V3):

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| May 5, 2007 | 0 | 5 | 32 |
| July 7, 2007 | 0 | 7 | 20 |
| July 22, 2007 | 0 | 4 | 23 |
| August 2, 2007 | 0 | 2 | 11 |
| August 5, 2007 | 0 | 5 | 15 |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| August 13, 2007 | 0 | 3 | 15 |
| February 11, 2008 | 0 | 12 | 13 |
| April 5, 2008 | 0 | 13 | 18 |
| June 23, 2008 | 0 | 11 | 13 |
| July 22, 2008 | 0 | 6 | 17 |
| **Total:** | **0** | **68** | **177** |
| **Percentage of Total:** | **0%** | **27.8%** | **72.2%** |

206. Borra's use of the CPT Codes associated with patient discharge reveals a similar pattern:

| **Date** | **99238 (D<30)** | **99239 (D>30)** |
|---|---|---|
| May 5, 2007 | 0 | 6 |
| July 7, 2007 | 0 | 8 |
| July 22, 2007 | 0 | 3 |
| August 2, 2007 | 4 | 7 |
| August 5, 2007 | 0 | 3 |
| August 13, 2007 | 1 | 2 |
| February 11, 2008 | 0 | 10 |
| April 5, 2008 | 2 | 3 |
| June 23, 2008 | 0 | 7 |
| July 22, 2008 | 0 | 9 |
| **Total:** | **7** | **58** |
| **Percentage of Total:** | **10.8%** | **89.2%** |

207.     Borra was one of many IPC hospitalists who engaged in IPC's upcoding scheme for their financial benefit, IPC's financial benefit, and to the detriment of Medicare and other federal payors.

208.     Due to IPC's detailed and aggressive monitoring of its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability, IPC knew or should have known that Borra was engaged in systematic upcoding that resulted in the submission of fale claims and false statements to Medicare, Medicaid and other federal payors.

**Dr. Linos Ramos**

209.     Dr. Lino Ramos (Ramos) is an IPC hospitalist who submitted billing records for November 22, 2008 that reveal the following information:

| **CPT Code** | **IPC Code** | **Quantity** | **Time Typically Required to Complete Task** | **Time Estimated Spent on Code** |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 10 | 70 minutes | 11 hours, 40 minutes |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 2 | 25 minutes | 50 minutes |
| 99233 | V3 | 29 | 35 minutes | 16 hours, 55 minutes |

58

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99291 | CC30-74 | 9 | 30-74 minutes | 4 hours, 30 minutes (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |
| 99239 | D>30 | 4 | More than 30 minutes | 2 hours (assuming 30 minutes per encounter) |
| 99236 | A3/D | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| TOTAL: | | 55 | | 36 hours |

210.     Ramos' excessive billing took place with regularity as illustrated by the following

chart:

| Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|
| June 28, 2008 | 21 hours, 15 minutes |
| July 7, 2008 | 24 hours, 5 minutes |
| August 16, 2008 | 26 hours, 40 minutes |
| October 18, 2008 | 33 hours, 50 minutes |
| November 22, 2008 | 36 hours (see above) |

211.     Like Borra, Ramos not only billed far in excess of 24 hours of services in a single

day, but Ramos also performed those services at multiple facilities, requiring travel time as well.

59

212.    Ramos' November 22, 2008 billing record reflects upcoded false claims not only because he submitted bills for apparently more than 36 hours of services in a 24-hour period, but also because 95 percent of his billing submissions for services provided in connection with admissions, subsequent hospital care, and discharges were at the highest possible CPT Code level.

