IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ) <br> BIJAN OUGHATIYAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> IPC THE HOSPITALIST COMPANY, ) <br> INC., a California corporation *et al.,* ) <br> ) <br> Defendants. ) | Case No. 09 CV 5418 <br><br> Judge Joan H. Lefkow |

**RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS OR, IN THE
ALTERNATIVE, TO SEVER CLAIMS AGAINST THE DEFENDANTS**

**INTRODUCTION**

The United States' Complaint in Intervention (Complaint) details a long-running, nationwide scheme by which IPC the Hospitalist Company, Inc. (IPC) and its wholly-owned subsidiaries train, compensate, and pressure their 2,500 physician-employees, called hospitalists, to routinely bill for higher levels of service than were actually provided. As a result of this scheme, Defendants have submitted and/or caused the submission of numerous false, "upcoded" claims to government-funded health insurance programs, resulting in a massive loss of taxpayer dollars. The Complaint sets forth in detail the elements of its claims under the False Claims Act, 31 U.S.C. §§ 3729-3733 (FCA). The United States alleges that Defendants knowingly presented, or caused to be presented, to government health care programs inflated, and therefore false, claims for payment for hospitalist services. 31 U.S.C. § 3729(a)(1)(A). The United States also alleges that Defendants knowingly made false statements or records material to inflated, and therefore false, claims for payment. 31 U.S.C. § 3729(a)(1)(B).

Faced with 257 paragraphs of specific and extensive factual allegations describing exactly how Defendants carried out the upcoding scheme, Defendants have responded by filing a motion to dismiss arguing that the Complaint does not contain sufficient facts to support plausible claims against them. Defendants misrepresent the allegations in the Complaint, feign ignorance of IPC's own corporate structure, and demonstrate disregard for controlling case law.

First, Defendants contend that the Complaint lacks details about "who" submitted false claims, and "where" and "how" they were submitted. Although the level of particularity Defendants seek is not required under well-established Seventh Circuit precedent, the Complaint nonetheless contains precisely those details — the Complaint describes, by way of example, fifteen false, upcoded claims. And, as alleged in the Complaint, the United States provided Defendants

with still more details about those particular claims under separate cover, eliminating any question about the "who," "where" or "how" of those claims.

Second, Defendants feign confusion about their own corporate relationship, suggesting that IPC's wholly-owned subsidiaries are unrelated enterprises, perhaps with no involvement in the national upcoding scheme. But the Complaint alleges otherwise, stating that Defendants are closely-related entities, each and every one of which was engaged in the same national upcoding scheme. Seventh Circuit precedent requires no more from an initial pleading. Each Defendant's role in the upcoding scheme has thus been alleged with particularity. In any event, IPC's own 10-K explains the relatively straightforward relationship between itself and the other IPC Defendants: IPC controls or wholly-owns each of the IPC subsidiaries, which, in turn employ all IPC-affiliated hospitalists. Moreover, all IPC Defendants share the same corporate officers, including President and CEO, Adam Singer. As alleged in the Complaint, those corporate officers were all aware of IPC's national upcoding scheme.

Defendants also argue that the United States somehow lacks standing and/or that the claims against Defendants should be severed. Both arguments essentially rehash Defendants' Fed. R. Civ. P. 9(b) (Rule 9(b)) contentions and are meritless for the same reasons. At bottom, Defendants' motion is nothing more than a demand for information already in the Complaint or Defendants' possession. The Complaint goes well beyond what is required to give Defendants sufficient notice so that they can fairly respond to the allegations they face.

## FACTUAL BACKGROUND

### The IPC Defendants

Defendant IPC, headquartered in North Hollywood, California, is one of the largest hospitalist companies in the country. (Compl. ¶¶ 6, 16, 66). Hospitalists are medical professionals who provide services to hospitalized patients. (*Id.* at ¶ 6). IPC, through the remaining Defendants

— IPC's wholly-owned subsidiaries or its affiliated professional organizations (hereinafter the IPC Subsidiaries, and together with IPC, the Defendants) — employs approximately 2,500 hospitalists, who provide medical services to patients in 28 states. (*Id.* at ¶¶ 6, 16-45).

