# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* BIJAN OUGHATIYAN, <br><br> Plaintiffs, <br><br> v. <br><br> IPC THE HOSPITALIST COMPANY, INC., et al. <br><br> Defendants. | Case No. 09 C 5418 <br><br> Judge Joan H. Lefkow |

## OPINION AND ORDER

On September 1, 2009, relator Bijan Oughatiyan filed a *qui tam* action alleging violations of the False Claims Act ("FCA").[1] (Dkt. 1.) The United States intervened on December 6, 2013. (Dkt. 20.) The government filed a complaint in intervention on June 16, 2014, to recover damages and civil penalties under the FCA as well as under the common law theories of payment by mistake and unjust enrichment. (Dkt. 48.) Defendants filed a joint motion to dismiss or, in the alternative, to sever claims. (Dkt. 50.) For the reasons stated below, defendants' motion is granted in part and denied in part.

---

[1] In a *qui tam* action, a private party called a relator brings an action on the government's behalf. The government, not the relator, is considered the real party in interest. *U.S. ex rel. Eisenstein* v. *City of New York*, 556 U.S. 928, 932, 129 S. Ct. 2230, 173 L. Ed. 2d 1255 (2009) (citing *Vermont Agency of Natural Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 769, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000)). If the government chooses to intervene, a relator in a False Claims Act *qui tam* action may receive up to 25% of the government's award. 31 U.S.C. § 3730(d)(1).

# BACKGROUND[2]

## I. The Parties

IPC The Hospitalist Company, Inc. ("IPC") operates a nationwide physician group practice focused on the delivery of "hospital medicine and related facility-based services." (Dkt. 51 at 3.) Its subsidiaries and affiliates provide medical services to patients in various facilities (usually hospitals) throughout the United States. (*Id.*)

Relator Bijan Oughatiyan is a physician who worked for IPC as a hospitalist (a medical professional who specializes in the practice of hospital medicine) from 2003 to 2009. (Dkt. 1 at 3.) The initial complaint alleges that Oughatiyan, concerned with IPC's billing practices, "began collecting billing records from various IPC hospitalists" in order to file the present suit. (*Id.*) The government's intervening complaint builds on Oughatiyan's assertions and alleges that, from January 1, 2003 through the present, IPC and its subsidiaries and affiliates knowingly billed Medicare and Medicaid, and other federal payors (including TRICARE,[3] FEHBP,[4] and the RRB[5]) for higher and more expensive levels of medical service than were actually performed. (Dkt. 48 ("Compl.") ¶ 5.) The government names IPC and twenty-nine subsidiaries and affiliated medical groups in the complaint. The government asks the court to hold defendants jointly and severally liable. (*Id.* ¶¶ 247, 250.)

---

[2] Unless otherwise noted, the following facts are taken from the intervening complaint and are presumed true for the purpose of resolving the pending motion. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

[3] TRICARE is a federally-funded medical benefit program that provides benefits to active-duty service members, retired service members, and their dependents, among others. 10 U.S.C. §§ 1071–1110.

[4] The FEHBP, or the Federal Employees' Health Benefits Program, is a federally-funded medical benefits program that provides health insurance coverage for federal employees, retirees, and their dependents. 5 U.S.C. §§ 8901–8914.

[5] The RRB, or the Railroad Retirement Board, administers a separate social security system for employees of railroads and their families. 45 U.S.C. § 231f.

## II. Code-Based Billing

IPC, like other physician group practices, is reimbursed for the services it provides to patients covered by government benefit programs. For example, Medicare reimbursements, which make up the heart of the government's complaint, are made according to the Medicare Fee Schedule. (*Id.* ¶ 51.) The Fee Schedule is based on the American Medical Association's Current Procedural Terminology ("CPT") codes, which are assigned to different medical services and are designed to facilitate the communication of information on these services among physicians, patients, and organizations. (*Id.* ¶¶ 51–52.) Each code corresponds to a different level of service. (*Id.* ¶ 52.)