213.    The following charts reveal that Ramos regularly billed excessively to the highest level CPT Codes:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|------|------------|------------|------------|
| June 28, 2008 | 0 | 0 | 2 |
| July 7, 2008 | 0 | 1 | 0 |
| August 16, 2008 | 0 | 0 | 6 |
| October 18, 2008 | 0 | 1 | 4 |
| November 22, 2008 | 0 | 0 | 10 |
| **Total:** | **0** | **2** | **22** |
| **Percentage of Total:** | **0%** | **8.3%** | **91.7%** |

| | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|------|------------|------------|------------|
| June 28, 2008 | 0 | 2 | 20 |
| July 7, 2008 | 0 | 6 | 20 |
| August 16, 2008 | 0 | 8 | 18 |
| October 18, 2008 | 0 | 9 | 29 |
| November 22, 2008 | 0 | 2 | 29 |
| **Total:** | **0** | **27** | **116** |

|  | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| **Percentage of Total:** | **0%** | **18.9%** | **81.1%** |

| **Date** | **99238 (D<30)** | **99239 (D>30)** |
|---|---|---|
| June 28, 2008 | 0 | 4 |
| July 7, 2008 | 0 | 9 |
| August 16, 2008 | 0 | 4 |
| October 18, 2008 | 0 | 10 |
| November 22, 2008 | 0 | 4 |
| **Total:** | **0** | **31** |
| **Percentage of Total:** | **0%** | **100%** |

214. Due to IPC's detailed and aggressive monitoring of its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability, IPC knew or should have known that Ramos was engaged in systematic upcoding that resulted in the submission of false claims and false statements to Medicare, Medicaid and other federal payors.

### Dr. Louis Pulicicchio

215. Dr. Louis Pulicicchio (Pulicicchio) is an IPC hospitalist who worked in and around the San Antonio area who submitted billing records for October 25, 2008 that reveal the following information:

61

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 1 | 50 minutes | 50 minutes |
| 99223 | A3 | 6 | 70 minutes | 7 hours |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 5 | 25 minutes | 2 hours, 5 minutes |
| 99233 | V3 | 28 | 35 minutes | 16 hours, 20 minutes |
| 99291 | CC30-74 | 4 | 30-74 minutes | 2 hours (assuming 30 minutes per encounter) |
| 99253 | C3 | 1 | 55 minutes | 55 minutes |
| 99238 | D<30 | 1 | 30 minutes or less | 5 minutes (assuming 5 minutes per encounter) |
| 99239 | D>30 | 6 | More than 30 minutes | 3 hours (assuming 30 minutes per encounter) |
| TOTAL: | | 52 | | 32 hours, 15 minutes |

216.  On October 25, 2008, Pulicicchio billed for services provided at three different facilities, adding significant travel time to his day.

217.  On each of the following days, Pulicicchio also traveled to multiple facilities and submitted bills for more than 24 hours of services:

| Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|
| April 10, 2008 | 30 hours |
| June 14, 2008 | 25 hours, 20 minutes |
| July 21, 2008 | 25 hours, 5 minutes |
| October 22, 2008 | 31 hours |

218.   The following charts reveal that Pulicicchio systematically billed to the highest level CPT Codes in order in increase the amount he could bill, consistent with IPC's scheme:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| April 10, 2008 | 0 | 1 | 7 |
| June 14, 2008 | 0 | 2 | 4 |
| July 21, 2008 | 0 | 1 | 8 |
| October 22, 2008 | 0 | 0 | 6 |
| October 25, 2008 | 0 | 1 | 6 |
| **Total:** | **0** | **5** | **31** |
| **Percentage of Total:** | **0%** | **13.9%** | **86.1%** |

| Date | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|
| April 10, 2008 | 0 | 3 | 20 |
| June 14, 2008 | 0 | 0 | 18 |
| July 21, 2008 | 0 | 2 | 12 |
| October 22, 2008 | 0 | 3 | 27 |
| October 25, 2008 | 0 | 5 | 28 |
| **Total:** | **0** | **13** | **105** |
| **Percentage of Total:** | **0%** | **11.0%** | **89.0%** |

| __Date__ | __99238 (D<30)__ | __99239 (D>30)__ |
|:---:|:---:|:---:|
| April 10, 2008 | 0 | 9 |
| June 14, 2008 | 0 | 9 |
| July 21, 2008 | 1 | 4 |
| October 22, 2008 | 0 | 6 |
| October 25, 2008 | 1 | 6 |
| **Total:** | **2** | **34** |
| **Percentage of Total:** | **5.6%** | **94.4%** |

219.    Due to IPC's detailed and aggressive monitoring of its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability, IPC knew or should have known that Pulicchio was engaged in systematic upcoding that resulted in the submission of false claims and false statements to Medicare, Medicaid and other federal payors.