Although the IPC Subsidiaries actually employ the IPC-affiliated hospitalists, IPC provides all of the administrative services for its hospitalists, including "billing and collection services," from its executive offices in California. (*Id.* at ¶¶ 68, 70, 75). IPC touts its integration with, and control over, the IPC Subsidiaries in its public SEC filings:

> We believe we are the largest dedicated hospitalist company in the United States based on revenues, patient encounters and number of affiliated hospitalists. As of December 31, 2013, our over 1,760 affiliated hospitalists, including physicians, nurse practitioners and physician assistants (collectively "affiliated hospitalists") provide hospitalist solutions at over 410 hospitals and 1,100 other inpatient and post-acute care facilities primarily in 26 states.
>
> … Our affiliated hospitalists are primarily full-time employees of our wholly-owned subsidiaries or our affiliated professional organizations.

(IPC's 2013 10-K, at pp. 1-2, attached hereto as Exhibit A).[1] IPC refers to itself as a "national company" and acknowledges that it "assume[s] responsibility for all billing, reimbursement and collection processes relating to hospitalist services provided by our affiliated hospitalists and practice groups." (*Id.* at pp. 6-7). Indeed, IPC's founder, Adam Singer, who serves as Chairman of the Board and Chief Executive Officer of IPC, is also the President of every IPC Subsidiary that provides such corporate officer information to the Secretary of State. (*See* Exh. B[2]). IPC's other

---

[1] The Court may take judicial notice of IPC's 10-K without converting Defendants' 12(b)(6) motion into a summary judgment motion. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir.1994) ("'[t]he district court may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment." (quoting *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)); *see also In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, No. 05-MD-527, 2010 WL 1253891, at *6 (N.D. Ind. Mar. 29, 2010) (taking judicial notice of defendant's 10-K where there was no dispute as to the facts contained therein); *Hernandez v. Midland Credit Mgmt., Inc.*, No. 04-cv-7844, 2006 WL 695451, at *4 (N.D. Ill. March 14, 2006) (judicial notice may be taken of the contents of documents filed with the Securities and Exchange Commission).

[2] To demonstrate the connection among the IPC Defendants, attached hereto as Exhibit B is a chart showing the corporate officers for each of the IPC Defendants, as well as the supporting documentation from each Secretary of State that makes this information available.

-3-

corporate officers similarly serve as officers of the IPC Subsidiaries. *Id.* Defendants thus operate and portray themselves as one unified organization.

### Reimbursement for Hospitalist Services

Defendants are reimbursed for the care IPC's affiliated hospitalists provide to their patients by several federal government programs, including Medicare, Medicaid, the Office of Personnel Management Federal Employees Health Benefits Program (FEHBP), the Railroad Retirement Board (RRB), and the Tricare Management Agency (TRICARE) (collectively, Federal Payors). (Compl. ¶ 5). Since 2006, Defendants have consistently received approximately 50 percent of their revenue from Federal Payors. (*Id.* at ¶ 65).

Federal Payors determine how much to pay for hospitalist services based on the level of Current Procedural Terminology Codes (CPT Codes) submitted by providers. (*Id.* at ¶¶ 51-52). The highest-level CPT Codes are appropriate only when the hospitalist provides the most complex level of care to the most significantly impaired patients, and spends significantly more time providing that care. (*Id.* at ¶¶ 53-54). Because IPC received higher reimbursement fees for higher-level CPT Codes (*Id.* at ¶ 55), IPC's revenues and profitability are directly correlated with their use of higher level CPT Codes. (*Id.* at ¶ 69).