For example, CPT Code 99221 (referred to within IPC as Code A1) applies to initial hospital care where a physician spends thirty minutes at the patient's bedside and all decision-making is straightforward or of low complexity. (*Id.* at 14.) The corresponding payment (the amount Medicare reimburses the hospital) is $82.16.[6] (*Id.*) CPT Code 99222 (IPC Code A2)[7] applies to initial hospital care where the physician spends fifty minutes at the patient's bedside and all decision-making is of moderate complexity. (*Id.*) The corresponding payment is $121.40. (*Id.*) The payment for seventy minutes of a physician's time requiring highly complex medical decisions is $174.35. (*Id.* at 15.) The more complex the service, the greater the government reimbursement. Similar codes exist for subsequent care and discharge. (*Id.* at 15–16.) For subsequent hospital care, there are another three IPC Codes: V1, V2, and V3, again describing low, moderate, and high complexity cases respectively. (*Id.*) The remaining codes

---

[6] Reimbursement rates vary nationally; this number represents the average reimbursement. (Compl. ¶ 54.)

[7] Because the IPC Codes are simpler than the CPT Codes, the court will use the IPC Codes for the remainder of the opinion.

are for the discharge of patients: D<30 is for hospital discharges that take thirty minutes or less and D>30 are for hospital discharges that take more than thirty minutes. (*Id.* at 16.) The government alleges that IPC used these codes to bill Medicare for higher and more expensive levels of medical service than were actually provided—what is commonly referred to as "upcoding."[8]

### III.     IPC's Billing Practices

According to the government, this upcoding is due to IPC's billing practices. IPC's key metric for measuring physician performance is revenue per patient encounter. (*Id.* ¶ 69.) When IPC hospitalists bill for higher levels of service, both the federal reimbursement rates and revenue per patient encounter are higher. (*Id.*) Thus, IPC hospitalists have a strong incentive to upcode. Indeed, under IPC's physician incentive plan, hospitalists receive bonuses based on the amount the hospitalist bills. (*Id.* ¶ 78.) These bonuses can equal or exceed the hospitalist's base salary. (*Id.*)

The government also alleges that IPC's use of the program IPC-Link encourages upcoding. IPC's hospitalists use IPC-Link to record patient encounters, and the hospitalists are personally responsible for entering data into the system. (*Id.* ¶ 73.) This data includes billing codes. (*Id.* ¶ 74.) Since at least 2003, IPC has monitored hospitalists' billing through IPC-Link "on a near real-time basis." (*Id.* ¶ 85.) Using data from IPC-Link, IPC ranks hospitalists against each other, and hospitalists who consistently use lower billing codes are pressured to use higher

---

[8]Although the government states that the codes are "generally followed" by other federal payors, such as TRICARE (*id.* ¶¶ 54, 60), it acknowledges that Medicaid uses a different repayment program. (*Id.* ¶ 57.) The government provides no information about FEHBP or RRB. The complaint does detail, however, IPC's revenues from government health insurance and benefits programs over the last eight years: Medicare consistently contributed just under 50% of the revenues, other payors (presumably TRICARE, FEHBP, and RRB, although the government does not say) contributed around 45% of the revenues, and Medicaid contributed around 5%. (*Id.* at 19.)

4

codes. (*Id.* ¶ 81.) Individual hospitals are also "red-flagged" for falling below IPC's revenue per encounter targets. (*Id.* ¶ 96.) As evidence of this pressure, the complaint includes six case studies on different IPC hospitalists which, the government claims, demonstrate that physicians who join IPC are pressured into upcoding. (*See id.* ¶¶ 118–132.)[9]

Also beginning in 2003, IPC's Medical Affairs committee created a "dashboard" report that was circulated on a monthly basis to IPC's officers, executive directors, and marketing and business development personnel, among others. (*Id.* ¶ 98.) The report tracks how individual hospitalists are performing with respect to IPC's business metrics. (*Id.* ¶ 99.) At least two of these metrics measure the volume of patient encounters per hospitalist, and at least three track how frequently a hospitalist bills to the higher codes. (*Id.* ¶ 100.)