### __Dr. Stanislav Ivanov__

220.    Dr. Stanislav Ivanov (Ivanov) is an IPC hospitalist who worked in and around the San Antonio area who submitted billing records for August 11, 2008, that reveal the following information:

| CPT Code | **IPC Code** | **Quantity** | **Time Typically Required to Complete Task** | **Time Estimated on Code** |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 8 | 70 minutes | 9 hours, 20 minutes |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 9 | 25 minutes | 3 hour, 45 minutes |
| 99233 | V3 | 20 | 35 minutes | 11 hours, 40 minutes |
| 99291 | CC30-74 | 4 | 30-74 minutes | 2 hours (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |
| 99239 | D>30 | 5 | More than 30 minutes | 2 hours, 30 minutes (assuming 30 minutes per encounter) |
| 99220 | OBS3 | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| 99255 | C5 | 1 | 110 minutes | 1 hour, 50 minutes |
| **TOTAL:** | | **48** | | **31 hours, 10 minutes** |

221.  Ivanov regularly, including on August 11, 2008, provided services at more than one facility.

65

222.  He also regularly submitted excessive daily billing totals, often billing for work that would have taken in excess of 24 hours to perform:

| Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|
| July 20, 2007 | 22 hours, 25 minutes |
| September 15, 2007 | 18 hours, 50 minutes |
| June 1, 2008 | 27 hours, 45 minutes |
| July 21, 2008 | 26 hours, 25 minutes |
| August 11, 2008 | 31 hours, 10 minutes (see above) |
| October 10, 2008 | 30 hours, 20 minutes |
| October 13, 2008 | 27 hours, 50 minutes |
| October 27, 2008 | 21 hours, 40 minutes |

223.  Ivanov's billing patterns, particularly with respect to the admissions and discharge process, are consistent with IPC's upcoding scheme:

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| July 20, 2007 | 0 | 0 | 5 |
| September 15, 2007 | 0 | 0 | 2 |
| June 1, 2008 | 0 | 0 | 5 |
| July 21, 2008 | 0 | 3 | 6 |
| August 11, 2008 | 0 | 0 | 8 |
| October 10, 2008 | 0 | 0 | 9 |
| October 13, 2008 | 0 | 0 | 6 |
| October 27, 2008 | 0 | 0 | 3 |

66

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|:---:|:---:|:---:|:---:|
| **Total:** | **0** | **3** | **44** |
| **Percentage of Total:** | **0%** | **6.4%** | **93.6%** |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|:---:|:---:|:---:|:---:|
| July 20, 2007 | 0 | 8 | 17 |
| September 15, 2007 | 0 | 10 | 11 |
| June 1, 2008 | 0 | 9 | 23 |
| July 21, 2008 | 0 | 7 | 17 |
| August 11, 2008 | 0 | 9 | 20 |
| October 10, 2008 | 0 | 6 | 22 |
| October 13, 2008 | 0 | 9 | 16 |
| October 27, 2008 | 0 | 12 | 17 |
| **Total:** | **0** | **70** | **143** |
| **Percentage of Total:** | **0%** | **32.9%** | **67.1%** |

| **Date** | **99238 (D<30)** | **99239 (D>30)** |
|:---:|:---:|:---:|
| July 20, 2007 | 1 | 4 |
| September 15, 2007 | 0 | 4 |
| June 1, 2008 | 0 | 3 |
| July 21, 2008 | 0 | 4 |
| August 11, 2008 | 0 | 5 |
| October 10, 2008 | 1 | 8 |
| October 13, 2008 | 0 | 11 |
| October 27, 2008 | 0 | 2 |
| **Total:** | **2** | **41** |
| **Percentage of Total:** | **4.7%** | **95.3%** |