### Defendants' Corporate Culture Encouraged Upcoding

Defendants have created a corporate culture that encourages affiliated hospitalists to routinely use significantly higher CPT Codes than warranted by the services actually provided. (Compl. ¶¶ 69, 77-79, 107-111). To create and enforce that culture, Defendants use a variety of methods. First, Defendants established a compensation structure that rewards hospitalists with significant bonuses that can meet or exceed the hospitalists' base salary depending upon the amount the hospitalists bill. (*Id.* at ¶ 78). Second, Defendants employ peer pressure to encourage upcoding — all hospitalists are routinely ranked against one another based on their "revenue per patient

encounter," a key IPC metric that can be "improved" only by billing at higher-level CPT Codes. (*Id.* at ¶ 81). Third, Defendants' management team and corporate "trainers" directly pressure IPC hospitalists who bill at moderate levels to increase their "revenue per encounter" and bill at higher-level CPT Codes without regard to the level of service actually provided. (*Id.* at ¶¶ 81, 92, 93). IPC's own 10-K promotes the fact that it provides its hospitalists "training on billing." (Exh. A, p. 6).

### Defendants' Corporate Culture Resulted in Upcoding

The corporate culture Defendants created is remarkably effective. Overall, IPC-affiliated hospitalists bill at the highest-level CPT Codes at significantly higher rates than the national average for similarly situated medical professionals. (Compl. ¶ 105). For example, IPC hospitalists bill at the highest-level CPT Code for making subsequent visits to patients in the hospital ("rounds") 70 percent of the time. The national average for billing that same code is only 20 percent. (*Id.* at ¶ 107). IPC hospitalists also routinely bill for services in a single day that would take longer — in some cases much longer — than 24 hours to perform. (*Id.* at ¶¶ 165-242). The Complaint also details the impact of IPC's corporate culture on hospitalists who join IPC. When hospitalists first join IPC, they typically use a significant percentage of the lowest-level CPT Codes, but after a few months' exposure to the IPC culture, those same hospitalists virtually eliminate the use of the lowest-level CPT Codes, and significantly increase their use of the highest-level CPT Codes. (*Id.* at ¶¶ 113-34) (detailing the billing patterns of six IPC hospitalists). Finally, the Complaint provides detailed information about 15 separate claims submitted by Defendants, and paid by Medicare, including the basis for the conclusion that those claims were upcoded. (*Id.* at ¶¶ 153-63).

### Defendants Knew About and Encouraged Upcoding

IPC's corporate officers — including the corporate officers of the IPC Subsidiaries — have long been aware that billing at the highest-level CPT Codes is critical to IPC's revenue goals.

(Compl. ¶¶ 94-95). Those officers, including CEO Adam Singer, COO Jeff Taylor and CFO Devra Shapiro (all officers of IPC Subsidiaries), regularly received reports regarding the rate at which IPC hospitalists (employed by IPC Subsidiaries) were billing, including a list of hospitalists who were "flagged" for falling below IPC's revenue-per-encounter targets, and for billing the highest-level CPT Codes at an insufficient level. (*Id.* at ¶¶ 95-96, 100-01). IPC hospitalists were "flagged" for billing an insufficient number of high-level codes, even though their use of those codes was consistent with the national average. (*Id.* at ¶¶ 101-03).[3] As described above, hospitalists flagged for billing an "insufficient" number of high-level CPT Codes were pressured by management to change their practices. (*Id.* at ¶ 82).

IPC's "corporate officers knew that the huge disparity between its utilization of the highest level [CPT Codes] and the national average utilization rates was a significant red flag indicating that it was likely submitting an enormous number of upcoded claims." (*Id.* at ¶ 108). Indeed, IPC's corporate officers agreed to not publicly discuss IPC's billing rates because it "easily could lead to trouble," and "has a large risk to it as well in terms of shouting out that we want to be audited." (*Id.* at ¶ 109). Despite this knowledge, IPC's corporate officers ignored the risk, even instructing IPC hospitalists to disregard warnings that they were upcoding. (*Id.* at ¶ 148; *see also Id.* at ¶¶ 135-52).