Although the dashboard also allows IPC to monitor hospitalists for excessive billing, the government claims that IPC's use of the dashboard "ensured that [IPC] would not be alerted to potentially false and fraudulent billing . . . ." (*Id.* ¶ 104.) At the time the dashboard was created, the national average for the use of IPC Code A3 was 65%, the national average for V3 was 20%, and the national average for D>30 was 24%. (*Id.* ¶ 103.) Despite these rates, IPC did not set any dashboard flag for excessive billing of A3 or D>30, and set its dashboard flag for V3 at 95%. (*Id.* ¶ 104.) Rather than keep track of hospitalists who billed to higher codes too frequently, IPC chose to monitor hospitalists who did not bill to those codes frequently enough. The government claims that, as a result, IPC's officers knew that these codes were being billed to at rates far in

---

[9] The way in which the government presents the data, however, is unrepresentative of the physicians' billing practices. The government relies on single days (on one occasion it relies on two days) to establish past practices of billing to lower codes. It then lists specific days with significant gaps between them (e.g. September 15, 2007, October 7, 2007, February 23, 2008, June 26, 2009, July 22, 2008) to establish that the physicians were pressured into upcoding. (*See id.* ¶ 120.) This selective use of data proves very little. Weekly or monthly averages would be more convincing; days can too easily be anomalies.

5

excess of national norms. The government references an email between IPC's officers agreeing that they should not publically discuss the rate at which IPC hospitalists billed to V3 and other codes because it "easily could lead to trouble" because "publicizing our numbers has a large risk to it as well in terms of shouting out that we want to be audited." (*Id.* ¶ 109.)

The government is clear that IPC is responsible for the fraudulent billing. The complaint alleges that IPC provides its subsidiaries with "all of the non-medical, administrative and management services—including billing services—necessary for the operations of each of its subsidiaries and affiliates pursuant to management agreements." (*Id.* ¶ 16.) As part of these services, IPC audits bills for "completeness and accuracy" and then submits them to payors—including the federal government. (*Id.* ¶ 75.) "These services are based in IPC's executive offices." (*Id.* ¶ 68.) As IPC's 10-K states, "We assume responsibility for all billing, reimbursement and collection processes relating to hospitalist services provided by our affiliated hospitalists and practice groups." (Dkt. 57-1 at 7.)

## IV. Evidence of Upcoding

As examples of the alleged fraud, the complaint includes five specific claims for initial hospital care submitted by IPC to Medicare for payment, including each claim number, date of service, code billed, date received, date paid, and amount paid for each claim. (*Id.* ¶ 153.) According to the government, "Neither the documentation created by IPC's hospitalists nor any other information recorded in the patient medical records corresponding to these claims support the highest level of initial hospital care—CPT 99223—billed to Medicare." (*Id.* ¶ 154.) The government provides the same information for five claims for subsequent hospital care and for five claims for discharge, all submitted by IPC to Medicare. (*Id.* ¶¶ 157, 161.)

6

The complaint also includes evidence of what the government claims are the effects of upcoding: hospitalists who have billed for so many complex procedures that the work they claimed to have completed in a day would take far more than twenty-four hours. For example, on April 5, 2008, hospitalist Dr. Rajeskhar Borra billed for treating sixty-five different patients in one day. (*Id.* ¶ 195.) Sixteen of those patients required initial care involving highly complex medical decisions and eighteen of those patients required subsequent care involving highly complex medical decisions. (*Id.*) Assuming that every service Borra billed for took the least amount of time possible, these services would have taken him over forty-three hours in a single day. (*Id.*) This was not an isolated incident. On at least five other days, Borra billed over twenty-four hours. (*Id.* ¶ 197.) Nor is Borra the only one: the government cites to eleven other hospitalists who billed over twenty-four hours in a day—five of whom did so repeatedly. (*Id.* ¶¶ 209–34.)