67

224.   Due to IPC's detailed and aggressive monitoring of its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability, IPC knew or should have known that Ivanov was engaged in systematic upcoding that resulted in the submission of false claims and false statements to Medicare, Medicaid and other federal payors

**Dr. Obinna Ozigbo**

225.   Dr. Obinna Ozigbo (Ozigbo) is an IPC hospitalist who submitted billing records for October 13, 2008 that reveal the following information:

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 6 | 70 minutes | 7 hours |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 0 | 25 minutes | 0 |
| 99233 | V3 | 23 | 35 minutes | 13 hours, 25 minutes |
| 99291 | CC30-74 | 6 | 30-74 minutes | 3 hours (assuming 30 minutes per encounter) |
| 99238 | D<30 | 0 | 30 minutes or less | 0 |

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99239 | D>30 | 2 | More than 30 minutes | 1 hour (assuming 30 minutes per encounter) |
| 99236 | A3/D | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| TOTAL: | | 38 | | 24 hours, 30 minutes |

226. As seen above, on October 13, 2008, Ozigbo not only billed for services that would have taken in excess of 24 hours to perform, but he never used any code other than the highest level CPT Codes for any task he performed.

227. As seen below, Ozigbo's October 13, 2008, billing records are consistent with Ozigbo's and IPC's pattern and practice:

| Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|
| August 10, 2007 | 20 hours, 45 minutes |
| August 29, 2007 | 19 hours, 5 minutes |
| September 8, 2007 | 23 hours, 20 minutes |
| October 13, 2008 | 24 hours, 30 minutes (see above) |
| October 20, 2008 | 24 hours, 45 minutes |

| Date | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|
| August 10, 2007 | 0 | 1 | 7 |
| August 29, 2007 | 0 | 0 | 3 |

69

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| September 8, 2007 | 0 | 0 | 3 |
| October 13, 2008 | 0 | 0 | 6 |
| October 20, 2008 | 0 | 0 | 5 |
| **Total:** | **0** | **1** | **24** |
| **Percentage of Total:** | **0%** | **4.0%** | **96.0%** |
| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
| August 10, 2007 | 0 | 3 | 17 |
| August 29, 2007 | 0 | 1 | 19 |
| September 8, 2007 | 0 | 3 | 25 |
| October 13, 2008 | 0 | 0 | 23 |
| October 20, 2008 | 0 | 2 | 25 |
| **Total:** | **0** | **9** | **109** |
| **Percentage of Total:** | **0%** | **7.6%** | **92.4%** |

| **Date** | **99238 (D<30)** | **99239 (D>30)** |
|---|---|---|
| August 10, 2007 | 1 | 1 |
| August 29, 2007 | 2 | 5 |
| September 8, 2007 | 0 | 5 |
| October 13, 2008 | 0 | 2 |
| October 20, 2008 | 0 | 7 |
| **Total:** | **3** | **20** |
| **Percentage of Total:** | **13.0%** | **87.0%** |

228. Due to IPC's detailed and aggressive monitoring of its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability, IPC knew or should have known that Ozibgo was engaged in systematic upcoding that resulted in the submission of false claims and false statements to Medicare, Medicaid and other federal payors

**Dr. Jesus Virlar**

229. Dr. Jesus Virlar (Virlar) is an IPC hospitalist who worked in and around the San Antonio area, and who submitted billing records for June 1, 2008 that reveal the following information:

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99221 | A1 | 0 | 30 minutes | 0 |
| 99222 | A2 | 0 | 50 minutes | 0 |
| 99223 | A3 | 12 | 70 minutes | 14 hours |
| 99231 | V1 | 0 | 15 minutes | 0 |
| 99232 | V2 | 4 | 25 minutes | 1 hour, 40 minutes |
| 99233 | V3 | 19 | 35 minutes | 11 hours, 5 minutes |
| 99291 | CC30-74 | 2 | 30-74 minutes | 1 hour (assuming 30 minutes per encounter) |