The culture created by Defendants, and monitored and encouraged by Defendants' corporate officers, caused the submission of numerous false claims and/or statements.

## LEGAL STANDARDS

In evaluating the sufficiency of a Complaint, the court must view it "in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB. v. Hofer*, 649 F.3d 610,

---

[3] By contrast, despite these reports being used by IPC's Compliance Department, IPC did not flag hospitalists for upcoding except for one category of service — subsequent hospital visits — and it set that "flag" at 95 percent when the national average was only 20 percent. (*Id.* at ¶¶ 103-04).

-6-

614 (7th Cir. 2011). A complaint need not be probable, only plausible to survive a motion to dismiss. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012). Because FCA claims are subject to Rule 9(b), the Government must plead the "who, what, when, where, and how" of the fraud with particularity. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). But to say that a complaint "has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *Id.* at 855.

## ARGUMENT

**I.     The Complaint Alleges a Nationwide Scheme to Defraud the Government with Sufficient Particularity to Comply with Rule 9(b)**

**A.     The Complaint Sufficiently Alleges the "Who" of the Fraudulent Scheme**

Defendants appear to make two related arguments directed at the "who" of the fraudulent scheme: (1) that the Complaint fails to identify which Defendant actually submitted the false claims (IPC Br. p. 7); and (2) that the Complaint improperly "lumps" Defendants together. (*Id.* at pp. 11-12). Both arguments lack merit.

First, Defendants contend that the Complaint does not sufficiently allege which Defendant, "if any," submitted the false claims to the government. (*Id.* at p. 7). Contrary to IPC's suggestion, however, the Complaint explains that IPC — as opposed to the IPC Subsidiaries — provides all of its affiliated hospitalists with "billing and collection services" from its "executive offices"; that IPC "audits the billing information entered by the hospitalists for ʻcompleteness and accuracy and creates an electronic billing file for automated submission to payor'"; and that "[t]he bills are then electronically submitted by IPC to the federal government for payment." (Compl. ¶¶ 68, 75). To the extent those allegations are not sufficiently clear, IPC's own 10-K announces that "[w]e assume responsibility for all billing, reimbursement and collection processes relating to hospitalist services provided by our affiliated hospitalists and practice groups." (Exh. A, p. 7).

The Complaint more than adequately alleges that all Defendants either submitted, or *caused to be submitted*, false claims for payment. The IPC Subsidiaries are liable for causing the submission of false claims because they employ the IPC hospitalists who engaged in the upcoding. And even assuming IPC can later prove that the IPC Subsidiaries, rather than IPC, submitted claims for payment, IPC would still be liable for causing the submission of false claims (and/or using false statements to get false claims paid) because its conduct brought about the upcoded claims in the first place. *See* 31 U.S.C. § 3729(a)(1)(A).[4]

Second, Defendants' contention that the Complaint improperly "lumps" the IPC entities together (IPC Br. pp. 11-12) should also be disregarded. Defendants operate as a single, integrated entity, sharing the same technology, the same administrative services, and the same corporate officers and agents. (*See supra*, pp. 2-4). IPC itself touts the services it provides as being "necessary to effectively manage these nationally integrated practice group organizations." (Exh. A, p. 3). And IPC advertises that the IPC Subsidiaries are "wholly-owned subsidiaries" or "affiliated professional organizations" in which IPC has "a controlling financial interest." (*Id.*). Accordingly, to the extent that the Complaint can be read to treat the Defendants as a single enterprise, it is entirely appropriate and consistent with IPC's own description of its corporate structure to its shareholders.