Based on this evidence, the government alleges violations of the FCA under §§ 3929(a)(1) and 3929(a)(2). (*Id.* ¶¶ 244–47, 248–250.) The government also alleges unjust enrichment and payment by mistake. (*Id.* ¶¶ 251–53, 254–57.) Defendants argue that the government does not have constitutional standing to bring its claims. (Dkt. 50 at 2.) Defendants also contend that the court should dismiss the complaint for failure to state a claim upon which relief may be granted because the government's claims are not pleaded with particularity and are not supported by "facts suggesting that each of the Defendants had *any* involvement in the conduct alleged." (*Id.* (emphasis in original).) In the alternative, defendants ask the court to sever the claims because they do not arise out of the same transaction, occurrence, or series of transactions or occurrences. (*Id.*)

## ANALYSIS

**I.     Standing**

Defendants argue that the government lacks constitutional standing because the complaint "does not allege any injury that is fairly traceable" to defendants' conduct. Constitutional standing has three requirements: (1) injury in fact—the invasion of a legally protected interest that is concrete and particularized and actual or imminent rather than conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). "'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues.'" *Perry* v. *Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir.1999) (quoting *Warth* v. *Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). As a jurisdictional requirement, the plaintiff bears the burden of establishing standing. *Id.* Because defendants' challenge to the court's jurisdiction is facial, not factual (defendants do not offer contrary evidence), the court will "not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." *Apex Digital Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009).

In arguing that the government has not established standing, defendants state that "the Intervener does not even allege a causal connection, or relationship, with the Defendants and therefore lacks standing." (Dkt. 51 at 13.) As an initial matter, Article III requires plaintiffs to establish a causal connection between the alleged injury and defendants' conduct; it does not require plaintiffs to establish a relationship with defendants or among different defendants.

Defendants' contention that the government does not allege a relationship "with" defendants is irrelevant.

Defendants' other arguments are equally perplexing. Defendants insist that the only specific allegations of fraud "relate to services which . . . were performed by hospitalists in Texas." (*Id.*) This is not true. The complaint describes (as examples of the alleged fraud) five claims for initial hospital care, five claims for subsequent care, and five claims for discharge—all submitted by IPC to Medicare for payment. (Compl. ¶¶ 153, 157, 161.) The complaint does not state that these specific instances of fraudulent billing occurred in Texas. What is more, defendants actually *fault* the government for not stating exactly where the fraud occurred in a different section of their brief. (Dkt. 51 at 8–9.) Only one of defendants' versions of the facts is supported by the complaint: the government's allegations of specific instances of fraud are not limited to Texas. Even if defendants' statement were true, and the only allegations of fraud related to services that were performed by hospitalists in Texas, defendants fail to explain why this would deprive the government of constitutional standing. IPC was responsible for billing services: it provided the hospitalists with software with which to enter billing codes, reviewed each hospitalist's use of the codes for completeness and accuracy, and then sent the bills to the federal government. The government's injury does not begin and end with the specific hospitalists—it is directly traceable to IPC.

Defendants also claim that the government does not "link" its claims to any specific defendant. (*Id.* at 13.) To the contrary, the government *does* link its claims to a defendant—it links them to IPC. The government states that IPC and its subsidiaries and affiliates knowingly billed Medicare and other federal payors for higher and more expensive levels of medical service than were actually performed. (Compl. ¶ 5.) The injury that the government allegedly suffered

as a result of this fraudulent billing is, to use defendants' word, directly "linked" to IPC. As the government explains in its complaint, IPC "provides all of the non-medical, administrative and management services—including billing services—necessary for the operations of each of its subsidiaries and affiliates pursuant to management agreements." (*Id.* ¶ 16.) IPC was responsible for the submission of the allegedly fraudulent claims. Because there is a causal connection between the government's injury and defendants' conduct, the government has sufficiently alleged standing.