71

| CPT Code | IPC Code | Quantity | Time Typically Required to Complete Task | Time Estimated Spent on Code |
|---|---|---|---|---|
| 99238 | D<30 | 0 | 30 minutes or less | 0 |
| 99239 | D>30 | 5 | More than 30 minutes | 2 hours, 30 minutes (assuming 30 minutes per encounter) |
| 99220 | A2/D | 1 | Not specified | 5 minutes (assuming 5 minutes per encounter) |
| 99255 | C4 | 1 | 80 minutes | 1 hour, 20 minutes |
| TOTAL: | | 44 | | 31 hours, 40 minutes |

230. Virlar regularly, including on June 1, 2008, provided services at more than one facility and submitted excessive daily billing totals:

| Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|
| July 14, 2007 | 31 hours, 5 minutes |
| July 16, 2007 | 29 hours, 35 minutes |
| August 26, 2007 | 23 hours, 15 minutes |
| September 8, 2007 | 27 hours, 45 minutes |
| February 2, 2008 | 22 hours, 5 minutes |

231. Virlar's use of the highest level CPT Codes is consistent with IPC's upcoding scheme:

72

| **Date** | **99221 (A1)** | **99222 (A2)** | **99223 (A3)** |
|---|---|---|---|
| July 14, 2007 | 0 | 0 | 6 |
| July 16, 2007 | 0 | 0 | 9 |
| August 26, 2007 | 0 | 0 | 7 |
| September 8, 2007 | 0 | 0 | 7 |
| February 2, 2008 | 0 | 1 | 3 |
| June 1, 2008 | 0 | 0 | 12 |
| **Total:** | **0** | **1** | **44** |
| **Percentage of Total:** | **0%** | **2.2%** | **97.8%** |

| **Date** | **99231 (V1)** | **99232 (V2)** | **99233 (V3)** |
|---|---|---|---|
| July 14, 2007 | 0 | 13 | 23 |
| July 16, 2007 | 0 | 11 | 15 |
| August 26, 2007 | 0 | 13 | 10 |
| September 8, 2007 | 0 | 13 | 19 |
| February 2, 2008 | 0 | 10 | 13 |
| June 1, 2008 | 0 | 4 | 19 |
| **Total:** | **0** | **64** | **99** |
| **Percentage of Total:** | **0%** | **39.3%** | **60.7%** |

| **Date** | **99238 (D<30)** | **99239 (D>30)** |
|---|---|---|
| July 14, 2007 | 1 | 9 |
| July 16, 2007 | 1 | 8 |
| August 26, 2007 | 0 | 5 |
| September 8, 2007 | 0 | 4 |
| February 2, 2008 | 2 | 5 |
| June 1, 2008 | 0 | 5 |

| Date | 99238 (D<30) | 99239 (D>30) |
|---|---|---|
| Total: | 4 | 36 |
| Percentage of Total: | 10.0% | 90.0% |

232.     Due to IPC's detailed and aggressive monitoring of its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability, IPC knew or should have known that Virlar was engaged in systematic upcoding that resulted in the submission of false claims and false statements to Medicare, Medicaid and other federal payors.

**Additional Examples of IPC Hospitalists Billing For Services Requiring More Than 24 Hours To Perform**

233.     As seen in the chart below, the six IPC hospitalists discussed above were not the only IPC hospitalists billing for services performed in one day that required more than 24 hours to perform:

| IPC Hospitalist | Date of Billing Record | Time Estimated Required to Perform Services Billed |
|---|---|---|
| Ravi Santhanam | August 13, 2007 | 24 hours, 25 minutes |
| Timothy Osanma | December 29, 2007 | 29 hours, 10 minutes |
| Dan Muro | June 15, 2008 | 31 hours, 20 minutes |
| Defeng Chen | June 28, 2008 | 24 hours, 10 minutes |
| Michael Fields | July 29, 2007 | 28 hours, 0 minutes |
| Jose Pujol | October 26, 2008 | 24 hours, 15 minutes |

234. These IPC hospitalists excessively used the highest level CPT Codes and, like the hospitalists discussed above, their billing records do not include a single entry at the lowest level CPT Code for either admissions or for subsequent hospital care.