Nonetheless, the Complaint does clearly allege the role of each Defendant. As set forth above, the Complaint alleges that IPC created the corporate culture that resulted in the IPC hospitalists' rampant upcoding through its compensation, training, monitoring and pressure. (*See supra*, pp. 4-6). The Complaint also alleges that the IPC Subsidiaries employed the IPC hospitalists

---

[4] Aside from the fact that Defendants are fully aware of the role each Defendant plays in the claims submitted for services provided by hospitalists employed by the IPC Subsidiaries, the United States provided Defendants with 15 specific claim numbers for the representative upcoded claims identified in the Complaint. (Compl. ¶¶ 153-63, n. 2, 3 and 4). From those claim numbers, Defendants can readily identify from their own records which IPC Subsidiary Medicare provider number was used to submit the claim, the name of the patient to whom service was rendered, where the service was rendered, and which IPC provider rendered the service.

who engaged in the upcoding. (*See supra*, pp. 2-4). Contrary to Defendants' suggestion, the Complaint also sufficiently alleges scienter with respect to each Defendant. The Complaint alleges that IPC hospitalists across the country were using the highest-level CPT Codes at three times the national average. (*See supra*, pp. 5-6). That allegation alone is sufficient to plead that IPC, and the IPC Subsidiaries who employed those hospitalists, acted in deliberate ignorance or reckless disregard of upcoding. *See* Rule 9(b) (intent may be alleged generally). The Complaint, however, also alleges that the corporate officers of IPC and the IPC Subsidiaries knew about and encouraged the upcoding. (*See supra*, pp. 5-6). No further differentiation is necessary for the IPC Defendants to have sufficient notice of the allegations against them.

Indeed, where all defendants are closely related entities, allegations ascribing fraudulent conduct to all defendants satisfy Rule 9(b). In *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994), upon which Defendants rely, the Seventh Circuit addressed RICO claims brought against Makita Corporation, and its wholly owned subsidiary Makita Corporation of America. *Id.* at 1326. The defendants argued, like Defendants in this case, that the plaintiff failed to specify which defendant performed which bad act. But the Seventh Circuit held that the allegations against the defendants generally was not cause for concern because the "defendants in this case are related corporations that can most likely sort out their involvement without significant difficulty." *Id.* at 1329.

Relying on *Jepson*, the court in *United States ex rel. Trombetta v. EMSCO Billing Servs., Inc.*, No. 96-cv-226, 2002 WL 34543515 (N.D. Ill. Dec. 5, 2002), addressed and rejected the same argument Defendants make in this case. The relator alleged an upcoding scheme involving eighteen corporate and three individual defendants. The defendants argued that the relator failed "to adequately delineate each defendant's role in the allegedly fraudulent activities." *Id.* at *3. The Court held that the defendants' contention was "not convincing for several reasons. Most

fundamentally, Trombetta alleges that each and every one of the defendants engaged in each and every one of the fraudulent practices." *Id.* Citing *Jepson,* the court held that those allegations were consistent with Rule 9(b), particularly where, as here, defendants "consist of closely related corporations and their sole owner and CEO." *Id.*; *see also United States v. Gwinn*, No. 06-cv-00267, 2008 WL 867927, at *13 (S.D.W. Va. Mar. 31, 2008) (holding that allegations against defendants as a group are appropriate where "it is clear from the allegations that the Government is indicating that all defendants undertook the actions described."); *United States ex rel. Carter v. Halliburton Co.*, No. 08-cv-1162, 2009 WL 2240331, at *16 (E.D. Va. July 23, 2009) (rejecting argument that FCA Complaint failed to apprise each defendant of the specific nature of his or her participation in the fraud).

Unlike the authority cited above, none of the cases on which the IPC Defendants rely for this argument involve closely related entities sharing administrative functions, corporate officers, and operating as one integrated organization. *See, e.g.*, *Destfino v. Reiswig*, 630 F.3d 952, 954 (9th Cir. 2011) (complaint against 29 individuals, ten businesses, and a church with little connection between them); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (RICO case involving entirely distinct and disparate defendants). The Complaint in this case does far more than the complaints in *Jepson* or *Trombetta* to provide Defendants with "sufficient notice so that defendants can fairly respond to the allegations against them." *Trombetta*, 2002 WL 34543515, at *3.