## II. Motion to Dismiss

### A. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).

Claims under the FCA are subject to the heightened pleading requirements of Rule 9(b). *U.S. ex rel. Gross* v. *AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) requires the plaintiff to state "with particularity" any "circumstances constituting fraud." Fed. R. Civ. P. 9(b). Although states of mind may be pleaded generally, the circumstances must be pleaded in detail. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see also U.S. ex rel. Lusby* v. *Rolls-Royce Corp.*, 570 F.3d 849, 852 (7th Cir. 2009).

The FCA imposes liability against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). It also imposes liability against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § (a)(1)(B). The government alleges violations of both sections. Thus, the government must state, with particularity, that IPC made false or fraudulent claims and false or fraudulent statements in order to receive reimbursements from the government. Although the government is not required to "list every single patient, claim, or document involved," it must offer "at least some representative examples." *Peterson* v. *Cmty. Gen. Hosp.*, No. 01 C 50356, 2003 WL 262515, *2 (N.D. Ill. 2003, Feb. 7, 2003).

**B.  Analysis**

Defendants argue that the complaint does not meet Rule 9(b)'s particularity standard "because it fails to adequately plead three essential elements: (1) 'who' was involved in the allegedly fraudulent conduct; (2) 'where' the allegedly fraudulent conduct occurred and (3) 'how' the allegedly fraudulent conduct occurred." (Dkt. 51 at 7 (emphasis omitted).) As an initial matter, defendants misread Rule 9(b) and the Seventh Circuit's interpretation of it. Rule 9(b) requires that a plaintiff state the circumstances surrounding the alleged fraud with particularly; the Seventh Circuit has explained that "particularity" means the detail that one would expect to find in the first paragraph of a newspaper story. *See DiLeo*, 901 F.2d at 624. "Who, what, when, where, and how" are examples of that detail; they are not, as IPC claims, "essential elements." (Dkt. 51 at 7.) While a claim alleging fraud with particularity will often include the above details, a complaint that fails to allege the exact time or specific location of the transmission of a fraudulent claim will not be dismissed under Rule 9(b). *See, e.g.*, *U.S. ex rel*

11

*Turner* v. *Michaelis Jackson & Assocs.*, No. 03-CV-4219-JPG, 2007 WL 496384, at *4 (S.D. Ill. Feb. 13, 2007) (finding that "it would be both impractical and inefficient to require detailed allegations of the who, what, when, where and how of every single submission of a false claim" where "a complaint alleges numerous instances of fraud over a multi-year period").

The government's complaint meets Rule 9(b)'s heightened standard. The complaint alleges that, from January 1, 2003 through the present, IPC and its subsidiaries and affiliates named in the complaint knowingly billed federal payors for higher and more expensive levels of medical service than were actually performed. (Compl. ¶ 5.) The government's allegations alone establish the "who" (IPC and its subsidiaries and affiliates), the "what" (fraudulent submission of claims), the "when" (from January 1, 2003 to the present) and the "how" (by coding for higher and more expensive levels of medical services than were actually provided). The government's representative examples of fraudulent claims submitted to Medicare—which include the claim number, date of service, code billed, date received, date paid, and amount paid—supply the needed specificity. Although the government does not allege exactly *where* the fraud occurred, this is not a requirement of Rule 9(b). And even if it were, the government lists the claim numbers; defendants could easily determine from what location the claims were submitted (or, given that the government alleges IPC submitted the claims, defendants could conclude the claims were submitted in California, where IPC is located). (*See id.* ¶ 16.) Thus, the government has stated a claim under the FCA; all the facts that one would expect to be in the first paragraph of a newspaper story are present.