**Additional Examples Of Excessive Billing**

235. Each of the examples discussed above involve IPC hospitalists who submitted billing records that included services that — even using extremely conservative estimates — could not have been performed in a single day.

236. The IPC hospitalists listed on the chart below submitted billing records for services that would have taken an unreasonable amount of time to complete in a single day, even if the extremely conservative estimates of the time required to perform those services did not exceed 24 hours:

| IPC Hospitalist | Date of Billing Record | Time Estimated to Perform Services Billed |
|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 20 hours, 30 minutes |
| Vu Vu | August 1, 2007 | 23 hours, 55 minutes |
| Artemio Joel Ramirez | August 19, 2007 | 13 hours, 40 minutes |
| In Seok Park | September 5, 2007 | 20 hours, 50 minutes |
| Kwame Obeng | September 15, 2007 | 14 hours, 20 minutes |
| Orlando Kypuros | February 16, 2008 | 22 hours, 15 minutes |
| Vijaya Rasamallu | August 18, 2008 | 19 hours, 55 minutes |
| Venkata Yerramilli | October 9, 2008 | 20 hours, 0 minutes |

237. The use of more reasonable proxies for the time required to complete the tasks for which these IPC hospitalists billed would push most, if not all, of these estimates in the chart above over the 24-hour threshold.

238. Similarly, accounting for transportation, meals, breaks, and the time required to prepare paperwork would, alone, push many of the estimates in the chart above over the 24-hour threshold.

239. The 24-hour threshold is only relevant because submitting a daily billing record for tasks that could not be completed within a 24-hour period is plainly fraudulent.

240. That does not mean, of course, that daily billing records for tasks that could conceivably have been completed within a 24-hour period were not fraudulent.

241. To the contrary, the billing records for the IPC hospitalists listed in the chart above reveal that they, too, were using billing patterns consistent with IPC's upcoding scheme:

| IPC Hospitalist | Date of Billing Record | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 0 | 1 | 4 |
| Vu Vu | August 1, 2007 | 0 | 0 | 5 |
| Artemio Joel Ramirez | August 19, 2007 | 0 | 0 | 3 |
| In Seok Park | September 5, 2007 | 0 | 0 | 7 |
| Kwame Obeng | September 15, 2007 | 0 | 0 | 2 |
| Orlando Kypuros | February 16, 2008 | 0 | 0 | 5 |
| Vijaya Rasamallu | August 18, 2008 | 0 | 0 | 8 |
| Venkata Yerramilli | October 9, 2008 | 0 | 0 | 4 |

| IPC Hospitalist | Date of Billing Record | 99221 (A1) | 99222 (A2) | 99223 (A3) |
|---|---|---|---|---|
| Total: | | 0 | 1 | 38 |
| Percentage of Total: | | 0% | 2.6% | 97.4% |

| IPC Hospitalist | Date of Billing Record | 99231 (V1) | 99232 (V2) | 99233 (V3) |
|---|---|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 0 | 4 | 11 |
| Vu Vu | August 1, 2007 | 1 | 6 | 20 |
| Artemio Joel Ramirez | August 19, 2007 | 0 | 0 | 17 |
| In Seok Park | September 5, 2007 | 0 | 2 | 10 |
| Kwame Obeng | September 15, 2007 | 0 | 2 | 13 |
| Orlando Kypuros | February 16, 2008 | 0 | 8 | 18 |
| Vijaya Rasamallu | August 18, 2008 | 0 | 1 | 13 |
| Venkata Yerramilli | October 9, 2008 | 0 | 0 | 18 |
| Total: | | 1 | 23 | 120 |
| Percentage of Total: | | 0.7% | 16.0% | 83.3% |