> **B. The Complaint Sufficiently Alleges the "How" and the "What" of Defendants' Upcoding Scheme**

Defendants contend that the Complaint as a whole fails to plead "how" false claims were submitted to the government because it fails to specifically identify the false claims that resulted from the upcoded billing records of "certain hospitalists." (IPC Br. p. 9). Similarly, Defendants argue that the Complaint is somehow deficient because it fails to specifically identify false claims

-10-

submitted to certain Federal Payors — the "what" of Defendants' scheme. (*Id.* at p. 10). Neither contention warrants significant scrutiny.

The Seventh Circuit has held that an FCA complaint need not allege any — let alone every — false claim with particularity. *Lusby*, 570 F.3d 849. In *Lusby*, on which Defendants rely, the relator alleged a fraudulent scheme in detail, but failed to allege the specific claim for payment. Reversing the district court, the Seventh Circuit held that the relator's allegations were nonetheless sufficient to satisfy Rule 9(b):

> We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. . . . much knowledge is inferential — people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime — and the inference that Lusby proposes is a plausible one.

*Lusby*, 570 F.3d at 854.[5] *See also Trombetta*, 2002 WL 34543515, at *4 (where relator alleged that "defendants' billing practices were intentionally and systematically flawed, resulting in hundreds of thousands of false claims and millions of dollars of overpayments during a nine-year period," relator did an "admirable job" of pleading even though relator did not identify a single fraudulent bill submitted to the government).

Accordingly, the United States is not required to specifically allege any particular false claim. The Complaint alleges with particularity Defendants' upcoding scheme, along with a plausible inference that Defendants — which obtain more than 50 percent of their revenues from Federal Payors — caused at least some upcoded claims to be submitted to Federal Payors. No more is required. Nonetheless, the Complaint does, in fact, specifically describe 15 separate upcoded claims, including the date the service was provided, the CPT Code billed, the date the

---

[5] Myriad Circuit Courts have followed *Lusby* for the proposition that an FCA complaint need only plead "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 158 (3d Cir. 2014); *see also, e.g.*, *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) ("claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme.").

claims were submitted and paid, the amount of the payment, and the specific reason each claim was upcoded. (Compl. ¶¶ 153-63). Further, the United States provided Defendants with each unique claim number, allowing Defendants to identify every other piece of information relevant to the claim, including exactly which entity submitted the claim. (*See supra*, p. 8, n. 4). Even the pre-*Lusby* cases cited by IPC acknowledge that the United States need not allege the specific who, what, when, where and how of every single false claim as long as it presents representative samples of such claims, which is exactly what it has done here. *United States ex rel. Turner v. Michaelis Jackson & Assocs.*, No. 03-cv-4219, 2007 WL 496384, at *4 (S.D. Ill. Feb. 13, 2007) ("When a complaint alleges numerous instances of fraud over a multi-year period, however, it would be both impractical and inefficient to require detailed allegations of the who, what, when, where and how of every single submission of a false claim.").

Defendants' suggestion that it is "possible" some "billing records were adjusted downward" or "never submitted to federal payors" (IPC Br. p. 9) is disingenuous in the face of such detailed allegations. To the extent Defendants' attack is limited to the proposition that the Complaint fails because it fails to allege specific false claims with respect to "certain hospitalists," or certain Federal Payors, Defendants' argument is foreclosed by the clear precedent holding that an FCA complaint need not allege every specific false claim.[6]