Defendants also argue that the claim should be dismissed because the government has failed to allege a "pattern of upcoding across all 30 Defendants or particular Defendants in the case." (Dkt. 51 at 7.) Alleging a pattern of upcoding is not a requirement under Rule 9(b) or

under §§ 3729(a)(1)(A) or 3729(a)(1)(B) of the FCA. The only case defendants cite in support of this assertion is a district court case that dismissed an FCA claim where the relator alleged a single example of upcoding and nothing else in the complaint suggested other instances of upcoding, or that the single instance was intentional. *See U.S. ex rel. Obert-Hong* v. *Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (N.D. Ill. 2002). Defendants' argument is unpersuasive.

Defendants also argue that the claim should be dismissed because the government "makes only passing reference to and conclusory allegations regarding non-Medicare government payers," including Medicaid, TRICARE, FEHBP, and RRB. (Dkt. 51 at 7.) Defendants are correct that there is a dearth of detail concerning these payors. The only specific examples of fraudulent billing that the government provides concern claims submitted to Medicare. This does not, however, counsel in favor of dismissal; the government's allegations concerning Medicare are sufficient to state a claim under the FCA.

Finally, defendants contend that the government fails to differentiate among them. (*Id.* at 11). More specifically, they argue that each defendants' participation in the fraud is not alleged with particularity, and, more significantly, that the government does not allege "any facts" suggesting that each defendant "had *any* involvement in the conduct alleged in the Complaint." Although the government does state a claim against IPC, the court agrees that it has failed to state a claim against IPC's subsidiaries and affiliates.

As noted above, Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Because fair notice is perhaps the most basic consideration underlying Rule 9(b), the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the

scheme." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994) (internal alternations, citations, and quotation marks omitted). In order to provide this notice, a plaintiff who pleads fraud must "reasonably notify the defendants of their purported role in the scheme." *Midwest Grinding Co.* v. *Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). "Lumping" defendants together is not enough. *Sears* v. *Likens*, 912 F.2d 889, 893 (7th Cir.1990) (affirming dismissal where "the complaint lump[ed] all the defendants together and [did] not specify who was involved in what activity"); *see also United States ex rel. Dolan* v. *Long Grove Manor, Inc.*, No. 10 C 368, 2014 WL 3583980, at *6 (N.D. Ill. July 18, 2014) (holding that a "relator is not entitled to embark on a fishing expedition against thirteen entities (not to mention three individuals) based on the fraud he claims to have witnessed as an employee of one of them" (internal citation omitted)); *U.S. ex rel Walner* v. *NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 897 (N.D. Ill. 2009) (dismissing *qui tam* action brought under the FCA because the relator failed to plead each defendant's "role in the fraud, including but not limited to who submitted the false claim").

Although the complaint states that IPC—which provided billing services—submitted false claims, it does not explain what role IPC's subsidiaries and affiliates played in the alleged fraud. Indeed, little is said about the subsidiaries and affiliates other than where they are located and what laws they are incorporated under. (*See* Compl. ¶¶ 17–45.) Even when the complaint makes allegations about specific doctors in specific states, it does not explain what role the subsidiaries in that state played in the alleged fraud. (*See, e.g.*, *id.* ¶¶ 195–208 (describing the excessive hours billed by a Texas hospitalist but failing to allege how the Hospitalists of Texas, L.P., was involved in the excessive billing, let alone the upcoding that contributed to it).) This is insufficient under Rule 9(b). Thus, although the government has stated a claim against IPC, it

14

has not stated a claim against its subsidiaries and affiliates. Because these defendants are dismissed from the case, defendants' request that the court sever their claims is denied as moot.

## CONCLUSION

For these reasons, defendants' motion to dismiss is granted in part and denied in part. IPC's subsidiaries and affiliates are dismissed without prejudice.

Date: February 17, 2015            _____
                                                              U.S. District Judge