| IPC Hospitalist | Date of Billing Record | 99238 (D<30) | 99239 (D>30) |
|---|---|---|---|
| Juan Carlos Gonzalez | July 17, 2007 | 1 | 6 |
| Vu Vu | August 1, 2007 | 0 | 2 |
| Artemio Joel Ramirez | August 19, 2007 | 0 | 0 |
| In Seok Park | September 5, 2007 | 0 | 7 |
| Kwame Obeng | September 15, 2007 | 0 | 3 |
| Orlando Kypuros | February 16, 2008 | 0 | 5 |
| Vijaya Rasamallu | August 18, 2008 | 0 | 5 |

| IPC Hospitalist | Date of Billing Record | 99238 (D<30) | 99239 (D>30) |
|---|---|---|---|
| Venkata Yerramilli | October 9, 2008 | 0 | 6 |
| **Total:** | | **1** | **34** |
| **Percentage of Total:** | | **2.9%** | **97.1%** |

242.     These billing patterns are the rule — not the exception — at IPC.

243.     IPC, through IPC-Link® and its corporate management, monitored every aspect of its hospitalists' billing and revenue, with particular focus on its hospitalists' use of the highest-level E&M codes and the relationship between the use of those codes and IPC's revenue and profitability. As a result, IPC knew and/or should have known that the above-mentioned hospitalists, in addition to numerous other hospitalists employed by IPC, were engaged in upcoding on a systematic, nationwide basis.

## COUNT I:  False or Fraudulent Claims

**Violation of the False Claims Act, 39 U.S.C. § 3729(a)(1) (January 1, 2003 to May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A) (May 20, 2009 to present)**

244.    The United States restates and incorporates by reference paragraphs 1 through 243 of the Complaint in Intervention as if fully set forth herein.

245.    IPC knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for payment in amounts that were falsely inflated or exaggerated.

246.    By virtue of the false or fraudulent claims presented or caused to be presented by the defendants, the United States suffered damages.

247.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT II:  False Statements

**Violation of the False Claims Act, 39 U.S.C. § 3729(a)(2) (January 1, 2003 to May 19, 2009) and 31 U.S.C. § 3729(a)(1)(B) (May 20, 2009 to present)**

248.    The United States restates and incorporates by reference paragraphs 1 through 243 of the Complaint in Intervention as if fully set forth herein.

249.    Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B), as amended on May 20, 2009.

250.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by defendants.

## COUNT III:  Unjust Enrichment

251.    The United States restates and incorporates by reference paragraphs 1 through 243 of the Complaint in Intervention as if fully set forth herein.

252.    This is a claim for the recovery of monies by which the defendants have been unjustly enriched.

253.    By directly or indirectly obtaining government funds to which he was not entitled, defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT IV:  Payment by Mistake

254.    The United States restates and incorporates by reference paragraphs 1 through 243 of the Complaint in Intervention as if fully set forth herein.

255.    This is a claim for the recovery of monies paid by the United States to IPC as a result of mistaken understandings of fact.  IPC received and retained the benefit of these monies.

256.    The claims which defendants submitted or caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

257.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of defendants, paid IPC certain sums of money to which IPC was not entitled.  Defendants are thus liable to account for and to repay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, the United States of America, requests that judgment be entered in its favor and against defendants, jointly and severally, as follows:

1.     On the first and second counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the third count, for unjust enrichment, for the amounts by which the defendants were unjustly enriched in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

3.     On the fourth count for payment by mistake, for the amounts of the monies defendants retained to which it was not entitled, plus interest, costs, and expenses, and all such further relief as may be just and proper in an amount to be determined.

4.     With respect to each count, interest, attorney's fees and costs as allowed by law, and any and all further relief as the Court deems just and proper.

Respectfully submitted,


STUART F. DELERY
Assistant Attorney General

ZACHARY T. FARDON
United States Attorney

By:  s/ Eric S. Pruitt
    ERIC S. PRUITT
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-5496
    eric.pruitt@usdoj.gov


MICHAEL D. GRANSTON
DANIEL R. ANDERSON
ELIZABETH A. RINALDO
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
elizabeth.rinaldo@usdoj.gov

*Attorneys for the United States of America*




Dated:  June 16, 2014