### C. The Complaint Sufficiently Alleges the "Where" of Defendants' Scheme

Like Defendants' arguments regarding the "who" and "what" and "how" of the scheme, Defendants' contention that the Complaint fails to allege the "where" of the scheme (IPC Br. p. 8) is belied by the allegations of the Complaint and contradicted by well-settled precedent. Again, Defendants point to select allegations of the Complaint to argue that the United States failed to

---

[6] Defendants' arguments regarding "certification" (IPC Br. p. 10) are entirely misplaced. The United States does not rely on any "certification" theory. Defendants' claims are false because Defendants submitted, or caused to be submitted, claims for services greater than actually provided — factually false claims — not because Defendant certified anything in particular.

identify where certain hospitalists — identified by name — practiced. Aside from the fact that Defendants certainly know exactly where those hospitalists practice,[7] Defendants' argument ignores other allegations detailing where certain IPC hospitalists engaged in the upcoding scheme practiced. (*See, e.g.*, Compl. ¶¶ 130, 195, 215; *see also* IPC Br. p. 13 (identifying allegations related to IPC hospitalists in Texas)). And Defendants again ignore the fact that, for the representative claims provided in the Complaint, the United States provided Defendants with the unique claim number allowing Defendants to identify exactly where each false claim originated, and exactly which entity submitted the claim. (*See supra*, p. 8, n. 4). Indeed, aside from the detailed allegations related to Defendants' Texas location, the 15 representative false claims identified in Paragraphs 153-63 of the Complaint originated from services rendered in Texas, California, Illinois, Michigan, Tennessee, Florida and Massachusetts.

In any event, courts have routinely "accepted, for purposes of a motion to dismiss, that a defendant violating the FCA in one location was engaging in the same conduct in another location." *United States ex rel. Tahlor v. AHS Hosp. Corp.*, No. 08-cv-02042, 2014 WL 4444055 (D.N.J. Aug. 26, 2014) (citing cases); *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 30 (1st Cir. 2009) ("Duxbury has alleged facts that false claims were in fact filed by the medical providers he identified, which further supports a strong inference that such claims were also filed nationwide."); *United States ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, 09-cv-10179, 2012 WL 8667597, at *1-2 (D. Mass. Mar. 6, 2012) (plaintiff sufficiently alleged nationwide violations where he pled that false claims were submitted for six patients and where they pled that defendant's nationwide billing practices were similar); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012) ("Indeed, the sheer number of claims identified by Plaintiff in at least three states and Puerto Rico suggests, without need for speculation, that

---

[7] *See, e.g.*, Exh. A, at p. 8 (IPC Link® "provides *our dispersed workforce* with extensive resources and information content and serves as a *centralized contact point for our affiliated hospitalists.*" (emphasis added)).

Defendants' reporting practices likely occurred at Defendants' other facilities throughout the country."). Given that the United States has provided specific examples of IPC's fraudulent claims from multiple locations, the United States has exceeded any obligation to plead fraud with particularity under 9(b), and Defendants' motion should be denied.

II. **The United States Has Standing to Pursue an FCA Action Against Defendants for Submitting False Claims to Federal Payors**

Defendants remarkably claim that the United States does not have standing to pursue this FCA action because the Complaint does not "allege any conduct by the Defendants that is fairly traceable to any of its alleged injuries." (IPC Br. pp. 13-14). Of course, the entire 257-paragraph Complaint alleges that Defendants' conduct caused injury to the Federal Payors that overpaid Defendants for upcoded claims. That is more than sufficient to establish the United States' standing to pursue this FCA action. *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 656 (7th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)) (to establish standing, a plaintiff must allege that "the relief he seeks will if granted avert or mitigate or compensate him for an injury . . . caused or likely to be caused by the defendant.") In support of their standing argument, Defendants re-hash their claim that the Complaint fails to specifically allege which Defendant submitted which claim. For the same reasons set forth in Section I above, Defendants' position lacks merit.

III. **Severing the Claims Against IPC and the IPC Subsidiaries is Improper**

Defendants seek to have the claims against them severed, turning this single action against a corporate parent and its wholly-owned subsidiaries into 30 separate federal actions, all based upon the same upcoding scheme orchestrated by IPC. Neither the cases Defendants cite, nor common sense, supports Defendants' request. Contrary to Defendants' contention that the United States' claims against Defendants are "not logically related," the Complaint alleges a nationwide scheme of rampant upcoding which IPC and its corporate officers systematically encouraged. Those same

corporate officers directed the IPC Subsidiaries which employed the hospitalists who carried out the upcoding scheme. It is hard to imagine claims that more closely arise out of the same transactions or occurrences, and involve questions of law and fact common to all defendants. *See, e.g., Carter*, 2009 WL 2240331, at *16 (holding that it would be impractical to require an FCA "[r]elator to bring multiple suits" against multiple defendants based on related allegations). And, as Defendants point out, Rule 20 permits defendants to be joined in one action if: "(a) the plaintiffs' claims against them arise out of the same transaction, occurrence, or series of transactions or occurrences, *and* (b) any question of law or fact common to all defendants will arise in the action." (IPC Br. p. 14).

Defendants' authorities are not to the contrary. Rather, they stand for the proposition that plaintiffs cannot sue in one lawsuit defendants who engage in similar bad acts, but do so entirely separately from one another. For example, in *Ramos v. Playtex Prods., Inc.*, No. 08-cv-2703, 2008 WL 4066250, at *3-4 (N.D. Ill. Aug. 27, 2008), the court addressed a complaint brought against multiple, unrelated corporations, all of whom produced and sold cooler/carrying cases for storing breast milk that were alleged to contain lead. None of the defendants' products were alleged to be identical, there was nothing connecting the plaintiffs' claims against each defendant, and the complaint made no allegation that there was any logical relationship between the defendants' production, marketing, or sales of the products. *Id.* Under those facts, the court held that severance was appropriate. *Id. See also Directv, Inc. v. Delaney*, No. 03-cv-3444, 2003 WL 24232530 (N.D. Ill. Nov. 20, 2003) (holding that defendants who purchased similar transmitters, at different times, could not be sued together because they did not act in concert and the claims against them were not logically related). The facts in *Ramos* and *Directv* are simply not present here. All Defendants are alleged to be related corporate entities that acted in concert with one another to defraud the United States in exactly the same way. There is, therefore, no reason to sever the claims.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that this court deny Defendants' Motion to Dismiss or Sever.[8]

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

ZACHARY T. FARDON
United States Attorney

By:  s/ Eric S. Pruitt
    ERIC S. PRUITT
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-5496
    eric.pruitt@usdoj.gov

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
ELIZABETH A. RINALDO
ADAM R. TAROSKY
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
elizabeth.rinaldo@usdoj.gov

*Attorneys for the United States of America*

---

[8] In the event that this Court finds that the Complaint fails to allege an FCA violation with the requisite specificity under Rule 9(b), the United States respectfully requests that the Court allow it to amend the complaint. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("[I]f a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the prospects for success."). The cases cited by Defendants acknowledge that leave to replead should be freely given. *See, e.g.*, *United States ex rel. Pecanic v. Sumitomo Elec. Interconnect Prods., Inc.*, No. 12-cv-0602, 2013 WL 774177 (S.D. Cal. Feb. 28, 2013) (denying request that dismissal be with prejudice even though relator had already amended his complaint twice; holding amendment would not be futile as it would allow defendant to differentiate among the different defendants in the complaint). Here, the United States has never amended the Complaint and there is no allegation that the United States has acted in bad faith or unduly delayed this case.

**CERTIFICATE OF SERVICE**

    I, Eric S. Pruitt, an attorney, hereby certify that on September 18, 2014, a true and correct copy of the foregoing document was filed electronically using the Court's ECF/electronic mailing system. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

    /s/ Eric S. Pruitt